# 24-2135-cr

**To be argued by**
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit

————————————

Docket No. 24-2135-cr

————————————

UNITED STATES OF AMERICA,

*Appellee,*

-against-

KARA STERNQUIST, a/k/a CARA SANTIAGO, a/k/a KARA WITHERSEA,

*Defendant-Appellant.*

————————————

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

————————————

**BRIEF FOR DEFENDANT-APPELLANT KARA STERNQUIST**

————————————

Federal Defenders of New York, Inc.
 Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

*Attorney for Defendant-Appellant*
**KARA STERNQUIST**

**ALLEGRA GLASHAUSSER**,
 *Of Counsel*

# TABLE OF CONTENTS

Statement of Jurisdiction ........................................................................ 1

Questions Presented ............................................................................... 2

Statement of the Case ............................................................................. 2

Statement of Facts .................................................................................. 3

    A childhood "marked with isolation and neglect," and "fear[ ] that she would not be accepted for her identity." .......................................................... 4

    Ms. Sternquist's prior felony convictions for theft and making fake identifications ....................................................................................... 5

    Ms. Sternquist found stability after she transitioned to being a woman ............. 6

    Leading up to her arrest, Ms. Sternquist was threatened because she was a transgender woman ................................................................................ 9

    The charges ......................................................................................... 10

    Second Amendment motion to dismiss and decision. ...................................... 11

    Conditions of pre-trial confinement ......................................................... 13

    Objections to the guidelines calculation. ................................................... 14

    Sentencing ........................................................................................... 19

Summary of Argument ............................................................................ 24

Argument .............................................................................................. 25

i

Point I

Kara Sternquist's possession of an unloaded gun inside her home was within the core of conduct protected by the Second Amendment and nothing about her felony convictions for thefts and making fake identifications should have undercut her rights. Her subsequent conviction for being a felon-in-possession of a gun was unconstitutional given *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) ...................... 25

    A. *Bruen* announced a new standard for assessing the constitutionality of restrictions on gun possession .......................................................... 25

    B. *Bruen* abrogated this Court's precedents, including *Bogle* ................................. 30

    C. Ms. Sternquist is part of the "people." ............................................. 31

    D. The government cannot meet its burden of proving § 922(g)(1) is constitutional here .................................................................. 33

    E. The government cannot show a historical precedent for permanent disarmament related to Ms. Sternquist's non-violent convictions. ................ 38

Point II

The court incorrectly calculated Ms. Sternquist's guideline range by finding that she possessed 15 gun silencers even though these items lacked holes in both ends, so couldn't be used to silence a gunshot, and there was no evidence that Ms. Sternquist – who possessed no ammunition – had any intent to use them to muffle gunshots ...................................... 42

    A. There was no alternative basis to increase Ms. Sternquist's base offense level .......................................................................... 48

Point III

Ms. Sternquist received abysmal care during the two years before
sentencing, where she was chained to a bed, had an untreated bowel
tear, and regularly missed her pain medications. In this context, her
sentence of 60 months for possessing a gun inside her home was
unreasonable, and the court's sentencing remarks about "gang bangers"
and September 11th were inappropriate...........................................................52

    A. The sentencing court relied on inappropriate and irrelevant considerations,
including about terrorism and gangs ....................................................53

    B. A 60-month sentence was too long....................................................56

Conclusion.........................................................................................58

# TABLE OF AUTHORITIES

<u>Cases</u>

*Davis v. Ayala*,
    135 S. Ct. 2187 (2015) ...................................................... 57

*District of Columbia v. Heller*,
    554 U.S. 570 (2008).............................................. 25, 28, 31

*Doscher v. Sea Port Grp. Sec., LLC*,
    832 F.3d 372 (2d Cir. 2016) .......................................... 30

*Gall v. United States*,
    552 U.S. 38 (2007)........................................................ 53

*Garland v. Cargill*,
    602 U.S. 406 (2024)........................................... 16, 49, 50

*Garland v. Range*,
    2024 WL 3259661 (U.S. July 2, 2024)......................... 28

*Gilbert v. United States*,
    370 U.S. 650 (1962)...................................................... 39

*Kanter v. Barr*,
    919 F.3d 437 (7th Cir. 2019)................................... 34, 38

*Kimbrough v. United States*,
    552 U.S. 85 (2007)........................................................ 53

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ...................................... 47, 51, 52

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010)............................................... 25, 40

iv

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................................................passim

*Range v. Attorney General,*
    69 F.4th 96 (3d Cir. 2023) ........................................................... 28

*Rehaif v. United States,*
    588 U.S. 225 (2019)..................................................................... 48

*Rogers v. United States,*
    522 U.S. 252 (1998).................................................................... 43

*Staples v. United States,*
    511 U.S. 600 (1994)................................................................. 48, 49

*United States v. Aldeen,*
    792 F.3d 247 (2d Cir. 2015) ...................................................55, 57

*United States v. Abreu,*
    No. 23-cr-67, 2023 WL 6541302 (S.D.N.Y. Oct. 6, 2023) ........................................ 32

*United States v. Bogle,*
    717 F.3d 281 (2d Cir. 2013) ............................................... 12, 30-31

*United States v. Booker,*
    543 U.S. 220 (2005)..................................................................... 42

*United States v. Booker,*
    644 F.3d 12 (1st Cir. 2011)........................................................... 34

*United States v. Bullock,*
    679 F. Supp. 3d 501 (S.D. Miss. 2023) ...................................33, 34

*United States v. Carter,*
    465 F.3d 658 (6th Cir. 2006)........................................................ 43

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008) ................................................................ 42, 55-57

*United States v. Coffell,*
    720 F. App'x 521 (11th Cir. 2017) ................................................. 43

*United States v. Crooker,*
    608 F.3d 94 (1st Cir. 2010)............................................................ 44

*United States v. Daniel,*
    701 F. Supp. 3d 730 (N.D. Ill. 2023) ........................................ 33

*United States v. Dorvee,*
    616 F.3d 174 (2d Cir. 2010) ................................................... 52, 53

*United States v. Figueroa,*
    622 F.3d 739 (7th Cir. 2010)......................................................... 54

*United States v. Ford,*
    No. 23-cr-107, 2023 WL 7131742 (S.D.N.Y. Oct. 30, 2023) ..................................... 32

*United States v. Hasson,*
    26 F.4th 610 (4th Cir. 2022) ......................................................... 47

*United States v. Hay,*
    46 F.4th 746 (8th Cir. 2022)………………………………………………………………...47

*United States v. Hostettler,*
    2024 WL 1548982 (N.D. Ohio Apr. 10, 2024) ......................................... 41

*United States v. Housholder,*
    664 F. App'x 720 (10th Cir. 2016) ................................................ 43

*United States v. Jimenez,*
    895 F.3d 228 (2d Cir. 2018) ......................................................... 24

vi

*United States v. Kavoukian,*
    354 F.3d 117 (2d Cir. 2003) ........................................................... 44

*United States v. Leblanc,*
    2023 WL 8756694 (M.D. La. Dec. 19, 2023) ............................. 41

*United States v. Lee,*
    818 F.2d 1052 (2d Cir. 1987) ....................................................... 55

*United States v. Malcolm,*
    432 F.2d 809 (2d Cir. 1970) ......................................................... 55

*United States v. Mateo,*
    299 F. Supp. 2d 201 (S.D.N.Y. 2004) ........................................ 57

*United States v. McDavid,*
    41 F.3d 841 (2d Cir. 1994) ........................................................... 55

*United States v. Meza-Rodriguez,*
    798 F.3d 664 (7th Cir. 2015) ....................................................... 32

*United States v. Mitchell,*
    No. 23-cr-198, 2023 WL 8006344 (S.D.N.Y. Nov. 17, 2023) ................................... 32

*United States v. Moore,*
    253 F.3d 607 (11th Cir. 2001) ..................................................... 45

*United States v. Neal,*
    715 F. Supp. 3d 1084 (N.D. Ill. 2024) ....................................... 38

*United States v. Olofson,*
    563 F.3d 652 (7th Cir. 2009) ....................................................... 49

*United States v. Rahimi,*
    602 U.S. 680 (2024) .................................................... 26-28, 35, 41

*United States v. Robinson,*
    829 F.3d 878 (7th Cir. 2016)..................................................................... 55

*United States v. Rowson,*
    652 F. Supp. 3d 436 (S.D.N.Y. 2023).................................................... 32

*United States v. Sindima,*
    488 F.3d 81 (2d Cir. 2007)..................................................................... 53

*United States v. Singh,*
    877 F.3d 107 (2d Cir. 2017)............................................................53, 58

*United States v. Skoien,*
    614 F.3d 638 (7th Cir. 2010)................................................................. 33

*United States v. Stein,*
    544 F.2d 96 (2d Cir. 1976).................................................................... 55

*United States v. Stewart,*
    No. 23-6330-CR, 2024 WL 3517853 (2d Cir. July 24, 2024)................... 56

*United States v. Tenorio,*
    No. CR 02-0058 JP, 2003 WL 27385299 (D.N.M. Feb. 6, 2003)............. 45

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990).........................................................................31, 32

*United States v. Verkhoglyad,*
    516 F.3d 122 (2d Cir. 2008).................................................................. 42

*United States v. Williams,*
    2718 F. Supp. 3d 651 (E.D. Mich. 2024) ............................................. 40

*VanDerStok v. Garland,*
    86 F.4th 179 (5th Cir. 2023).............................................................17, 52

## Statutes

18 U.S.C. § 701 .................................................................................................. 10

18 U.S.C. § 921 ...................................................................................17, 43, 51

18 U.S.C. § 922(g) .......................................................3, 10, 27, 33, 41

18 U.S.C. § 1017 ............................................................................................... 10

18 U.S.C. § 3231 ................................................................................................. 1

18 U.S.C. § 3553 ..................................................................................53 , 58

18 U.S.C. § 3742(a) ............................................................................................ 2

26 U.S.C. § 5845(a) ...............................................................14, 43, 48

28 U.S.C. § 1291 ................................................................................................. 1


## United States Sentencing Guidelines

U.S.S.G. § 2K2.1(a)(4) ................................................................................... 43

U.S.S.G. § 2K2.1(a)(6)(A) ............................................................................ 47

U.S.S.G. § 2K2.1(b) ...........................................................................17, 47, 51


## Other Authorities

*Heller's* Catch-22,
    56 UCLA L. Rev. 1551 (2009) ......................................................... 34

Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons
    from Possessing Arms, 20 WYO. L. REV. 249, 268–69 (2020) .................................. 45

ix

Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009) ............................... 43

C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009) ............................................................. 34

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

—————————————

Docket No. 24-2135

——————————————————————————

UNITED STATES OF AMERICA,

Appellee,

-against-

KARA STERNQUIST,

Defendant-Appellant.

——————————————————————————

APPEAL FROM A JUDGMENT
OF THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

——————————————————————————————

BRIEF FOR APPELLANT KARA STERNQUIST

——————————————————————————————

## Statement of Jurisdiction

The district court had jurisdiction under 18 U.S.C. § 3231 and entered

judgment on August 2, 2024 (Hon. Dora L. Irizarry). A notice of appeal was timely

filed on April 18, 2024. This Court has jurisdiction under 28 U.S.C. § 1291 and 18

U.S.C. § 3742(a).

1

## Questions Presented

1.  Kara Sternquist's possession of an unloaded gun inside her home was within the core of conduct protected by the Second Amendment and nothing about her felony convictions for thefts and making fake identifications should have undercut her rights. Was her subsequent conviction for being a felon-in-possession of a gun unconstitutional, given *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)?

2.  Did the court incorrectly calculate Ms. Sternquist's guideline range by finding that she possessed 15 gun silencers even though the items lacked holes in both ends, so couldn't be used to silence a gunshot, and there was no evidence that Ms. Sternquist – who possessed no ammunition – had any intent to use them to muffle gunshots?

3.  Ms. Sternquist received abysmal care during the two years before sentencing, where she was chained to a bed, had an untreated bowel tear, and regularly missed her pain medication. In this context, was her sentence of 60 months for possessing a gun inside her home unreasonable, and were the court's sentencing remarks about "gang bangers" and September 11th inappropriate?

## Statement of the Case

Kara Sternquist pleaded guilty on December 20, 2023, to possessing a gun after having a previous felony conviction. On August 2, 2024, the court sentenced her to 60 months' incarceration and three years' supervised release. She is currently incarcerated.

2

## Statement of Facts

Kara Sternquist, a transgender woman, was born in jail and raised by her grandparents as a boy. She never knew her parents and her youth was extremely hard: she was sent to an all-boys military school, she was physically and sexually abused, and her family did not accept that she was transgender. As a young adult, she was frequently homeless and was convicted of felonies for theft and creating fake identifications.

Decades later, fearful for her personal safety after receiving death threats due to her gender identity, she assembled guns in her home in New York. She was convicted of possessing a gun after having a prior felony conviction, under 18 U.S.C. § 922(g)(1). At the time of her arrest, she had been working full-time at a Jewish community center for six years; her most recent prior felony conviction was 12 years old; and she was handling a new disability after a severe spinal injury caused paralysis from the waist down. During her two years of pretrial incarceration, Ms. Sternquist was shackled to a bed at a nursing home, where she was watched 24-hours a day by two armed guards.

This Court should find that pursuant to *Bruen*, 597 U.S. 1, her conviction is unconstitutional facially and as applied to Ms. Sternquist. Her possession of a gun inside her home is at the core of the type of conduct protected by the Second

3

Amendment and there is no historical tradition of criminalizing this type of conduct for people with non-violent felony convictions.

Alternatively, this Court should vacate her sentence of 60 months' incarceration, which was unreasonable both because of errors in the guideline calculation and because the sentence was too long, especially considering Ms. Sternquist's extremely difficult pretrial incarceration.

A childhood "marked with isolation and neglect," and "fear[ ] that she would not be accepted for her identity."

Ms. Sternquist was born in jail. PSR 21.[1] When her birth mother, who was addicted to drugs, was released, she collected baby Kara and tried to raise her. PSR 22. A couple years later, her grandmother found young Kara "dirty and emaciated." PSR 22. After that, her birth mother disappeared and Ms. Sternquist has never found her. PSR 22. Ms. Sternquist does not know who her father is. *Id.*

Her grandmother and step-grandfather adopted her. PSR 22. Ms. Sternquist's grandmother was "tough" and "unaffectionate." Dkt. 111. Her grandmother was also an alcoholic, as was her grandfather, who would "str[i]k[e] her with a belt." PSR 22 & 28. Her childhood was "marked with isolation and neglect." PSR 23.

When Ms. Sternquist was 10 years old, her grandparents shipped her off to an all-boys military academy boarding school. PSR 22-24. There she was paddled, held

---

[1] Numbers preceded by "A" and refer to pages of the appendix; docket ("Dkt") citations are to ECF case #22-cr-473; references to the PSR are to the presentence report.

down while boys "bludgeon[ed] her with socks filled with soap bars," PSR 24, and sexually harassed in communal showers. Dkt. 111. She also had to participate in weekly military parades, which involved standing perfectly still while holding a rifle for up to an hour and a half. Dkt. 111. When she was a young teen, she told the school's psychiatrist that she was a woman; the school suggested she leave. PSR 24; Dkt. 111.

Her grandparents shipped her off again, this time to Casa by the Sea, a place in Mexico that purported to be a school. PSR 22-24. There she was again abused: she was forced into stress positions, for example, putting her chin on the floor, arms behind her back, and legs crossed. PSR 24. If she moved from the position, she was hit. PSR 24. She was locked in a kennel, ordered to march, and made to sit underneath a desk for hours. PSR 24. Later, Mexican child protective services closed the facility. PSR 24. As her grandmother described it, "the damage we and that school has caused [ ] has been great[.]" PSR 23.

At 18, she enlisted in the United States Navy. PSR 25. There, six Navy men severely beat her, due to her gender identity. PSR 25. She reported the attack, but was ignored. PSR 25. Her commanding officer suggested she leave the service, which she did. PSR 25.

<u>Ms. Sternquist's prior felony convictions for theft and making fake identifications.</u>

During her young adulthood, as she tried and failed to fully transition, Ms. Sternquist was often homeless and had frequent contact with the police, resulting in

violations and misdemeanors for, *inter alia*, petit larceny, turnstile jumping, and possession of stolen property. PSR 12-19. During this same time, she had three felony convictions. In 2003, when she was 19 years old, she was convicted of felony theft and was sentenced to probation. PSR 9. When she was 22 years old, in 2006, she was arrested and later convicted of federal identity theft, for making fake identifications. PSR 10-11; ECF 07-cr-333, Dkt. 28 (convicted under Section 1028(a)(1)). She was sentenced to 12 months' incarceration. PSR 10. When she was 26 years old, in 2010, she was charged with a second federal offense for making fake identifications. PSR 14-15; ECF 10-cr-432, Dkt. 16 (convicted under Section 1028(a)(5)). She was convicted and sentenced to 27 months' incarceration. PSR 14. The two federal crimes involved using special paper, inks, and "lamination pouches" to make fake IDs. PSR 17.

After her release from federal custody in 2012, she had one petit larceny conviction and served 10 days in jail; she was 28 years old. PSR 19. For the next 10 years, until the instant case, she had no new convictions. When she was arrested in the instant case, she was about to turn 39 years old. PSR 1-2.

<u>Ms. Sternquist found stability after she transitioned to being a woman.</u>

Ms. Sternquist realized that she was a girl when she was a student at the all-boys military academy, but tried to keep it hidden. Dkt. 111. Once, her grandmother caught her wearing her grandmother's underwear; her grandmother beat her. Dkt.

111. Her family and her teachers tried to push her into their "idea of normal" and would ask her "what's wrong with you?" so Ms. Sternquist tried to suppress her feelings. *Id.* She felt "alone," "abandoned," and "feared that she would not be accepted for her identity." PSR 28.

Eventually she came out to her grandparents, but she had to do it more than once. Her grandmother didn't want to "talk further on the topic of [Ms. Sternquist's] gender." PSR 26. Ms. Sternquist started hormone therapy, but that therapy was "abrupt[ly]" discontinued by the BOP after her 2010 arrest. PSR 25. She restarted hormone therapy in 2015, and came out again to her grandparents. PSR 26. Her grandmother's difficulty with Ms. Sternquist's identity strained their relationship. PSR 26. Ms. Sternquist had longed to mend their bond, but her grandmother died while she was incarcerated. *See* Dkt. 75.

Despite how hard it was to come out, coming out allowed Ms. Sternquist to build a stable life for the first time. As probation noted, Ms. Sternquist had "lived a productive and community-driven life" in New York City for the decade before her arrest. PSR 30. Ms. Sternquist worked at the Manhattan Jewish Community Center for six years, until the day of her arrest. PSR 30. She volunteered for the National Yiddish Theatre Folksbiene, PSR 29, and was a member of the New York City Ghostbusters, a "nonprofit and charitable organization," "focused on providing an interactive children's educational program." PSR 30.

7



Dkt. 109, Exhibit 2 (Ms. Sternquist, second from the right at a Ghostbusters event).



Dkt. 109, Exhibit 2 (Ms. Sternquist first on the right, performing at a Doctor Who event).

<u>Leading up to her arrest, Ms. Sternquist was threatened because she was a transgender woman.</u>

Starting around 2020, however, Mr. Sternquist became painfully aware of the rise of anti-trans rhetoric. Dkt. 83. As she wrote to a friend in 2021, she heard "political ads on [the] radio [that] were basically 'I'd shoot one of them transgenders for even looking at the same bathroom' as my child.'" Dkt. 83. In a message to a friend, she wrote that she "realized that [the] government [ ] already showed me they don't [care] about my rights/existence" and she should "t[a]k[e] the necessary steps to ensure my own safety." *Id.* She added, "we have a constitutional amendment protecting [the right to gun] possession." *Id.*

Also in 2021, Ms. Sternquist was threatened by two men near her home. Dkt. 83, Ex. D. They used a slur related to her being a transwoman, and one picked up a liquor bottle, threatening to hit her. *Id.* The police didn't seem to take her report seriously, which taught her to be concerned whether police would protect her. *Id.*

That same year, she became a target of hateful, vitriolic speech after her address was posted on Kiwi Farms, a website devoted to stalking and harassing people, including those in the LBGTQ community.[2] *Id.* She started receiving death threats,

---

[2] *See e.g.,* Josh Taylor, "'It's not that hard': Does kicking Kiwi Farms off the internet prove tech firms can act against hate speech?", THE GUARDIAN, Sept. 19, 2022, available at https://tinyurl.com/546zcdbp (describing Kiwi Farms as "An internet forum known for its active targeting and harassment of trans people, Kiwi Farms has also been blamed for suicides after people were hounded offline – and sometimes out of their homes – by a firehose of vitriol coordinated and directed from the site"); Margaret Pless, "Kiwi Farms, the Web's Biggest Community of Stalkers," NEW YORK MAGAZINE, July 19, 2016, available at https://tinyurl.com/yc8mfaf3.

9

including ones saying that she would "get a bullet" and that "I'm gonna slaughter you and your family when I find you":





*Id.* at Ex. E.

## The charges

In September 2022, Ms. Sternquist was charged with possessing a gun after having a prior felony conviction, under 18 U.S.C. § 922(g)(1), possessing fraudulent badges and credentials for federal law enforcement agencies, in violation of 18 U.S.C. § 1017, and misdemeanor unauthorized possession of badges, in violation of 18 U.S.C. § 701. The charged gun was found in a large apartment that was crammed with things, including three other guns, and many collections: collections of gun parts, home-made leather goods, such as purses and belts, and intricate costumes. Dkts. 74

10

& Dkt. 111, Ex. D. There were bags of keychains, coins, and plastic flowers; piles of discarded keys, business cards, and old electronics. *Id.* There were countless boxes of dried foods, containers of bottled water, and medical supplies. *Id.* And there were many fake identifications. *Id.* Ms. Sternquist's apartment demonstrated that she was a collector, who engaged in hoarding-like behavior.

Despite the sheer volume of items in the apartment, there wasn't one piece of ammunition.

Second Amendment motion to dismiss and decision.

In a motion to dismiss, based, *inter alia*, on *Bruen*, the defense argued that 922(g)(1) was unconstitutional facially and as applied to Ms. Sternquist, who had no history of violence or being dangerous. Dkts. 74 & 83. Her prior felony convictions for crimes committed with special paper and ink and for simple theft were not valid grounds to permanently ban her from possessing a gun. *Id.*

Counsel argued that the Second Amendment was designed to allow people to protect themselves, particularly inside a home. In Ms. Sternquist's case, there was no evidence she had any intent to do anything violent, or unlawful with any gun. On the contrary, the available evidence showed that Ms. Sternquist perceived a need to protect herself as the rights of transgendered people came under attack. Before her arrest, Ms. Sternquist was preparing to talk to InRange TV – an online forum that discussed the history of gun ownership, including by marginalized communities –

11

about gun safety and self-defense in the trans community. Dkt. 83. This made sense from her background: where she grew up, it was normal for families to have guns and for children to learn to shoot them; she had learned gun safety at her military school. In this context, the government's evidence didn't show that Ms. Sternquist had any intent related to the alleged gun possession except for her own defense.

In response, the government argued that 922(g)(1) was constitutional, citing *United States v. Bogle*, 717 F.3d 281 (2d Cir. 2013) (per curiam), historical "loyalty" laws, a "minority report" from a Pennsylvania delegation, and a North Carolina forfeiture law. Dkt. 82. Although, earlier, the government had recognized that Ms. Sternquist was "building the firearms to defend herself," Dkt. 55 at 5, in its opposition to the motion to dismiss, it made conclusory assertions that Ms. Sternquist was a "threat" to "public safety." Dkt. 82.

The court denied Ms. Sternquist's motion, saying that *Bruen* "did not disturb and, if anything, endorsed, prior Supreme Court dicta assuring the validity of 'longstanding prohibitions' of felony firearm possession, and, as such, the Second Circuit's incorporation of that dicta into binding Second Circuit precedent upholding the constitutionality of § 922(g)(1) remains in effect." A. 32. The court stated that *Bogle*, was "binding precedent." A. 35-36. The court also dismissed Ms. Sternquist's as applied challenge by stating that "the challenge to the statute as applied also has no merit as she has multiple felony convictions." A. 37 (cleaned up).

12

After this ruling, Ms. Sternquist pleaded guilty to possessing a gun after having a prior felony conviction. A. 73. At the plea proceeding, the court granted government's motion to dismiss the other two counts of the indictment. A. 75.

Conditions of pre-trial confinement

Shortly before her arrest, in March 2022, Ms. Sternquist had major spinal surgery for Cauda Equina Syndrome, which causes compression of the spinal cord and paralysis. PSR 27. Afterward, she was incontinent, had a catheter to urinate, and used a wheelchair. Dkt. 25. When she arrived at the Metropolitan Detention Center ("MDC") in Brooklyn, however, her catheter went unchanged for a week and a half. *Id.* Eventually, MDC staff replaced it incorrectly, inflated the catheter at the wrong place, and "caus[ed] a tremendous amount of pain." PSR 27. Ms. Sternquist was rushed to the hospital, where she stayed for about six weeks, fighting a life-threatening infection, a "massive enlargement of the scrotum," and penial debridement. Dkt. 25.

When she was discharged, she went to a nursing home. There, her feet were shackled to each other and then shackled to her bed or her wheelchair. Dkt. 111. Her feet were shackled even during her 20-30 minutes of physical therapy. She was always watched by two armed guards.

13



Dkt. 111, Ex. F (Ms. Sternquist's shackled feet, with bandages where the handcuffs had injured her).

During her 19 months in the nursing home, she made only small progress in rehabilitation, from not being able to stand, to being able to stand for 1 to 2 minutes. Dkt. 111. She took about 13 medications regularly, including daily morphine and oxycodone for pain, although she was regularly not provided her medications. PSR 27-28; Dkt. 111. She still had urinary incontinence and had been diagnosed with post-traumatic stress disorder and depression. PSR 28. At the time of sentencing, she had a bleeding bowel tear that was left untreated for many months. Dkt. 111.

Objections to the guidelines calculation.

The presentence report calculated Ms. Sternquist's base offense level as 20, under U.S.S.G. § 2K2.1(a)(4)(B)(II), stating that her "offense involved" a "firearm silencer" as described in 26 U.S.C. § 5845(a)(7). This was based on the ATF having classified 15 items found in her home as silencers. PSR ¶ 20-21. None of the items

14

had holes drilled all the way through, as would be necessary to use when firing a gun, but ATF's report stated that any item with a mark where a hole would need to be drilled to make it a silencer, was the "equivalent" to having an "actual hole." A. 140-62. The cylinders possessed by Ms. Sternquist had these "marks" or "dimples." *Id.*

Counsel objected, arguing that none of the items the ATF deemed to be silencers were intended to be used by Ms. Sternquist to silence gunshots, but instead were solvent traps, which are used to clean guns. Dkt. 101, citing A. 149-57. Because of the lack of holes, agents couldn't test these items without modification. *Id.* Even after modification, the sound of gunshots was barely reduced by the cylinders: one modified cylinder reduced the gunshot sound from approximately 153 decibels to approximately 146 decibels; the others reduced the sound by only 6.37 to 13.84 decibels. *Id.* In response, probation stated that the PSR "will remain unchanged with respect to its guideline calculation." PSR addendum.

Counsel also objected to the PSR's conclusion that one of the guns Ms. Sternquist possessed was a machinegun, which was an alternative justification for base offense level 20. PSR 7. In support, counsel noted that the first government agency to test the gun concluded it wasn't a machinegun. A. 168-70. The ATF reached a different conclusion, but, even the ATF could only get, at most, two bullets to shoot from that gun with one pull of the trigger. A. 176-77. In five testing attempts, only twice did the tester report that the gun fired two bullets. *Id.* After each firing, the agent had to "remove[ ]" an "unfired cartridge" and reload before firing again. *Id.* Ms.

15

Sternquist's gun also didn't have an "auto sear," a part that "permits a shooter to fire multiple shots." *See Garland v. Cargill*, 602 U.S. 406, 420, n.4 (2024). As ATF noted, "[w]ithout the delay imparted by the automatic sear, the hammer fall is uncontrolled and may lack sufficient force to detonate" the cartridge. A. 176. Counsel argued that, based on this testing, and the lack of any evidence Ms. Sternquist intended to make the gun automatic, it was more likely that, after numerous attempts, the ATF got the gun to misfire. *Id.*

In response, the government relied on the ATF report, which stated that the gun had a "three-position" "safety selector," with an "unmarked 'automatic' (3 o'clock) position" and a "semiautomatic (12 o'clock) position marked 'FIRE.'" Dkt. 121, citing A. 176 (no third position for the selector was noted in the report). ATF further stated that the gun had a "three-round machinegun burst feature"[3] that did "not function." A. 176. Instead, the gun only worked in a "'hammer follow' condition," meaning that the "hammer is not retained by the disconnector and follows the bolt as it feeds the cartridge into the chamber." A. 176. The report stated that "[h]ammer follow AR-type firearms that shoot automatically are classified as 'machineguns.'" *Id.* The government argued that the ATF report showed that the gun

---

[3] This non-functioning "feature" wasn't fully explained. The ATF report purported to list the "burst" "parts," but this list included regular gun parts, such as a hammer and trigger. A. 176. Although the government quoted the portion of ATF report stating that the gun had "three-round burst parts" in passing in its argument, it didn't explain it further, or rely on it as evidence of Ms. Sternquist's intent. Dkt. 121.

fired automatically, "albeit with glitches." Dkt. 121. Probation agreed with the government. PSR Second Addendum.

Counsel also objected to the PSR's conclusion that Ms. Sternquist possessed more than eight guns, resulting in a four-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B). PSR 8. Counsel argued that Ms. Sternquist should only receive a two-level enhancement for possessing three to seven guns, counting four assembled guns and two completed receivers. [4] PSR 7; PSR addendum. Specifically, counsel objected to counting the cylindrical items as guns because they were not silencers and counsel objected to counting a "partially completed" receiver as a gun. Dkts. 101, 103. As counsel argued, incomplete receivers didn't fall within the statutory definition of a gun. Dkt. 103 (citing 18 U.S.C. § 921(a)(3), which includes "the frame or receiver of any such weapon" in the definition of gun).

Counsel also argued that the court should not rely on a new ATF rule issued in August 2022, just weeks before Ms. Sternquist's arrest, stating that the definition of gun included "[p]artially complete, disassembled, or nonfunctional frame[s] or receiver[s]." 27 C.F.R. § 478.12 (c). Dkt. 103, citing *VanDerStok v. Garland*, 86 F.4th 179, 190 (5th Cir. 2023) (holding that the new ATF rule "clearly conflicts with the plain language of the" statute by "redefin[ing] 'frame or receiver' to include partially complete, disassembled, or nonfunctional frames or receivers," and therefore

---

[4] Below, counsel also objected to a seventh item being counted as gun, but this argument isn't pursued on appeal.

"constitutes unlawful agency action"), *cert. granted*, 144 S. Ct. 1390 (2024) (argued Oct. 8, 2024). The government didn't respond to this argument, except to "point out" that ATF had "conclude[d] that each [item was] a 'firearm.'" Dkts. 100 & 102. Probation stated that it "agree[d] with the Government." PSR Addendum.

During the oral sentencing proceeding, the court said that it had "carefully reviewed the addendum to the pre-sentence report and concur[ed] with the conclusions that were made by Probation…for all of the reasons that were stated therein." A. 94. It "agree[d] with the government" that the "15 cylindrical objects" "qualify as silencers." A. 100. It added that, "even if those silencers did not qualify as firearms because there were already eight firearms that were recovered here, the four-level enhancement would still apply and there would be no change to the total offense level." A. 100.

The court also "agree[d] with the ultimate conclusion by Probation" that "in essence, *Cargill* really has no effect here" and that one gun was a machinegun. A. 94-95. The court said that it "appears more likely that the instances where [the gun] fired one round in the automatic position were the true misfires," saying that the gun had "components" to "fire in three-round bursts." A. 96, 98-99. It repeated the line from the ATF report that "[h]ammer-follow AR-type firearms that shoot automatically are classified as 'machineguns.'" A. 96. The court made no mention of Ms. Sternquist's intent. A. 112.

18

The court adopted the PSR's calculation of Ms. Sternquist's criminal history category as IV and her offense level as 21, for a guideline range of 57-71 months' imprisonment. A. 100. Counsel requested the opportunity to "make a brief record with respect to the ruling[s] that [the court] made." A. 101. The court said, "[n]o." A. 101. Counsel attempted again, saying that the argument with "respect to the partial frames and receivers" was relevant to whether the other rulings impacted the guidelines, and stated that the machinegun argument was about Ms. Sternquist's "lack of intent." A. 101. The court said it had "considered every argument that you have raised in connection with the application of any of those enhancements and definitions." A. 102.

<u>Sentencing</u>

At sentencing, the government noted that Ms. Sternquist's health was a "mitigating factor." A. 105. The government, however, also said that possessing guns was "alarming conduct" and, when "considered in conjunction" with the "possession of law enforcement credentials," it is "hard to think of a benign explanation." A. 104. Counsel rebutted the government's comment that it was "alarming" that Ms. Sternquist had many fake badges, explaining that she was a collector and a hoarder and there was no indication in any of the discovery that she had any intent to use the badges in relation to the guns. A. 108-09.

19

Counsel also explained that Ms. Sternquist had guns for defense and because she was scared after she received death threats and was the victim of a hate crime. A. 108; Dkt 111. The court interjected, "I have had gang bangers sitting right there in that seat who are involved in all kinds of terrible crimes…they're murdering people, they're assaulting people, they're robbing drug dealers and so on; and then I had to have the gun for self-defense. There is no defense there either." A. 108. Ms. Sternquist had no history of gang activity, murder, robbery, or assault. Counsel replied that Ms. Sternquist wasn't arguing self-defense as a legal justification, but to explain that she "had the guns out of [ ] fear." A. 108-09.

Defense counsel also described the extreme pretrial conditions of confinement Ms. Sternquist had endured. It had been "indescribably hard for her, both physically and mentally" to be shackled to a bed for 23 months. A. 105. At the time of her arrest, she had hoped to regain feeling in her lower extremities through medical care and physical therapy. A. 105. Instead, she suffered a life-threatening infection because of the jail's lack of medical care, that was likely to impact her ability to have further gender affirming surgery. A. 105. Even once she was moved to the nursing home, she had only limited physical therapy, while her legs were chained together. A. 105. Consequently, she had made "almost no progress" in regaining movement in her legs. A. 105. She was in constant pain and the nursing home frequently missed her pain medication. A. 106. For months, she had an untreated bowel tear, meaning she was regularly left "sitting in her own urine and feces for hours on end." A. 106.

20

Mentally, she was in conditions akin to solitary confinement, with no social interaction. A. 106. As counsel described it, the conditions were "extremely scary[,] debilitating psychologically," "and dehumanizing." A. 106, 115. Ms. Sternquist personally apologized to the court, and explained, while crying, that the time shackled to a bed had "been so lonely and so difficult…just managing my pain…living with the inhumanity of some of the things that I've had to suffer …because of my disability and people's inability to care for me." A. 119-20.

The court said that there was "no question that the offense here is serious and this isn't just a run-of-the-mill felon-in-possession of a firearm." A. 123. It continued, saying that "[w]hat we have here is a person who bought pieces online and created what are commonly called now ghost guns, which …creates a specific danger. When those guns get out into the community, they are not traceable. They do as much damage as a regular gun. And there wasn't just one gun for self-defense, there were multiple guns." A. 123. The court also focused on the dismissed counts related to fake badges and her prior convictions for fake documents, saying it is "beyond any understanding about how possession of any of those items had to do with the defendant's fear for her life." A. 124. The court asserted that what was "scary about the prior two convictions is that she was selling them online," "selling…blank birth certificates." A. 125.

The court then brought up September 11th, saying "in an age where we have already suffered in this country terrorist attacks, and continued to have to deal with

21

that specter hanging over our heads, I don't understand for the life of me why people forget that we lost more than thirty – [three thousand] American lives on 9/11 right here on our soil." A. 125. It continued, "[t]o have identifications like that available on an open internet market is a scary thing. And then you add to that the ghost guns that cannot be traced." A. 125.

The court next turned Ms. Sternquist's letters of support against her, saying that "given all the letters that have been written in support and testament to the intelligence and creativity…and apparent handiness in creating things…it is not beyond the imagination to think that – the estimate was what, five minutes – under five minutes to create a silencer drilling where there was a dimple at the end." A. 123-24. The court also turned the "horrors" Ms. Sternquist went through against her, saying "it is not a far stretch to think that she might have a slight axe to grind with the Navy or even the NYPD for their failure to protect in her time of need." A. 126.

The court asserted that counsel was asking the "court to take on faith, on blind faith at that, that Ms. Sternquist is going to comply with whatever conditions…while on bond she committed new crimes, sometimes several crimes." A. 127. Ms. Sternquist had not been released on bond. The court added that the "conditions at the MDC are horrible. We see that documented every day almost these days" and that Ms. Sternquist had "suffered more than the average inmate." A. 127-28. Ms. Sternquist was only at the MDC for the first approximately two weeks of her incarceration.

22

In written papers, counsel had argued that the court should avoid sentence disparities, citing numerous cases of 922(g)(1) in the same district, including with more serious conduct, where defendants had been sentenced to probation or time served. Dkt. 111, citing, *inter alia*, *United States v. Dwayne Patterson*, 21-cr-524 (PKC) (person fired gun several times; guidelines of 51-63 months imprisonment; sentenced to time served of about 5 months); *United States v. David Wright*, 20-cr-351 (ENV) (30 months of imprisonment; person shot another person in the leg); *United States v. Matthew Ottey*, 19-cr-334 (MKB) (three years of probation, when person shot gun in the air; guideline range of 57 to 71 months); *United States v. Raheem Boomer*, 17-cr-453 (ENV) (multiple shots fired; sentence of 6 months of home detention, with work permitted, and two years of supervised release).

In response the court said, "[t]here was some discussion in the defense papers about avoiding unwarranted sentencing disparity among defendants; and in this case, [that would be defendants] charged with being felons-in-possession of a firearm." A. 122-23. The court said, "I do have to say that there was a whole laundry list of cases, but I am sure that the factual backgrounds of all of those cases is quite varied. So, it is always difficult to make a comparison when not doing a deep dive into the specific background facts of each particular case." A. 123.

The court concluded by saying that it had "read everything that has been submitted by the parties and all the arguments made by the defense. And even if [Ms. Sternquist's] criminal history and total offense level should be as proposed by the

23

defense, in this Court's view, the sentence of 60 months under all of the circumstances is appropriate here." A. 130. Counsel attempted to object, saying that the sentence was "much greater than necessary," and that the court's overall sentence was based on the determination that "various items did count as guns," which was "related directly to the guidelines issues." A. 133-34. The court said, "save it for [the] appeal" A. 134.

## Summary of Argument

After receiving death threats, Kara Sternquist built herself guns at home. She had no history of violence or dangerousness; she had no ammunition; and she didn't take any gun outside her home. Her actions taken in preparation to defend herself and her home fell within the core of the protections of the Second Amendment. *See, e.g., Bruen*, 597 U.S. 1. That she had prior felony convictions for theft and making fake identifications should not have impacted her Second Amendment rights. This Court should instead find that 922(g)(1) is unconstitutional facially and as applied to Ms. Sternquist.[5]

In the alternative, this Court should vacate her sentence, which was procedurally and substantively unreasonable.

---

[5] Standard of Review: This Court reviews § 922(g)(1)'s constitutionality *de novo. See, e.g., United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018).

24

## Argument

## Point I

**Kara Sternquist's possession of an unloaded gun inside her home was within the core of conduct protected by the Second Amendment and nothing about her felony convictions for thefts and making fake identifications should have undercut her rights. Her subsequent conviction for being a felon-in-possession of a gun was unconstitutional, given** *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* **597 U.S. 1 (2022).**

A.    *Bruen* announced a new standard for assessing the constitutionality of restrictions on gun possession.

Under the Second Amendment, "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. The Supreme Court has long recognized that this Amendment protects an individual's fundamental right to possess a gun at home for self-defense. *See District of Columbia v. Heller*, 554 U.S. 570, 602 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 767-68 (2010) (plurality opinion). Moreover, the Second Amendment right to have guns for self-defense is not limited to one gun. The court's implication at sentencing that Ms. Sternquist couldn't have multiple guns to defend herself, A. 123, has no basis in case law.

In *Bruen*, 597 U.S. at 9-10, the Court announced a new test for determining when the government may constitutionally restrict this right. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 17. When a law burdens this conduct,

25

"the government must demonstrate" that the law "is consistent with this Nation's historical tradition of firearm regulation." *Id.* Because the Second Amendment presumptively protects the right to possess a gun, a law restricting gun possession can only be constitutional if the government has identified historical analogues sufficient to support that law. *Id.*

The government must "affirmatively" prove that a challenged law is supported by "historical precedent" that "evinces a comparable tradition of regulation." *Id.* at 19, 27. When analyzing a regulation directed at "a general societal problem that has persisted since the 18th century," courts must conduct a "straightforward historical inquiry." *Id.* at 26-27. A court itself is "not obliged to sift the historical materials for evidence …. That is [the government's] burden." *Id.* at 60; *see also id.* at 25 n.6 ("Courts are thus entitled to decide a case based on the historical record compiled by the parties."). Relevant evidence that a modern regulation is unconstitutional includes "the lack of a distinctly similar historical regulation," earlier generations' attempts to regulate the conduct at issue "by materially different means," or the rejection of "analogous regulations" at the time of the founding. *Id.* at 26-27. Essentially, if "the Founders themselves could have adopted" a particular regulation to "confront" a problem that existed in 1791, but didn't do so, then that regulation is unconstitutional. *See id.*

In the Supreme Court's recent opinion in *Rahimi*, the Court further interpreted *Bruen*, explaining that "the appropriate analysis involves considering whether the

26

challenged regulation is consistent with the principles that underpin our regulatory tradition." *United States v. Rahimi*, 602 U.S. 680, 692 (2024). The *Rahimi* Court explained that the "[w]hy and how the regulation burdens the [Second Amendment] right are central to th[e] inquiry." *Id.* The Court further explained that even if a current gun regulation is consistent with a traditional "why," it still "may not be compatible" with the Second Amendment if the regulation burdens the right "to an extent beyond what was done at the founding." *Id.* at 693.

The issue in *Rahimi* was a <u>temporary</u> ban on gun possession based on Rahimi's having "fired" a gun "at [his girlfriend] C. M. or [a] witness" who saw him abusing her. *Id.* at 686. A court entered a restraining order and "suspended Rahimi's gun license for two years," but he nonetheless "threatened a different woman with a gun" and was the "suspect in a spate of at least five additional shootings." *Id.* He was convicted of "possessing a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8)." *Id.* Upholding the conviction, the Court said, "we conclude only this: An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* at 702. In reaching this conclusion, the Supreme Court discussed historical laws that allowed <u>temporary</u> disarmament, with "significant procedural protections." *Id.* at 697.

Notably, the *Rahimi* Court explicitly disavowed previous dicta, which had implied that only "responsible" citizens could possess guns. *Id.* at 701-02. *See e.g.,*

27

*Heller* 554 U.S. at 635 ("whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). The *Rahimi* Court explained:

> In *Heller* and *Bruen*, we used the term "responsible" to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not "responsible." The question was simply not presented.
>
> *Rahimi*, 602 U.S. at 701–02 (internal citations omitted).

The court, thus, rejected the government's argument that Rahimi could be "disarmed simply because he [was] not 'responsible.'" *Id.* at 701.

After *Rahimi*, courts have started to use an as-applied framework, assessing whether a particular defendant is dangerous or "pose[s] a credible threat to the physical safety of another." *Id.* at 702.[6] The Sixth Circuit recently held that there was no historical tradition in disarming people who were not dangerous and that individuals should be permitted to show they are not dangerous, based on their individual record and characteristics. *United States v. Williams*, 113 F.4th 637, 657 (6th Cir. 2024). The Circuit explained that "[i]n determining whether an individual has met his burden to demonstrate that he is not dangerous, and thus falls outside of §

---

[6] The Third Circuit took a similar approach in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) (en banc), although that decision was vacated and remanded "for further consideration in light of" *Rahimi*, and is currently pending. *Garland v. Range*, 2024 WL 3259661, at *1 (U.S. July 2, 2024).

28

922(g)(1)'s constitutionally permissible scope, courts—much like the officials of old—must focus on each individual's specific characteristics." *Id.*

The Fifth Circuit too has used an as-applied framework to assess the historical record. *United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024). In *Connelly*, the court explained that "not one piece of historical evidence suggests that, at the time they ratified the Second Amendment, the Founders authorized Congress to disarm *anyone* it deemed dangerous." *Id.* Instead the evidence presented an "abstract belief that one's right to bear arms count be stripped if he were legitimately dangerous to the public." *Id.* The circuit held that a conviction under 922(g)(3) was unconstitutional as-applied to a nonviolent marijuana user. *Id.*

Section 922(g)(1) forbids anyone convicted of a "crime punishable by imprisonment for a term exceeding one year" from ever possessing a gun anywhere. And Ms. Sternquist, previously convicted of three such crimes (discussed below), violated § 922(g)(1) by possessing a gun. Here, however, the Second Amendment's plain text covers Ms. Sternquist's gun possession, and the government cannot identify a historical tradition, at the time of the Amendment's ratification in 1791, of forever banning someone like her, with no history of violence, from having a gun inside her home.

29

B.   *Bruen* abrogated this Court's precedents, including *Bogle.*

In rejecting Ms. Sternquist's Second Amendment motion, the district court

relied on *Bogle*, 717 F.3d 281, a pre-*Bruen* decision that is 8 sentences long, conducted

no historical analysis and identified no founding-era analogues that were comparable

to Section 922(g)(1). Instead, it simply cited *dicta* that categorical bars on firearm

possession by people with felony convictions are "presumptively lawful" even absent

any historical analogue. *Id.* at 281. *Bruen* flips that presumption on its head; any

restriction on arms-bearing is presumptively unlawful absent a sufficiently close

historical analogue. Under the new *Bruen* test, therefore, *Bogle's* reasoning is invalid.

In general, published decisions like *Bogle* "are binding on future panels unless

they are 'reversed en banc or by the Supreme Court.'" *United States v. Afriyie*, 27 F.4th

161, 168 (2d Cir. 2022). But that rule gives way "when an 'intervening Supreme Court

decision . . . casts doubt on [the otherwise] controlling precedent." *Id.* The intervening

decision "need not address the precise issue already decided[;]" rather, there need only

"be a 'conflict, incompatibility, or inconsistency between this Circuit's precedent and

the intervening Supreme Court decision.'" *Id.* An intervening Supreme Court decision

may be "subtle" in its impact, but if it "alter[s] the relevant analysis fundamentally

enough," later panels may depart from earlier, inconsistent precedent. *Doscher v. Sea

Port Grp. Sec., LLC*, 832 F.3d 372, 378 (2d Cir. 2016), abrogated on other grounds by

*Badgerow v. Walters*, 596 U.S. 1 (2022). Thus, later panels can depart from prior

30

precedent when an intervening Supreme Court case "undermined an assumption of that decision." *Id.*

That is precisely what *Bruen* did to *Bogle*. This Court recognized as much, holding unequivocally that *Bruen* "abrogated [this Court's] circuit precedent . . . and the general approach [this Court] took to Second Amendment claims." *Antonyuk v. James*, 120 F.4th 941, 964 (2d Cir. 2024). That understanding comports with other circuits, which have recognized that *Bruen* fundamentally altered Second Amendment jurisprudence, "rendering . . . prior precedent obsolete." *United States v. Diaz*, 116 F.4th 458, 465 (5th Cir. 2024).

This Court should thus treat *Bogle* as effectively abrogated and analyze the constitutional question under the correct standard as articulated in *Bruen*.

C.    Ms. Sternquist is part of the "people."

The Second Amendment's plain text covers the "right of the people to keep and bear Arms." U.S. Const., Amend. II. And Ms. Sternquist – who was born in California and is a former member of the U.S. Navy, PSR 2, 9-11 is part of "the people," meaning "'persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.'" *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)).

Ms. Sternquist's prior non-violent felony convictions don't change that. "[I]n all six other provisions of the Constitution that mention 'the people,' the term

31

unambiguously refers to all members of the political community, not an unspecified subset." *Id.* Indeed, "the people" appears in the First and Fourth Amendments, both of which cover felons, and there is "no reason to adopt an inconsistent reading of 'the people'" such that felons have rights under those Amendments but not the Second. *Range*, 69 F.4th at 102. *See also, e.g., United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015)(holding that someone's "criminal record" is irrelevant in determining whether he is among "the people" protected under the Second Amendment, noting that the amendment "is not limited to such on-again, off-again protections"); *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2002) (observing that "felons" are "indisputably part of 'the people'"); *United States v. Rowson*, 652 F. Supp. 3d 436, 461 (S.D.N.Y. 2023) (Engelmayer, J.) ("[F]elons have been held to be within the scope of 'the people' whom the Second Amendment covers.") *United States v. Mitchell*, No. 23-cr-198, 2023 WL 8006344, at *3–*4 (S.D.N.Y. Nov. 17, 2023; *United States v. Ford*, No. 23-cr-107, 2023 WL 7131742, at *2 (S.D.N.Y. Oct. 30, 2023; *United States v. Abreu*, No. 23-cr-67, 2023 WL 6541302, at *3 (S.D.N.Y. Oct. 6, 2023 (same).

Tellingly, the government has conceded that the Founders wouldn't have thought people with felony convictions were excluded from "the people." In "2011, for example, the Department [of Justice] told … the Fourth Circuit that '[a]s for convicted criminals, Colonial societies do not appear to have categorically prohibited their ownership of firearms.' Similarly, in a case pending before the … the First

32

Circuit, the government told the court that 18 U.S.C. § 922(g)(1) is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified.'" *United States v. Bullock*, 679 F. Supp. 3d 501, 534 (S.D. Miss. 2023) (citations omitted), *rev'd on other grounds and remanded*, No. 23-60408, 2024 WL 4879467 (5th Cir. Nov. 25, 2024).

Ms. Sternquist is, therefore, one of "the people" the Second Amendment covers despite her felony convictions for paper crimes.

D. <u>The government cannot meet its burden of proving § 922(g)(1) is constitutional here</u>.

The "government must affirmatively prove," *Bruen*, 597 U.S. at 19, that § 922(g)(1)'s forever banning Ms. Sternquist from having a gun is supported by a "long, unbroken line of common-law precedent," *id.* at 35, or practice "when the Bill of Rights was adopted in 1791." *Id.* at 37. The government can't make this showing.

First, the government cannot show there is any historical precedent to permanently disarm people simply because they have a felony conviction. As "acknowledged in *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc), the first federal statute disqualifying people with certain violent felony convictions from firearm possession wasn't enacted until the Federal Firearms Act in 1938, which was 147 years after the ratification of the Second Amendment." *United States v. Daniel*, 701 F. Supp. 3d 730, 737 (N.D. Ill. 2023). As the DOJ has explained, "'[c]olonial

33

societies do not appear to have categorically prohibited" "convicted criminals" from owning guns. *Bullock*, 679 F. Supp. 3d at 534 (citation omitted).

Indeed, the "Founding generation had no laws limiting gun possession by . . . people convicted of crimes." Adam Winkler, *Heller's* Catch-22, 56 UCLA L. Rev. 1551, 1563 (2009). "[B]ans on convicts possessing firearms were unknown before World War I." C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 HARV. J. L. & PUB. POL'Y 695, 708 (2009). In 2019, then-Judge Barrett acknowledged that the "best historical support for a legislative power to permanently dispossess all felons [of firearms] would be founding-era laws explicitly imposing – or explicitly authorizing the legislature to impose – such a ban. But at least thus far, scholars have not been able to identify any such laws." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019 (Barrett, J., dissenting). That is unsurprising; "state laws prohibiting felons from possessing firearms or denying firearms licenses to felons date from the early part of the twentieth century." Carlton F.W. Larson, *Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1376 (2009; *accord United States v. Booker*, 644 F.3d 12, 23-24 (1st Cir. 2011) (noting that the "federal felony firearm disqualification law, 18 U.S.C. § 922(g)(1), is firmly rooted in the twentieth century."). In other words, "no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms." Larson, *Four Exceptions*, at 1374.

Felony convictions were commonplace in the founding era, but no contemporaneous legislation permanently disarmed them. "[T]he lack of a distinctly similar historical regulation addressing that problem is relevant evidence" that Section 922(g)(1) is "inconsistent with the Second Amendment." *See Bruen*, 597 U.S at 26-27.

Without any evidence that founding-era legislatures enacted any form of felony disarmament, Section 922(g)(1) can only stand if a sufficient consensus of "relevantly similar" analogues restricted gun rights to the same extent. *Rahimi*, 602 U.S. at 692. Focusing on the *Rahimi* analysis of the "why and how" a gun regulation burdens the Second Amendment right, the government fails, especially with respect to "how" 922(g)(1) burdens the right. For example, the historical laws the *Rahimi* Court relied on involved temporary bans on gun possession: surety rules involved bonds that "could not be required for more than six months at a time," and the person could "obtain an exception if he needs his arms for self-defense or some other legitimate reason." *Id.* at 697. And, the "going armed" laws were similar: "[w]hen an individual pose[d] a clear threat of physical violence to another," he could be disarmed. *Id.* at 698. When that threat dissipated, however, the sanction would too.

The history the government relied on below has the same flaws: none of the historical laws involved permanent disarmament. The government first pointed to so-called "loyalty laws" that permitted disarming disfavored groups such as Catholics or Loyalists. But those laws were not categorical or permanent. English common law, for example, only disarmed those who "refuse[d] or neglect[ed] to make repeate [sic] and

35

subscribe" a declaration renouncing Catholicism. 1 W. & M., Sess. 1, c. 15, in 6 The Statutes of the Realm 71–73 (1688). Impacted people could simply swear an oath of allegiance, or seek judicial approval, and restore their right to bear arms. *See* Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 WYO. L. REV. 249, 268–69 (2020) (discussing history of rights restorations for individuals who swore oaths of loyalty to the new republic); *Williams*, 113 F.4th at 653 (explaining that Catholics could petition a justice of the peace to possess weapons "necessary for defending their home"); *Range*, 69 F.4th at 126–27 (Krause, J., dissenting) (noting that "those presumptively untrustworthy individuals who came forward and established that they were indeed law-abiding by swearing the loyalty oath before state authorities had their firearm rights restored"). Other disarmament laws were also time-limited. *See, e.g.*, 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780-1805, 145, 146–47 (1805) (imposing three-year bar on firearm possession by those participating in rebellion against State).

By contrast, Section 922(g)(1) contains no mechanisms for lifting its categorical, permanent gun ban. No oath Ms. Sternquist can swear, nor any judicial petition, will permit her even a limited restoration of her right to own a firearm for any purpose. Section 922(g)(1) thus restricts Second Amendment rights well beyond "loyalty laws."

Second, the government cited a proposal from the "minority report" from the Pennsylvania delegation during the ratification debates that would have amended the

Second Amendment's text to include a clause reading "unless for crimes committed, or real danger of public injury from individuals" as evidence that "members of the Founding generation" supported permanent disarmament of individuals with criminal convictions. Dkt. 82. This proposed limitation to the right for people who committed crimes was <u>not</u> incorporated into the Second Amendment. If anything, that this recommendation from the Pennsylvania delegation was rejected and not included in the U.S. Constitution supports Ms. Sternquist's argument.

Third, the North Carolina law cited by the government, also pre-dating the Second Amendment, required forfeiture of a person's gun for illegal hunting. "Acts of the North Carolina General Assembly," 1745, Ch. III, Sec. V, available at https://docsouth.unc.edu/csr/index.php/document/csr23-0015 (noting that person "shall forfeit his Gun" and pay a fine). Dkt. 82. Contrary to the government's implication, however, there is no indication that the person was forever prevented from getting a gun afterward. Forfeiture of an item used to commit a crime was and is common. It is not the same as permanently taking away a person's right to have a similar item. This is easy to understand: today, people who have illegal content on a computer routinely forfeit the computer as part of their criminal conviction. This forfeiture does not stop the person from getting a new computer.

Moreover, although, in addition to forfeiture, the death penalty existed in 1791, "'capital punishment in the colonies was used sparingly'" and people with felony convictions who were not executed "could 'repurchase arms' after they discharged

37

their sentence." *United States v. Neal*, 715 F. Supp. 3d 1084, 1101 (N.D. Ill. 2024)

(quoting, respectively, *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J.,

dissenting), and *Range*, 69 F.4th at 105).

Section 922(g)(1)'s lifetime proscription, therefore, vastly exceeds the scope of

even the limited estate forfeiture that existed in the colonies.

E.    The government cannot show a historical precedent for permanent
      disarmament related to Ms. Sternquist's non-violent convictions.

In 1791, there was no "long, unbroken line of common-law precedent," *Bruen*,

597 U.S. at 35, or practice of imposing lifetime bans on gun possession as punishment

for Ms. Sternquist's felonies, theft and two crimes related to creating fake

identifications. Following *Rahimi*, this Court should adopt an as-applied framework to

find that Ms. Sternquist posed no danger. Unlike Rahimi, Ms. Sternquist posed no

credible threat to the physical safety of another by possessing a gun. She had no

ammunition; her extensive internet history revealed no intent to harm anyone; and she

had no history of using a weapon in any unsafe manner. No court had found that she

posed any credible threat before she possessed the guns.

On the contrary, none of Ms. Sternquist's felony convictions have any

relationship to violence, a threat of violence, or any danger. (Indeed, the same is true

of her misdemeanor convictions, which were crimes of poverty like turnstile jumping,

rather than crimes involving violence). There is no logical connection between Ms.

Sternquist's convictions for theft or creating fake documents and her rights under the

38

Second Amendment. As the Sixth Circuit explained in *Williams*, the category of crimes like "mail fraud" or "making false statements," cause "no physical harm to another person or the community," and "we trust district courts will have no trouble concluding that many of these crimes don't make a person dangerous." 113 F.4th at 659.

Moreover, when a "'challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.' So too if the Founders used 'materially different means' to address the same problem." *Atkinson v. Garland*, 70 F.4th 1018, 1020-21 (7th Cir. 2023) (quoting *Bruen*, 597 U.S. at 26). The "problem" of theft has existed "since [and before] the 18th century," yet no "historical regulation" existed in 1791 that forever disarmed a person convicted of theft. *Bruen*, 597 U.S. at 26.

Fake documents, or forgeries, are also a "problem" that has existed at least since the 18th century. *See, e.g., Gilbert v. United States*, 370 U.S. 650, 655-57 (1962) (discussing the common law understanding of forgery as a "false making" "of any written instrument for the purpose of fraud and deceit"); Paul Baines, "The House of Forgery in Eighteenth-Century Britain," 1999, Rutledge (positing that 18th century Britan was a "defining period for modern concepts of fraud"); History of Forgery. In: Forensic Document Examination. Humana Press, 2007, available at https://doi.org/10.1007/978-1-59745-301-1_5 ("The art of forgery is as old as the

39

alphabet."); University of Gottingen, Germany, "Press release: The trail of the master forger: new evidence discovered," Nov. 19, 2024, available at https://www.uni-goettingen.de/en/3240.html?id=7622 (explaining that historians had identified an 18th century forgery). Thus, regulations related to fake documents were not "unimaginable at the founding." *Bruen*, 597 U.S. at 28. While Ms. Sternquist surely used more advanced inks and the aid of electronics in creating fake identifications than were available historically, this is not a "dramatic technological change[ ]," but simply a variation on the ancient practice of forgery. *Id.*

As applied to Ms. Sternquist, thus, 922(g)(1) is unconstitutional.

\*       \*       \*

*Bruen* upended Second Amendment law. "No longer, the Supreme Court made clear, can lower courts balance interests – of an individual's right to possess a firearm and the state's commitment to promoting personal or public safety – to resolve the constitutionality of the challenged restriction. The new approach anchors itself exclusively in the Second Amendment's text and the pertinent history of firearms regulation, with the government bearing the burden of 'affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'" *Atkinson*, 70 F.4th at 1019 (quoting *Bruen*, 597 U.S. at 19). This is an "exacting" and "demanding standard." *Id.* at 1021-22. *See e.g., United States v. Williams*, 718 F. Supp. 3d 651, 655 n.2 (E.D. Mich. 2024) (dismissing § 922(g)(1) indictment against defendant with previous "convictions for first and

40

second-degree murder"); *United States v. Hostettler*, 2024 WL 1548982, at *2 (N.D. Ohio Apr. 10, 2024) (dismissing § 922(g)(1) indictment against defendant with six felony convictions and "more than twenty-five misdemeanor convictions" for "assault, various drug offenses, disorderly conduct, domestic violence, and operating a vehicle while under the influence"); *United States v. Leblanc*, 2023 WL 8756694, at *1 (M.D. La. Dec. 19, 2023) (same for "armed robbery").  The government can't meet it here: none of Ms. Sternquist's prior felony convictions would have resulted in 1791 in a lifetime ban on firearm possession.

Additionally, while an "individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment," *Rahimi*, 602 U.S. at 702, no court found that Ms. Sternquist posed any credible threat of danger. She didn't. Yet, she was not temporarily, but permanently, disarmed. Because the government hasn't shown a "long, unbroken line of common-law precedent," or practice "when the Bill of Rights was adopted in 1791," *Bruen*, 597 U.S. at 35, 37, of forever banning someone like Ms. Sternquist from having a gun, doing so is "inconsistent with the Second Amendment." *Id.* at 26. Her conviction should be vacated.

## Point II

**The court incorrectly calculated Ms. Sternquist's guideline range by finding that she possessed 15 gun silencers even though these items lacked holes in both ends, so couldn't be used to silence a gunshot, and there was no evidence that Ms. Sternquist – who possessed no ammunition – had any intent to use them to muffle gunshots**

None of the cylindrical items Ms. Sternquist possessed were intended for use as gun silencers. They couldn't be used as silencers without having holes drilled through them. When agents modified them, they barely reduced the sound of gunshots. Ms. Sternquist never said anything suggesting she planned to modify them to be silencers. And, she had not tried to use them as silencers – despite her collection of gun parts, she had no ammunition. Instead, the items appeared to be solvent traps, which are used to clean guns. Because there was no evidence Ms. Sternquist intended to use any of the items to silence gunshots, none of them should have been counted in her base offense level, or been used to support an enhancement for the number of guns.[7] The court's conclusion to the contrary, which was unsupported by citations to case law, or any ruling about Ms. Sternquist's intent, was wrong.

---

[7] <u>Standard of Review</u>: This Court reviews sentences for "unreasonableness," *United States v. Booker*, 543 U.S. 220, 261 (2005) (Remedial Op., Breyer, J.), which "amounts to review for abuse of discretion." *United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (en banc). A court commits procedural error when it fails to properly calculate or consider the Guidelines range. *See, e.g., Cavera*, 550 F.3d at 190. A court also errs procedurally if it rests its sentence on a mistake of law. *See id.*; *United States v. Verkhoglyad,* 516 F.3d 122, 127 (2d Cir. 2008).

42

The sentencing guidelines provides that the base offense level for possessing a gun is 20 if the person possessed a gun described in 26 U.S.C. § 5845(a). U.S.S.G. § 2K2.1(a)(4). As relevant here, Section 5845(a) includes "silencer[s]" as defined in 18 U.S.C. § 921 (25). Section 921 (25) states that a "firearm silencer" is

> any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication. 18 U.S.C. § 921 (25).

The plain language of this statute requires proof of intent to use an item as a gun silencer. *See also Rogers v. United States*, 522 U.S. 252, 255 (1998) (explaining that "petitioner's admission that he knew the item was a silencer constituted evidence sufficient to satisfy the *mens rea* element of the charged offenses"); *United States v. Coffell*, 720 F. App'x 521, 528 (11th Cir. 2017) ("Coffell's own testimony reflects that he obtained the silencer with the understanding that it was intended to be used to silence a firearm"); *United States v. Housholder*, 664 F. App'x 720, 723 (10th Cir. 2016) (evidence of intent and knowledge was sufficient when "[t]he device was attached to his rifle when seized, which clearly speaks to intent," it had been "modified to fit [his] rifle," and he spontaneously said that it was "not a silencer"); *United States v. Carter*, 465 F.3d 658, 666 (6th Cir. 2006) (evidence of intent included expert testimony "that the device was designed and intended to be used as a silencer;" defendant's testimony "that he was interested in silencers and had researched how they work;" a neighbor's testimony "that the defendant had told him he was trying to make a silencer;" and

43

evidence that "that the defendant had stated that he had fired a blank through the cylinder and it "didn't work too well.""); *United States v. Kavoukian*, 354 F.3d 117, 119 (2d Cir. 2003) (defendant "frequently spoke … of his intent to make a silencer" and made a device that marginally reduced the sound of a gunshot).

Indeed, without a robust interpretation of the requirement that an item be "intended for use" as a "firearm silencer," the statute would be impermissibly vague, capturing a range or ordinary household items, such as a pillow, a potato, or a soda bottle. *See United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010) (explaining "[t]he peculiar problem of silencers is that many objects, including relatively innocent ones," including "potato[s]" or "soda bottles," "have some capacity to muffle the sound of a shot."). The knowledge and intent requirement "tempers problems of overbreadth and vagueness created by the multiple legitimate objects that can be used to silence a firearm." *Id.* at 99.

Here, there were no indicia of Ms. Sternquist's knowledge or intent: none of the cylindrical items were attached to a gun; Ms. Sternquist didn't say anything indicating she believed them to be silencers or intended them to be used as silencers; she didn't use any of the items as silencers; and they appeared to have been purchased on the regular internet as solvent traps, which are designed to collect gun solvent and cleaning fluid. As ATF explained in a published bulletin, "[n]umerous manufacturers and sellers are marketing" solvent traps, which have a "legitimate purpose," and are "attached to the barrel of a firearm during cleaning in order to catch excess cleaning

44

fluids." Dkt. 101. In distinguishing between a legal solvent trap and an illegal silencer, intent is the "key factor." *Id.*

Courts have found that a fully drilled hole through a cylinder can be evidence the person intended an item to be a silencer. *See United States v. Moore*, 253 F.3d 607, 611 (11th Cir. 2001) (pointing to fact that "there were holes drilled in the central cylinder" as evidence supporting item was a silencer); *United States v. Tenorio*, No. CR 02-0058 JP, 2003 WL 27385299, at *2 (D.N.M. Feb. 6, 2003) (agent "observed the uneven holes drilled into the silencer without manipulating the weapon"). Ms. Sternquist, however, had no items with fully drilled holes. On the contrary, none of the 15 cylindrical items the PSR called silencers could be used as silencers without modification.

Moreover, that Ms. Sternquist's items were quite bad at muffling gunshots, even after agents modified them, further supports that Ms. Sternquist didn't intend to use them as silencers. The sound level from a gunshot, using the modified cylinders, was still around 140 decibels or more – so loud as to cause "pain and ear injury." CDC, "What Noises Cause Hearing Loss?," available at, https://tinyurl.com/5n6czmue. *See also* American Speech-Language-Hearing Association, "Loud Noise Dangers," https://www.asha.org/public/hearing/loud-noise-dangers/ (noises above 120 decibels are "not safe for any period of time" and that noises starting at 140 decibels will "hurt your hearing right away"). In contrast, actual silencers reduce sound significantly more. *See, e.g.,* Wipfler, E. John, "Sound

45

Arguments For The Purchase And Use Of Firearm Suppressors: A Physician's

Perspective and Recommendations," July 25, 2023,

https://www.acep.org/talem/newsroom/july-2023/Sound-arguments-for-the-

purchase-and-use-of-firearm-suppressors/ (explaining that silencers "reduce the

sound from a gunshot by around 1000 times (30dB) with some weapon/suppressor

combinations offering significantly more sound energy reduction."); Congressional

Sportsmen's Foundation, "Firearm Suppressors," https://tinyurl.com/5d3f8v8v

(explaining that silencers generally reduce sound by 20-30 dB); American Suppresser

Association, "Firearm Suppressor Fact Sheet," 2019,

https://americansuppressorassociation.com/wp-content/uploads/2020/01/ASA-

Virginia-Written-Testimony-December-2019-1.pdf (average sound reduction of 20-35

decibels).

      Despite the lack of evidence of Ms. Sternquist's intent to use any item as a

silencer, the PSR relied on the government's assertion that a mark or "dimpling" in

the center of the cylinders is a "reference point" to show where to "drill the center

hole," which the ATF claimed was "equivalent" to having an "actual hole." PSR

Addendum; A. 140-62. ATF's claim wasn't the subject of administrative rulemaking, is

not part of the statutory law, and has not been mentioned in any case law the parties

could find.[8] It is contrary to the plain language of the statute. And it is simply illogical:

---

[8] Indeed, the government cited no caselaw in support of its argument. Dkt. 102. The only two cases
defense counsel found even mentioning index marks in reference to solvent traps provided no

46

marks are simply not the same as holes. ATF cannot change the statutory definition of silencer or eliminate the knowledge and intent requirements. Indeed, ATF's statutory interpretation is entitled to no deference. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires").

In deciding Ms. Sternquist had 15 gun silencers, the district court stated only that it "agree[d] with the Government … that, in fact, those did qualify as silencers," and that it would take "under five minutes to create a silencer drilling where there was a dimple at the end." A. 100, 124. This explanation, which cited no case law and didn't address Ms. Sternquist's intent, was wrong.

Because Ms. Sternquist had neither the knowledge nor the intent to possess gun silencers, her base offense level should have been 14, under U.S.S.G. § 2K2.1(a)(6)(A). Also, none of the 15 cylindrical items should have been counted as guns, under U.S.S.G. § 2K2.1(b)(1). She should have received a two-level enhancement for possessing between three and seven guns, rather than a four-level

---

useful guidance. In one, the person drilled a hole, thus indicating he intended to create a silencer. *United States v. Hasson*, 26 F.4th 610, 615 (4th Cir. 2022) ("Among those purchases were metal parts with pre-indexed holes ready to be drilled and assembled into unlawful silencers. Hasson purchased a drill press and fully assembled one of the silencers, which he test-fired at least once"). The other addressed a challenge to a warrant, which relied on ATF bulletins "about fuel filters and solvent traps"; the court found the warrant "difficult to follow," but held it wasn't so "facially deficient" or "so lacking in indicia of probable cause" that it met the standard for suppression. *United States v. Hay*, 46 F.4th 746, 751 (8th Cir. 2022). *Hay* too does not address the question raised here.

enhancement for possessing more than eight guns. Her offense level, thus, should have been 16, minus three levels for acceptance of responsibility, for a total offense level of 13.

> A.   There was no alternative basis to increase Ms. Sternquist's base offense level.

The court also erred in finding that Ms. Sternquist possessed a machinegun as an alternative basis to find a base offense level of 20 because there was insufficient evidence that Ms. Sternquist intended the gun to fire more than one shot with one trigger pull or even knew that it could.

A "machinegun" is a weapon that fires "automatically more than one shot…by a single function of the trigger." 26 U.S.C. § 5845(b). Just as with silencers, knowledge and intent is required. As the Supreme Court explained, "It is unthinkable to us that Congress intended" to punish people for having a machinegun when "what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon." *Staples v. United States*, 511 U.S. 600, 615 (1994) (citation omitted) (interpreting 26 U.S.C. § 5861(d)). *See also Rehaif v. United States*, 588 U.S. 225, 229 (2019) (applying "the presumption in favor of scienter even when Congress does not specify any scienter in the statutory text"). As the *Staples* Court explained, to obtain a conviction for possessing a machinegun, "the Government should have been required

48

to prove that petitioner knew of the features of his AR–15 that brought it within the scope of the Act." 511 U.S. at 619.

Here, there was insufficient evidence that Ms. Sternquist intended the gun to fire automatically. One government agency concluded the gun wasn't automatic, as it only fired one shot. A. 168-70. The second agency could only get the gun to fire more than one round twice in five attempts. A. 176. In the two attempts where it fired more than one shot, it fired only two shots. *Id.* It jammed each time. Based on the numerous attempts in which the gun didn't fire automatically, it appeared likely that the times it fired more than one shot were misfires.

This conclusion is supported by the fact that the gun didn't have an auto sear, which is a "component" in "[m]achinegun variants of the AR-15 style rifle" that "permits a shooter to fire multiple shots." *Cargill*, 602 U.S. at 420, n.4. As the ATF report explained, because Ms. Sternquist's gun had no "delay imparted by the automatic sear, the hammer fall is uncontrolled and may lack sufficient force to detonate" the cartridge. A. 176. In other words, the hammer in her gun didn't function properly. *See Cargill* 57 F.4th at 453 (describing a "'hammer follow' malfunction"); *United States v. Olofson*, 563 F.3d 652, 656 (7th Cir. 2009) (noting that the "expert stated that such firing capabilities did not result from a 'hammer-follow' malfunction but rather were intended features of the gun"). Instead of having an auto sear, Ms. Sternquist's gun had the same internal mechanism illustrated in *Cargill* as the firing components of a semi-automatic weapon. *See Cargill*, 602 U.S. at 419-21. This

49

lack of the automatic firing piece supported that the gun was never intended to fire automatically.

Additionally, as the Supreme Court explained in *Cargill*, if the agents had to take any extra action – even if they just used a different pressure – to get Ms. Sternquist's gun to shoot two bullets rather than one, that also meant the gun wasn't a machinegun. *See Cargill*, 602 U.S. at 408 (holding that a bump stock device didn't convert a gun into a machinegun because the shooter "must maintain forward pressure" for multiple shots to fire). The ATF report doesn't explain what agents did to get Ms. Sternquist's gun to shoot two bullets two times, but only one the other times. It is a reasonable inference, however, that the agents did something different – such as using a different pressure – to get the gun to shoot differently. *See id.* 424 ("If something more than a 'single function of the trigger' is required to fire multiple shots, the weapon does not satisfy the statutory definition."). Of course, unlike the device in *Cargill*, which allowed hundreds of rounds to be fired in minutes, but wasn't a machinegun, Ms. Sternquist's gun never fired more than two shots and jammed immediately.

Below, the government pointed to the existence of a three-position selector as showing the gun was meant to shoot automatically. Dkt. 121. But, although the ATF called one of the selector positions "automatic," that position wasn't marked on the gun. A. 176. Instead, as the ATF report explained, only one position was marked, with the label "FIRE." *Id.* The "fire" position fired only one bullet at a time. *Id.* It is

50

unclear why ATF called the other position "automatic," but there is no indication that Ms. Sternquist shared ATF's view about the purpose of that position. This wasn't enough to conclude Ms. Sternquist intended the gun to shoot automatically.

At sentencing, the court repeated a phrase from ATF in concluding the gun was a machinegun, stating that "[h]ammer follow AR-type firearms that shoot automatically are classified as 'machineguns.'" A. 96. The court also repeated ATF's comment about a "three-round" burst feature, but failed to mention that this supposed feature – which hadn't been explained – didn't work. The ATF's assertion about "hammer follow" was unsupported by caselaw, didn't illustrate Ms. Sternquist's intent, and wasn't entitled to deference. *Loper Bright*, 144 S. Ct. 2244. This Court should instead find that the district court was wrong and that this gun wasn't a machinegun.

Similarly, the court was also wrong to conclude that Ms. Sternquist had more than eight guns, under U.S.S.G. § 2K2.1(b)(1)(B), even if she had no silencers, by counting an incomplete receiver as a gun. Incomplete receivers are not included in the statutory definition for gun, which includes the "frame or receiver" of a gun, but does not mention incomplete frames or receivers. 18 U.S.C. § 921(a)(3). The plain language of the statute supports that a partially completed receiver is not a gun. This Court should not rely on a new ATF rule defining "frame" and "receiver" as including "[p]artially complete, disassembled, or nonfunctional frame[s] or receiver[s]," 27 C.F.R. § 478.12 (c), which was promulgated just weeks before Ms. Sternquist was

51

arrested and was already found invalid by the Fifth Circuit. *VanDerStok*, 86 F.4th at 190. That Circuit decision is currently pending before the Supreme Court. *VanDerStok*, 144 S. Ct. 1390 (argued Oct. 8, 2024). As with the ATF's interpretation of the definitions of silencer and machinegun, this interpretation is also entitled no deference. *Loper Bright*, 144 S. Ct. 2244. Instead, looking to the plain language of the statute, this Court should hold that the incomplete receiver wasn't a gun.

*     *     *

Accordingly, this Court should find that the sentencing court miscalculated Ms. Sternquist's guideline range, vacate her sentence, and remand for a resentencing.

## Point III

**Ms. Sternquist received abysmal care during the two years before sentencing, where she was chained to a bed, had an untreated bowel tear, and regularly missed her pain medications. In this context, her sentence of 60 months for possessing a gun inside her home was unreasonable, and the court's sentencing remarks about "gang bangers" and September 11th were inappropriate.**

The "overarching" statutory directive to sentencing courts under § 3553(a) is the "parsimony" clause – the duty to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010); 18 U.S.C. § 3553(a). To do so, the court must "consider every convicted person as an individual and every case as a unique study in human failings" that either mitigate or aggravate

the punishment, and then impose the lowest sentence sufficient to satisfy the sentencing goals. *Gall v. United States*, 552 U.S. 38, 52-53, 59 (2007) (citation omitted). "While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of humankind…a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (citations omitted).

The substantive reasonableness of a sentence depends on whether its length is justified by the reasons given for it. *See United States v. Sindima*, 488 F.3d 81, 85-86 (2d Cir. 2007); *Dorvee*, 616 F.3d at 184 ("district court offered no clear reason why the maximum available sentence, as opposed to some lower sentence, was required").

Here, the sentencing court's analysis gave insufficient weight to Ms. Sternquist's significant mitigating circumstances, while giving too much weight to inappropriate, extraneous remarks. This resulted in a sentence that was too long.

A.  <u>The sentencing court relied on inappropriate and irrelevant considerations, including about terrorism and gangs.</u>

Ms. Sternquist was disabled. She had no history of committing violence, but had been the victim of violence and had received death threats. She had no ammunition in her home. Despite this, at sentencing, the court compared her to "gang bangers" who were "murdering people," connected her conduct in possessing unloaded guns to "terrorist attacks," and turned her personal hardships against her,

53

suggesting that because of the "horrors" she suffered, "she might have a slight axe to grind with the Navy or even the NYPD for their failure to protect in her time of need." A. 108, 125-26. The court then proclaimed that it didn't "understand for the life of [the court] why people forget that we most more than thirty – [three thousand] American lives on 9/11 right here on our soil." A. 125. No one had forgotten September 11th; it simply wasn't relevant to Ms. Sternquist's sentencing. People in gangs, murderers, and terrorists were similarly irrelevant to Ms. Sternquist and her conduct. There was also no indication she had any type of dangerous "axe to grind" with law enforcement. These remarks weren't valid justifications for her sentence. *See United States v. Robinson*, 829 F.3d 878 (7th Cir. 2016) (vacating sentence when court made extraneous comments about defendant's family structure); *United States v. Figueroa*, 622 F.3d 739, 741 (7th Cir. 2010) (noting that "extraneous and inflammatory comments during the sentencing hearing-cast doubt on the validity of the sentence").

The court also made seemingly inaccurate remarks, declaring that Ms. Sternquist had "committed new crimes" "while on bond," when Ms. Sternquist had not been on bond. A. 127. And, in response to counsel's argument about Ms. Sternquist being shackled to a bed for two years at a nursing home, the court said that the "conditions at the MDC are horrible. We see that documented every day." A. 127. But Ms. Sternquist was only at the MDC for about two weeks. Her conditions of confinement the next 19 months were in many ways worse than they were at the MDC: she couldn't leave her room; she had no one to talk to; she had no access to

54

commissary items; and she was watched 24-hours a day by armed guards. These inaccurate facts were also not valid justifications for her sentence. *See e.g., Aldeen*, 792 F.3d 247, 254 (vacating sentence and criticizing the district court for relying on allegations with "no specific findings); *Cavera*, 550 F.3d at 190 (error to rely on "clearly erroneous finding of fact."). Indeed, "[d]ue process is violated when the information on which the defendant is sentenced is 'materially untrue.'" *United States v. Lee*, 818 F.2d 1052, 1055 (2d Cir. 1987) (quotation omitted). *Accord United States v. McDavid*, 41 F.3d 841, 843–44 (2d Cir. 1994) (court erroneously believed defendant was on probation); *United States v. Malcolm*, 432 F.2d 809, 815-16 (2d Cir. 1970) (court attributed criminal record of codefendant to defendant); *United States v. Stein*, 544 F.2d 96, 102 (2d Cir. 1976) (court was under a misapprehension "as to at least two material facts"). Ms. Sternquist had not committed new crimes while on bond – she was not on bond, and she had spent the bulk of her incarceration shackled to a bed in a nursing home – not at MDC. The court's contrary statements were materially incorrect.

Counsel also argued that the court should avoid sentence disparities, citing sentences for other similar and more aggravated cases in the district. In response, the court was dismissive, saying that counsel raised "a whole laundry list of cases, but I am sure that the factual backgrounds of all of those cases is quite varied. So, it is always difficult to make a comparison when not doing a deep dive into the specific background facts of each particular case." A. 123. The court's comments suggested

55

that it had not even considered whether the other cases were comparable, but simply discounted all of them, based on a supposition that the "factual backgrounds" in those cases were "varied." A. 123. The court didn't explain why Ms. Sternquist merited a longer sentence than others.

That type of "sparse reasoning" with respect to avoiding sentencing disparities has been rejected by this Court. *United States v. Stewart*, No. 23-6330-CR, 2024 WL 3517853, at *2 (2d Cir. July 24, 2024)(citing, *Cavera*, 550 F.3d at 193 ("We cannot uphold a discretionary decision unless we have confidence that the district court exercised its discretion and did so on the basis of reasons that survive our limited review.")). In *Stewart*, this Court vacated a sentence when the judge addressed the "need to avoid unwarranted sentencing disparities" "in cursory fashion." *Id.*

The 60-month sentence wasn't justified based on the reasons provided by the court.

B      A 60-month sentence was too long.

Ms. Sternquist's sentence was also unreasonably long and the court didn't sufficiently take the significant mitigating circumstances into account. Ms. Sternquist had an exceedingly difficult childhood and young adulthood, including suffering regular physical, sexual, and emotional abuse. At the time of her arrest, she had recently become partially paralyzed. Instead of receiving appropriate care, she was first injured by the MDC, landing her in the emergency room, and then was shackled to a

56

bed at a nursing home, where she received physical therapy only in chains, and frequently wasn't provided her pain medications. For months, she sat in urine and feces with an untreated bowel tear.

Her abysmal pretrial conditions should have militated for a lower sentence. *See Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant); *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"). Additionally, the community was where she would have received medical care in the "most effective manner." *See* 18 U.S.C. § 3553(a)(2)(D).

Her offense was also not aggravated. She possessed guns only inside her home, did she not take a gun outside or use a gun, and never even had any ammunition. Her digital history showed that she never planned to use any guns except for defense or as part of a collection. The court's and the government's speculation to the contrary was unsupported by the record.

In these circumstances, the Ms. Sternquist's 60-month sentence was too long. *See United States v. Aldeen*, 792 F.3d 247, 255 (2d Cir. 2015) (remanding when 18-month sentence for violation of supervised release seemed "exceedingly harsh," noting that even if the sentence "does not shock the conscience, it at the very least

57

stirs the conscience"); *see also Singh*, 877 F.3d at 116 (same; 60-month sentence for illegal reentry).

## Conclusion

For the reasons set forth above, the Court should vacate Ms. Sternquist's conviction. In the alternative, it should vacate her sentence and remand for a resentencing.

Dated:     New York, New York
           December 11, 2024

                                    Respectfully submitted,

                                    FEDERAL DEFENDERS OF NEW YORK
                                    APPEALS BUREAU

                                    *Allegra Glashausser*
                                    _____
                                    Allegra Glashausser
                                    Assistant Federal Defender
                                    52 Duane Street, 10th Floor
                                    New York, New York 10007
                                    Tel.: (212) 417-8739

58

# CERTIFICATE OF SERVICE

I certify that a copy of this Brief has been served by **ACMS** on the United States Attorneys/E.D.N.Y.; Attention: **FRANK TURNER BUFORD, ESQ., and ANDRES PALACIO, ESQ.**, Assistant United States Attorneys, 271 Cadman Plaza East, Brooklyn, NY 11201.

Dated:   New York, New York
             December 11, 2024

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

59

## CERTIFICATE OF COMPLIANCE WITH RULE 32 (a)

1. This brief complies with the type-volume limitations of Fed. R. App. P. 32(a) (7) (B) because:

   this brief contains 13,990 words, excluding the parts of the brief exempted by Fed. R. P. 32(a) (7) (B) (iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a) (5) and type style requirements of Fed. R. App. P. 32(a) (6) because:
   This brief has been prepared in a monospaced typeface using
   **Microsoft Word** with **14 characters per inch in Garamond** type style.

Dated:     New York, New York
           December 11, 2024

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

60