# 24-2135

*To Be Argued By*:
ANDRÉS PALACIO

## United States Court of Appeals

### For the Second Circuit

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

KARA STERNQUIST, also known as CARA SANDIEGO,
KARA WITHERSEA,

*Defendant-Appellant.*

**On Appeal From The United States District Court
For The Eastern District of New York**

**BRIEF AND APPENDIX FOR THE UNITED STATES**

JOHN J. DURHAM,
*United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

ANTHONY BAGNUOLA,
FRANK TURNER BUFORD,
ANDRÉS PALACIO,
  *Assistant United States Attorneys,*
    *Of Counsel.*

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................. iii

PRELIMINARY STATEMENT ............................................... 1

STATEMENT OF FACTS ......................................................... 4

    I.    The Offense Conduct ...................................................... 4

    II.   Sternquist's Criminal History ...................................... 7

    III.  Procedural History ........................................................ 9

SUMMARY OF ARGUMENT ................................................. 13

ARGUMENT ........................................................................... 15

POINT ONE - STERNQUIST'S CONVICTION
            SURVIVES *BRUEN* ........................................... 15

    I.    Standard of Review ........................................................ 15

    II.   Relevant Legal Background ........................................... 15

    III.  The Same Issues Raised by Sternquist Are
           Currently Pending Before This Court in at
           Least Two Other Fully Submitted Appeals ........................ 21

    IV.  Neither *Bruen* Nor *Rahimi* Requires Reversal
           of Sternquist's Conviction ...................................... 22

           A.   *Bogle* Remains Binding Precedent .............................. 22

           B.   Sternquist Is Not a Law-Abiding Citizen
                Covered by the Second Amendment ............................. 25

    V.   The Government Has Met Its Post-*Bruen*
           Burden of Proof ...................................................... 30

VI.   Sternquist's Facial and As-Applied Challenges
      to Section 922(g)(1) Fail ........................................ 36

POINT TWO - STERNQUIST'S SENTENCE WAS
                  PROCEDURALLY AND SUBSTANTIVELY
                  REASONABLE ............................................ 43

I.    Standard of Review ............................................ 43

      A.    Procedural Reasonableness ........................ 44

      B.    Substantive Reasonableness ...................... 46

II.   Sternquist's Sentence Was Procedurally
      Reasonable ...................................................... 48

      A.    The District Court Properly Determined
            the Base Offense Level .............................. 48

            1.    Sternquist Possessed At Least One
                  "Silencer" ...................................... 48

            2.    Sternquist Possessed a Machinegun ................. 56

      B.    The District Court Properly Determined
            the Total Number of Firearms .................... 62

III.  Sternquist's Sentence Was Substantively
      Reasonable ...................................................... 65

CONCLUSION ........................................................ 72

## TABLE OF AUTHORITIES

Page

### CASES

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024) ............................................................. 28

*Bondi v. VanDerStok,*
  No. 23-852 (2d Cir.) ........................................................................... 64

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................ 16, 25, 26

*Garland v. Cargill,*
  602 U.S. 406 (2024) ........................................................................ 57, 58

*Hamilton v. Pallozi,*
  848 F.3d 614 (4th Cir. 2017) .............................................................. 27

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010) ...................................................................... 16, 26

*Medina v. Whitaker,*
  913 F.3d 152 (D.C. Cir. 2019) ............................................ 27, 29 n.9, 34

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 1 (2022) ...................................................................... passim

*Range v. Attorney General of the United States,*
  124 F.4th 218 (3d Cir. 2024) .................................................. 40, 41, 42

*Range v. Attorney General of the United States,*
  69 F.4th 96 (3d Cir. 2023) .................................................................. 40

*United States v. Bogle,*
  717 F.3d 281 (2d Cir. 2013) ...................................................... 17, 23, 27

*United States v. Broxmeyer,*
  699 F.3d 265 (2d Cir. 2012) ...................................................... 44, 48, 70

iv

*United States v. Cavera,*
   550 F.3d 180 (2d Cir. 2008) ..................................................... 44, 46, 47

*United States v. Cramer,*
   777 F.3d 597 (2d Cir. 2015) ............................................................ 45

*United States v. Crooker,*
   608 F.3d 94 (1st Cir. 1999) ......................................................... 55, 56

*United States v. Crosby,*
   397 F.3d 103 (2d Cir. 2005) ............................................................ 44

*United States v. Dial,*
   No. 24-10732,
   2024 WL 5103431 (11th Cir. Dec. 13, 2024) ....................................... 24

*United States v. Diaz,*
   116 F.4th 458 (5th Cir. 2024) ................................................... passim

*United States v. Fiumano,*
   721 F. App'x 45 (2d Cir. 2018) ................................................... 47, 71

*United States v. Fleming,*
   397 F.3d 95 (2d Cir. 2005) ......................................................... 44, 46

*United States v. Friedberg,*
   558 F.3d 131 (2d Cir. 2009) ............................................................ 44

*United States v. Goffi,*
   446 F.3d 319 (2d Cir. 2006) ............................................................ 46

*United States v. Hunt,*
   123 F.4th 697 (4th Cir. 2024) ................................................... passim

*United States v. Jackson,*
   110 F.4th 1120 (8th Cir. 2024) ................................................. passim

*United States v. Kavoukian,*
   354 F.3d 117 (2d Cir. 2003) ............................................................ 52

v

*United States v. Lanese,*
  890 F.2d 1284 (2d Cir. 1989) ............................................... 45

*United States v. McCane,*
  573 F.3d 1037 (10th Cir. 2009) .......................................... 27

*United States v. Muzio,*
  966 F.3d 61 (2d Cir. 2020) ......................................... 47, 66

*United States v. Norman,*
  776 F.3d 67 (2d Cir. 2015) ................................................ 45

*United States v. Peguero,*
  34 F.4th 143 (2d Cir. 2022) ............................................... 23

*United States v. Perez-Garcia,*
  96 F.4th 1166 (9th Cir. 2024) ........................................... 34

*United States v. Pope,*
  554 F.3d 240 (2d Cir. 2009) ......................................... 48, 71

*United States v. Price,*
  656 F. Supp. 3d 772 (N.D. Ill. 2023) ................................ 26

*United States v. Quiroz,*
  125 F.4th 713 (5th Cir. 2025) ........................................... 34

*United States v. Rahimi,*
  602 U.S. 680 (2024) ............................................... passim

*United States v. Ramos,*
  979 F.3d 994 (2d Cir. 2020) ............................................. 44

*United States v. Riley,*
  635 F. Supp. 3d 411 (E.D. Va. 2022) ................................ 29

*United States v. Rozier,*
  598 F.3d 768 (11th Cir. 2010) .......................................... 27

*United States v. Ruhl,*
  No. 21-2892,
  2025 WL 262309 (2d Cir. Jan. 22, 2025) ....................................24 n.7

*United States v. Ryan,*
  806 F.3d 691 (2d Cir. 2015) .................................................45

*United States v. Simmons,*
  No. 23-6771,
  2025 WL 615459 (2d Cir. Feb. 26, 2025) ....................................24 n.7

*United States v. Skoien,*
  614 F.3d 638 (7th Cir. 2010) ................................................34

*United States v. Thawney,*
  No. 22-1399 (2d Cir.)...........................................22, 28 n.8, 31

*United States v. Traficante,*
  966 F.3d 99 (2d Cir. 2020) ..................................................45

*United States v. Verdugo-Urquidez,*
  494 U.S. 259 (1990)..........................................................25

*United States v. Verkhoglyad,*
  516 F.3d 122 (2d Cir. 2008) ..............................................46, 47

*United States v. Wasylyshyn,*
  979 F.3d 165 (2d Cir. 2020) ................................................15

*United States v. Watkins,*
  667 F.3d 254 (2d Cir. 2012) ..............................................47, 71

*United States v. Williams,*
  113 F.4th 637 (6th Cir. 2024) ..........................................29 n.9, 37, 39

*Vincent v. Bondi,*
  127 F.4th 1263 (10th Cir. 2025) ...........................................24

*Zherka v. Bondi,*
  No. 22-1108 (2d Cir.)...........................................22, 31, 34

## FEDERAL STATUTES

U.S. Const. amend. II ................................................................. 16

18 U.S.C. § 701 ........................................................................ 10

18 U.S.C. § 921 ................................................................... passim

18 U.S.C § 922 .................................................................... passim

18 U.S.C. § 1017 .................................................................... 9, 10

18 U.S.C. § 1028 ..................................................................... 7, 8

18 U.S.C. § 3553 ................................................... 45, 46, 68, 70

26 U.S.C. § 5845 ................................................................. passim

## STATE STATUTE

New York State Penal Law § 265.02(8) ...................................... 5

## GUIDELINE

U.S.S.G. § 2K2.1 ................................................................ passim

## OTHER AUTHORITIES

*On Analogical Reasoning*,
    106 Harv. L. Rev. 741 (1993) ............................................. 18

*Open Letter to All Federal Firearm Licensees*,
    Bureau of Alcohol, Tobacco, Firearms and
    Explosives (Nov. 20, 2023) ......................................... 53 n.11

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 24-2135

_____

UNITED STATES OF AMERICA,

*Appellee*,

-against-

KARA STERNQUIST, also known as CARA SANDIEGO,
KARA WITHERSEA,

*Defendant-Appellant*.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

Defendant-Appellant Kara Sternquist appeals from a judgment entered on August 9, 2024, in the United States District Court for the Eastern District of New York (Irizarry, J.), convicting Sternquist, upon a guilty plea, of possessing a firearm as a previously convicted felon, in violation of 18 U.S.C. § 922(g)(1). The charge arose from Sternquist's possession of a homemade, automatic "ghost gun" that Sternquist had

assembled.  For this crime, the district court sentenced Sternquist to a 60-month term of incarceration.

On appeal, Sternquist argues that the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), renders the felon-in-possession statute, 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)"), unconstitutional (both facially and as applied to Sternquist) because there is no founding-era analog for a statute that criminalizes possession of a firearm by individuals who had committed non-violent felonies.  Sternquist also argues that the district court erred in imposing the 60-month term of incarceration because: (1) the sentence was based on a mistaken calculation of the offense level under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"); and (2) the sentence was substantively unreasonable in light of various mitigating factors that should have carried more weight than the district court assigned to them.

As set forth in greater detail below, Sternquist's arguments should be rejected.  The *Bruen* decision does not abrogate longstanding Second Circuit precedent upholding the constitutionality of Section 922(g)(1).  In addition, the district court's calculation of the

3

offense level was correct, and the sentence it handed down reflected a reasonable application of the evaluative sentencing factors. Accordingly, the judgment should be affirmed in its entirety.

<u>STATEMENT OF FACTS</u>

## I.    <u>The Offense Conduct</u>

On September 15, 2022, federal agents executed a search warrant at Sternquist's apartment in Manhattan.  (DE:1 at 2-3, 9-10; PSR ¶ 5).[1]  The warrant was predicated on evidence that Sternquist had purchased fraudulent law enforcement credentials, including badges and identification cards identifying Sternquist (sometimes by the alias "Kara Withersea") as, among other things, a special agent with the U.S. Environmental Protection Agency.  (DE:1 at 2-5; PSR ¶¶ 7-10).  Specifically, prior to the execution of the warrant, U.S. Customs and Border Protection agents had intercepted several packages from overseas locations addressed to Sternquist that contained fraudulent law enforcement credentials and badges purportedly issued by federal agencies, including the U.S. Marshals Service, the U.S. Department of State, and the U.S. Coast Guard.  (*Id.*).  In addition, purchase records

---

[1]    "DE" refers to entries on the district court's docket in *United States v. Sternquist*, 22-CR-473 (DLI) (E.D.N.Y.).  "SBr." and "SA" refer to Sternquist's brief and appendix, respectively.  "PSR" refers to the Presentence Investigation Report, which has been submitted to the Court under seal.  "GA" and "GSA" refer to the government's appendix and sealed appendix, respectively.

showed that Sternquist (sometimes using the alias "Cara Sandiego") had acquired parts and equipment commonly used in the creation of homemade firearms, also known as "ghost guns."[2]  (DE:1 at 7-9; PSR ¶¶ 13-16).

During the execution of the warrant, federal agents seized from Sternquist's apartment eight guns in various stages of construction, each of which was later determined by technical examiners employed by the U.S. Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to qualify as a "firearm" under the definition set forth in 18 U.S.C. § 921(a)(3).  (SA:172-79; GA:1-9; *see* DE:108 (depicting firearms)).

The ATF's technical examiners determined that, of the eight guns recovered from Sternquist's apartment, four were operable, based on successful test-firing of those weapons.  (SA:174-79).  Examiners determined that one of the guns qualified as a "machinegun," as defined

---

[2]    In addition to purchasing and receiving components and accessories related to the private manufacturing of firearms, Sternquist had also purchased items (including high-capacity magazines, which are illegal to possess under New York State Penal Law § 265.02(8)) that Sternquist had shipped to a third party in Missouri, who had agreed to transmit the items to her apartment in Manhattan.  (DE:55 at 5-6 & n.1; PSR at 6 n.4).

in 18 U.S.C. § 921(a)(24) and 26 U.S.C. § 5845(b), because it fired more than one bullet with a single trigger pull (as it was designed to do). (SA:176-77).

In addition to the firearms, federal agents also recovered fifteen silencers from Sternquist's apartment. (PSR ¶¶ 18, 20-21). Silencers also qualify as "firearm[s]" under 18 U.S.C. §§ 921(a)(3) and (a)(25), provided that they function as "device[s] for silencing, muffling, or diminishing the report of a portable firearm." *See* 18 U.S.C. § 921(a)(25). In this case, ATF technical examiners studied the relevant devices and concluded that they satisfied the statutory definition to qualify as "silencers." (SA:138-66; *see* DE:108 (depicting silencer and component parts)).

Agents also recovered from Sternquist's apartment dozens of fraudulent law enforcement credentials for various federal agencies, including counterfeit personal identification verification ("PIV") cards bearing Sternquist's likeness. (*See, e.g.*, DE:26 (depicting PIV card falsely identifying Sternquist as an employee of the Central Intelligence Agency)). In total, agents recovered more than 50 fraudulent law enforcement badges or credentials from approximately 18 federal

agencies, including the Federal Bureau of Investigation, the U.S. Bureau of Prisons, and the Central Intelligence Agency. (*Id.*).

In addition, agents seized from Sternquist's apartment hundreds of identification documents and credit and debit cards in the names of other people. (PSR ¶ 18). At least four of the identification documents were New York State driver licenses that corresponded to complaints of lost or stolen items filed with the New York City Police Department. (DE:108 at 4). In Sternquist's apartment, agents also found multiple passports in the names of other people that purported to have been issued by foreign countries. (PSR ¶ 18).

## II. Sternquist's Criminal History

At the time of the seizure described above, Sternquist had a significant criminal history, including two prior federal felonies. The first conviction resulted from Sternquist's plea of guilty on April 11, 2007 in the United States District Court for the Southern District of Ohio to producing false identification documents, in violation of 18 U.S.C. §§ 1028(a)(1) and (b)(1)(A). (PSR ¶¶ 6, 40; SA:27). As part of a plea agreement, Sternquist admitted to creating at least 15 fraudulent identification cards, including a counterfeit identification card for the

8

U.S. Department of Defense. (DE:1 at 6). Sternquist also admitted to using official names, seals, and other authentication features to make the cards appear legitimate. (*Id.*). Sternquist was sentenced to a twelve-month term of incarceration for this conviction, to be followed by a three-year term of supervised release. (PSR ¶¶ 6, 40). Upon release from custody, in violation of court-imposed conditions of supervision, Sternquist committed additional crimes and was resentenced to four months' imprisonment. (PSR ¶ 40).

Thereafter, on June 30, 2010, Sternquist pleaded guilty in the United States District Court for the District of New Jersey to making and selling computerized templates for producing fake identification documents, in violation of 18 U.S.C. §§ 1028(a)(5) and (b)(3)(C). (PSR ¶¶ 6, 47; SA:27-28). The felony complaint in that case alleged that Sternquist had used computerized templates to manufacture false identification documents, including multiple driver licenses and federal law enforcement credentials, for the purpose of selling them online. (PSR ¶ 47). Sternquist was sentenced to 27 months' imprisonment, to be followed by three years of supervised release. (*Id.*). Upon release,

Sternquist again violated court-imposed conditions of supervision and was resentenced to three months' imprisonment. (PSR ¶ 47).

In addition, at the time the above-described warrant was executed, Sternquist was on pretrial release following a June 2021 state arrest for felony criminal mischief. (PSR ¶¶ 52, 57). That charge arose from allegations that Sternquist had broken nine windows of a Manhattan storefront, causing an estimated $30,000 in damage. (PSR ¶ 57).[3]

## III. Procedural History

On September 15, 2022—the day the warrant was executed— Sternquist was arrested and charged with wrongfully procuring and using government seals, in violation of 18 U.S.C. § 1017. (DE:1). Sternquist was ordered detained pending trial. (DE:3, 10). Shortly thereafter, a medical incident necessitated Sternquist's hospitalization. Sternquist sought to be released on bond. (DE:25). Following litigation on that issue, United States District Judge Eric Komitee issued a

---

[3] Sternquist had numerous other arrests and convictions prior to the instant case, including convictions for theft, carrying a concealed weapon, and possession of stolen property. (PSR ¶¶ 39, 42, 45).

memorandum and order denying Sternquist's request, finding that Sternquist presented both an unacceptable risk of flight and a danger to the community. (DE:31).

On October 17, 2022, a federal grand jury returned a three-count indictment charging Sternquist with wrongfully procuring government seals, in violation of 18 U.S.C. § 1017 (Count One); unauthorized possession of badges, identification cards, and other insignia, in violation of 18 U.S.C. § 701 (Count Two); and possession of a firearm after having previously been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1) (Count Three). (DE:40). On November 7, 2022, Sternquist filed a motion for release on bond, which the government opposed on November 9, 2022. (DE:51, 55). The district court denied that motion. (DE dated November 10, 2022).[4]

On May 30, 2023, Sternquist moved to dismiss Count Three of the indictment, arguing that the Supreme Court's decision in *Bruen*

---

[4] On June 5, 2023, Sternquist, who was at that time housed in a long-term rehabilitation facility (under the guard of the U.S. Marshals), again filed a motion for temporary release of custody to travel to an out-of-state memorial service for a family member. (DE:75). That request was denied too. (DE dated June 16, 2023).

11

had rendered Section 922(g)(1) unconstitutional. (DE:74). The government filed an opposition to the motion on June 22, 2023, and Sternquist filed a reply brief on July 3, 2023. (DE:82, 83). In a written opinion entered on September 12, 2023, the district court denied that motion. (DE:86).[5]

On December 20, 2023, Sternquist pleaded guilty to the felon-in-possession count, whereupon the government moved to dismiss without prejudice the remaining counts of the indictment. (DE dated December 20, 2023).

In connection with Sternquist's sentencing, the Probation Department determined the advisory Guidelines range to be 57 to 71 months' imprisonment, based on a total offense level of 21 and Sternquist's criminal history score of seven (Criminal History Category IV). (PSR ¶¶ 49-50, 93). On August 2, 2024, the district court adopted that range and, after hearing from Sternquist and counsel for the parties, imposed a within-Guidelines sentence of 60 months'

---

[5] The opinion was subsequently amended and re-issued on September 15, 2023. (DE:87).

12

imprisonment. (DE dated August 2, 2024; *see* DE:133). This timely appeal followed.

## SUMMARY OF ARGUMENT

*First*, Sternquist's constitutional challenge fails because *Bruen* did not abrogate longstanding Second Circuit precedent upholding the constitutionality of Section 922(g)(1)'s prohibition on possession of firearms by convicted felons. Even the Supreme Court justices who have supplied support for an expansive understanding of the Second Amendment's freedoms with respect to gun possession have consistently expressed the view that the felon-in-possession statute is not implicated by their analysis. Clear historical precedent (supported by sound policy) justifies application of the statute to Sternquist's conduct—which amply demonstrates the dangers posed by even non-violent felons' possession of firearms.

*Second*, the 60-month sentence imposed by the district court was based on a correct interpretation of the Guidelines. The district court did not clearly err in determining that the devices recovered from Sternquist's apartment included "silencers" and a "machinegun," as those terms are statutorily defined, or in counting a partially assembled handgun receiver as a "firearm." Nor was Sternquist's sentence excessive given the seriousness of the offense conduct and Sternquist's

14

extensive criminal history. The district court considered the relevant sentencing factors, explicitly weighing the impact of Sternquist's medical conditions, and imposed a within-Guidelines sentence that was reasonable and appropriate under the circumstances.

Accordingly, the judgment should be affirmed in its entirety.

ARGUMENT

POINT ONE

STERNQUIST'S CONVICTION SURVIVES *BRUEN*

Sternquist first contends that the Supreme Court's decision in *Bruen* rendered unconstitutional Section 922(g)(1)'s prohibition on gun possession by convicted felons. (SBr.25-41). As the district court correctly determined, however, *Bruen* did not abrogate longstanding precedent upholding the constitutionality of the felon-in-possession statute or cast doubt on the nation's historical tradition of disarming lawbreakers.

## I. Standard of Review

This Court reviews *de novo* challenges to the constitutionality of a statute. *United States v. Wasylyshyn*, 979 F.3d 165, 172 (2d Cir. 2020).[6]

## II. Relevant Legal Background

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the

---

[6] Unless otherwise noted, all case quotations omit internal quotation marks and citations, and they accept alterations.

people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment foreclosed regulations preventing possession of handguns by individuals in their homes, as well as regulations preventing (in essence) the use of firearms in the home for the purpose of immediate self-defense. *Id.* at 635. The Court nevertheless acknowledged that the freedoms secured by the Second Amendment were not "unlimited[,]" observing that, throughout history, "commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

In so observing, the Court specifically noted that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Id.* The Supreme Court explicitly repeated that assurance in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which held that the Second Amendment had been incorporated against the States by the Due Process Clause of the Fourteenth Amendment. *See id.* at 786. Relying on *Heller* and

*McDonald*, this Court decided in *United States v. Bogle*, 717 F.3d 281, 281-82 (2d Cir. 2013) (per curiam), that enforcement of Section 922(g)(1) did not violate the Second Amendment.

In the wake of *Heller* and *McDonald*, some circuits "adopted a two-step inquiry for analyzing laws that might impact the Second Amendment." *United States v. Diaz*, 116 F.4th 458, 463 (5th Cir. 2024). The first step addressed whether a particular law in fact restricted a right protected by the Second Amendment. *See id.* If it did, the second step applied some level of "means-end scrutiny" to ascertain whether the law could be enforced consistently with the protections of the Second Amendment. *See id.* at 463-64. Notwithstanding the advent of that approach, however, most courts continued to rely on the statements in *Heller* and *McDonald* to find that Section 922(g)(1) was constitutional. *See, e.g.*, *id.* at 463.

In 2022, the Supreme Court clarified the appropriate analysis for considering the scope of the Second Amendment's reach in *Bruen*. There, in striking down New York State's licensing regime for granting permits to carry firearms in public, the Court explained that "[d]espite the popularity of the two-step approach" for assessing restrictions on

18

firearms, "it [was] one step too many." *Id.* at 19. Instead, the Court held that the government—in justifying a particular restriction on the possession of firearms—must prevail at step one by "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

*Bruen* explained that courts may "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by assessing "whether the two regulations are 'relevantly similar.'" *Id.* at 28-29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). In doing so, courts should examine "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. The Court further explained:

> [A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check. On the one hand, courts should not uphold every modern law that remotely resembles a historical analogue, because doing so risks endorsing outliers that our ancestors would never have accepted . . . On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical

> precursors, it still may be analogous enough to
> pass constitutional muster.

*Id.* at 30.

Notably, while not necessary to decide *Bruen*, Justice Kavanaugh (joined by Chief Justice Roberts), filed a concurring opinion specifically re-emphasizing the assurances from *Heller* and *McDonald* that "longstanding" prohibitions on felons' possession of firearms remained undisturbed by the Court's analysis in the *Bruen* majority opinion. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring).

At the time the district court decided Sternquist's motion to dismiss, *Bruen* was the Supreme Court's last word on the matter. Since then, however, the Court (per Chief Justice Roberts) has further refined the relevant analysis. *See United States v. Rahimi*, 602 U.S. 680 (2024). In *Rahimi*, the Supreme Court upheld the constitutionality of 18 U.S.C. § 922(g)(8), which criminalizes possession of a firearm by a person who is, at the time of possession, subject to a domestic violence restraining order. *See id.* at 688.

With respect to the identification of an historical analogue with which to justify the modern prohibition, the Supreme Court clarified

that its prior decisions had not meant to suggest a "law trapped in amber" and that "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* at 691-92 (emphasis added).

> Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary *laws imposing similar restrictions for similar reasons* fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster.

*Id.* at 692 (emphasis added).

Having provided this guidance, the Supreme Court found that historical surety laws, as well as "going armed" laws, were sufficiently analogous to Section 922(g)(8) to establish that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 693-98, 700. Since that was the obvious policy goal embodied by

Section 922(g)(8)'s prohibition on firearm possession by those under temporary restraining orders based on the prospect of their committing domestic violence, Section 922(g)(8) did not offend the Second Amendment: "[the] provision [was] 'relevantly similar' to those founding era regimes in both why and how it burden[ed] the Second Amendment right." *Id.* at 698. The majority opinion in *Rahimi* again noted—in keeping with *Heller* and *McDonald*—that prohibitions on felons' possession of firearms were "presumptively lawful" and emphasized that nothing in its analysis should be taken as suggesting "that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Id.* at 698-99.

III. **The Same Issues Raised by Sternquist Are Currently Pending Before This Court in at Least Two Other Fully Submitted Appeals**

At the outset, it warrants noting that the arguments raised by Sternquist in this appeal have been made by two other appellants in cases currently pending before this Court. A fully briefed as-applied challenge to the constitutionality of Section 922(g)(1) by a defendant who pleaded guilty to a non-violent felony is pending before a panel of this

22

Court in *Zherka v. Bondi*, No. 22-1108 (argued May 8, 2023). A fully briefed facial challenge to Section 922(g)(1) based on the Second Amendment is pending before a panel of this Court in *United States v. Thawney*, No. 22-1399 (argued November 29, 2023). In both cases, the parties have submitted numerous letters pursuant to Federal Rule of Appellate Procedure 28(j), as well as supplemental briefs in *Zherka*, advising the respective panels of developments in the law during the pendency of the appeals, including, among other things, the Supreme Court's decision in *Rahimi*. For the sake of efficiency, the arguments below will sometimes reference and rely upon the submissions made by the government in those two cases.

IV.  **Neither *Bruen* Nor *Rahimi* Requires
Reversal of Sternquist's Conviction**

   A.  ***Bogle* Remains Binding Precedent**

      As noted above, the *Bruen* Court rejected only step two of the then-prevailing test used by some courts for evaluating firearms regulations after *Heller* and *McDonald* but the Court in no way sought to undo the holdings and observations of those prior decisions. *Bruen*, 597 U.S. at 19 ("Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's

text, as informed by history"). Accordingly, this Court's decision in *Bogle* has not been abrogated by *Bruen*. Indeed, this Court's categorical holding in *Bogle* did not relate to, or rely upon, the means-ends scrutiny that *Bruen* abrogated. It therefore remains controlling precedent. *See Bogle*, 717 F.3d at 281-82; *see United States v. Peguero*, 34 F.4th 143, 158 (2d Cir. 2022) (prior panel decisions are "binding authority from which [this Court] cannot deviate" unless, as relevant (but not present) here, "the Supreme Court's conclusion in a particular case broke the link on which [this Court] premised [its] prior decision, or undermined an assumption of that decision").

As also noted above, the conclusion in *Bogle* was premised on the observations in both *Heller* and *McDonald* that prohibitions on felons' possession of firearms are presumptively lawful. Those same observations were reiterated in a critical concurrence in *Bruen* and in the majority opinion in *Rahimi*. Under those circumstances, there is simply no basis upon which to reexamine *Bogle* since the Supreme Court has given every indication—beginning with *Heller*—that Section 922(g)(1) is constitutional and no reason that it is unconstitutional. In the wake of *Rahimi*, and on the continued strength of *Heller*'s and *McDonald*'s

24

endorsements of disarming convicted felons, at least two other courts of appeals have reaffirmed prior decisions (like *Bogle*) that upheld Section 922(g)(1) against Second Amendment challenges. *See Vincent v. Bondi*, 127 F.4th 1263, 1264-65 (10th Cir. 2025) (noting that the court was bound by its prior precedent relying on *Heller* and *McDonald* unless that precedent had been "indisputably and pellucidly abrogated" and finding that "*Rahimi* doesn't clearly abrogate the presumptive validity of § 922(g)(1)" reflected in those earlier Supreme Court cases); *United States v. Dial*, No. 24-10732, 2024 WL 5103431, at *2-3 (11th Cir. Dec. 13, 2024) (per curiam) (observing that prior circuit precedent had interpreted *Heller* as "limiting the Second Amendment right to law-abiding and qualified individuals and as clearly excluding felons from those categories by referring to felon-in-possession bans as presumptively lawful" and concluding that *Rahimi* did not undermine, but rather reinforced, that interpretation). This Court should do the same and re-affirm *Bogle*.[7]

---

[7] This Court has upheld the constitutionality of Section 922(g)(1) multiple times after *Rahimi* but, in each instance, on plain error review. *See, e.g.*, *United States v. Simmons*, No. 23-6771, 2025 WL 615459, *5 (2d Cir. Feb. 26, 2025); *United States v. Ruhl*,

25

B.    Sternquist Is Not a Law-Abiding
       Citizen Covered by the Second Amendment

Even if this Court were inclined to reexamine *Bogle*, it should

find that Sternquist's conviction is constitutional because Sternquist is

not a "law-abiding" citizen (in fact, a recidivist felon) and, as such, is

precluded from possessing a firearm based on a longstanding, historical

tradition of disarming felons that does not run afoul of the Second

Amendment.

The Second Amendment protects the rights of "law-abiding,

responsible citizens" to bear arms, as the Supreme Court has repeatedly

stated, including in *Bruen*.   597 U.S. at 26.   That category does not

include felons.   The *Heller* Court found that the term "the people," as it

is used in six other provisions of the Constitution, "unambiguously refers

to all members of the political community, not an unspecified subset[,]"

and thus that "a strong presumption [exists] that the Second Amendment

right is exercised individually and belongs to all Americans."  554 U.S. at

580-81; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265

---

No. 21-2892, 2025 WL 262309, *1 (2d Cir. Jan. 22, 2025) (affirming on
plain error review conviction under Section 922(g)(1) where prior felony
conviction was for forgery).

(1990). The Court, however, also held (as noted above) that the right secured by the Second Amendment is "not unlimited" and proceeded to explain that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." *Heller*, 554 U.S. at 626-27; *see also McDonald*, 561 U.S. at 786 (plurality "repeat[ing the] assurances" set forth in *Heller* that the decision "did not cast doubt on [certain] longstanding regulatory measures").

The *Bruen* Court's repeated characterization of the right guaranteed by the Second Amendment as belonging to "law-abiding citizens" (no fewer than 14 times in the majority opinion), *see United States v. Price*, 656 F. Supp. 3d 772, 774-75 (N.D. Ill. 2023), is consistent with the carve-outs noted in *Heller* and *McDonald*, *see Bruen*, 597 U.S. at 71 (finding New York's licensing requirement unconstitutional for "prevent[ing] law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms"). *See id.* at 60 (summarizing historical evidence of gun regulations and finding "none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose"). Indeed, every member of the Court apparently agreed that the Second Amendment pertains to the

27

rights of law-abiding citizens only. *See id.* at 8-10 (majority), 79-80 (Kavanaugh, J. concurring), 72 (Alito, J. concurring), and 131 (Breyer, J. dissenting).

Federal courts have thus recognized that although individuals convicted of a felony may be part of "the people," their Second Amendment rights are not co-extensive with those of "law-abiding citizens." *E.g., Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) (felons "not among those entitled to possess arms"); *Hamilton v. Pallozi*, 848 F.3d 614, 626 (4th Cir. 2017) ("[W]e simply hold that conviction of a felony necessarily removes one from the class of 'law-abiding, responsible citizens' for the purposes of the Second Amendment[.]"); *Bogle*, 717 F.3d at 281-82 & n.1 ("join[ing] every other circuit to consider the issue in affirming that § 922(g)(1) is a constitutional restriction"; collecting cases); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam) (felons as a class fall outside the scope of the Second Amendment); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009) (same).

*Bruen* reinforced that conclusion, as it approved of "shall-issue" regimes that "require applicants to undergo a background check or pass a firearms safety course." 597 U.S. at 38 n.9; *see id.* at 80-81

28

(Kavanaugh, J., concurring) ("[S]hall-issue licensing regimes are constitutionally permissible"). In reaching that result, the Court had no occasion to analyze the history of shall-issue licensing regimes. Instead, it explained that those regimes generally pass constitutional muster because they "are designed to ensure only that those bearing arms . . . are, in fact, law-abiding, responsible citizens." *Id.* at 38 n.9; *see also Antonyuk v. James*, 120 F.4th 941, 998 (2d Cir. 2024) (upholding New York State licensing regime for firearms after *Bruen* and *Rahimi* because it mandated "the issuance of a license to anyone except those found to present a danger to the community").[8] Such reasoning reinforces that Section 922(g)(1)—which likewise aims to ensure that "those bearing arms" are "law-abiding, responsible citizens"—accords with the Second Amendment. *Bruen*, 597 U.S. at 38 n.9; *see also United States v. Hunt*, 123 F.4th 697, 704 (4th Cir. 2024) (finding that neither *Bruen* nor *Rahimi* provided any basis upon which to disturb the court's prior precedent

---

[8] *See Thawney*, No. 22-1399, Dkt. No. 69, at 54 n.6 (citing examples of "shall issue" licensing regimes that categorically preclude the issuance of a license to anyone convicted of a felony).

holding that convicted felons fell outside the scope of "law-abiding" citizens protected by the Second Amendment).

Sternquist argues that "the people" referenced in the Second Amendment are the same people referenced in other Amendments, which do not draw distinctions based on prior felony convictions. (SBr.31-32). But our nation's history demonstrates a longstanding tradition of excluding those convicted of felonies from the right to vote, hold public office or serve on a jury, all of which are political rights akin to that conferred by the Second Amendment. *See, e.g.*, *United States v. Riley*, 635 F. Supp. 3d 411, 425 (E.D. Va. 2022). "Therefore, it would seem strange that the Founders considered the right to bear and keep arms somehow less prone to restriction than the right to cast a ballot," especially when those two rights "are historically closely knit."[9] *Id.*

---

[9] The contention by the Sixth Circuit in *United States v. Williams*, 113 F.4th 637, 647 (6th Cir. 2024), that those other rights (the right to vote, serve on a jury, etc.) are "civic" rights (*i.e.*, rights that are "exercised collectively"), as opposed to the right to keep and bear arms, which is an "individual" right, is unpersuasive. The government submits that all such rights are best understood as individual rights— particularly the right to vote, which can be understood as a variation on the right to self-defense. *Cf. Medina*, 913 F.3d at 160 ("The commission of a felony often results in the lifelong forfeiture of a number of rights, including the right to serve on a jury and the fundamental right to vote.

By that light, Sternquist's multiple felony convictions plainly situate Sternquist outside the category of people with full Second Amendment protection. Indeed, the frequent references throughout recent Supreme Court cases to "law-abiding" persons' right to enjoy the protections of the Second Amendment speaks to the long-held understanding that Congress can restrict firearms possession by those who cease to abide by the law. As shown below, this understanding enjoys a robust historical pedigree. Even those courts that have declined to find felons categorically excluded from "the people" have taken account of the Supreme Court's rhetoric in assessing whether Section 922(g)(1) is consistent with the nation's tradition of firearms regulation. *See Diaz*, 116 F.4th at 466-67 ("Diaz's status as a felon is relevant to our analysis, but it becomes so in *Bruen*'s second step . . . rather than in considering the Second Amendment's initial applicability").

V.    The Government Has Met Its Post-*Bruen* Burden of Proof

Even if Sternquist's challenge were not foreclosed by *Bogle*, *Heller*, *Bruen*, and the plain text of the Second Amendment (it is), a

---

A prohibition on firearm ownership, like these other disabilities, is a reasonable consequence of a felony conviction").

review of "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, would independently compel the same conclusion. Several courts have traced the long historical tradition—both before and around the time of the country's founding—of disarming those who demonstrated disobedience toward the sovereign, regardless of whether that disobedience bore any relationship to violence or dangerousness. Multiple courts of appeals have reaffirmed those conclusions after *Bruen* and *Rahimi*. *See, e.g., Hunt*, 123 F.4th at 706-07; *United States v. Jackson*, 110 F.4th 1120, 1126-29 (8th Cir. 2024).

The government's briefs in *Zherka* and *Thawney* lay out the historical record showing that legislatures have long been understood to have the power to prohibit those who did not show sufficient respect for the law from possessing firearms. *See Zherka*, No. 22-1108, Dkt. No. 79 at 17-26; *Thawney*, No. 22-1399, Dkt. No. 69 at 57-65. The historical sources cataloged there overlap substantially with the ones identified as persuasive historical analogues for Section 922(g)(1) in *Jackson*, *Hunt*, and other cases. Among the referenced materials, for example, is evidence that colonial legislatures regularly prohibited disfavored classes of people (Native Americans and religious minorities, among others) from

owning firearms. *See Jackson*, 110 F.4th at 1126. Similarly, "[i]n the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty." *Id.* Taken together, these sources "support[] the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.* at 1127.

These and other historical examples also support the proposition that legislatures could disarm "categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." *Jackson*, 110 F.4th at 1128. Significantly, the assessment of the danger posed could be made by the legislature at the class level. As the Eighth Circuit observed: "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons." *Id.* at 1127-28. "This history demonstrates that

there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."[10] *Id.*

Historical sources also conclusively establish that disarmament (or worse) was well understood to be a permanent penalty for serious crimes. "Early legislatures . . . ordered forfeiture of firearms by persons who committed non-violent hunting offenses . . . And they authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property." *Jackson*, 110 F.4th at 1127; *see also Diaz*, 116 F.4th at 468 ("Our own research reveals that those convicted of horse theft . . . were often subject to the death penalty"). Other non-violent crimes that were punishable by death included smuggling, fraudulent bankruptcy, violating quarantine, or

---

[10]    The "going armed" laws referenced in *Rahimi*, 602 U.S. at 697-98, also show that disarmament was considered an appropriate penalty for individuals who had shown themselves to be dangerous in a specific way. *See also Diaz*, 116 F.4th at 470-71 (concluding that the same "going armed" laws referenced in *Rahimi* as historical analogues for Section 922(g)(8) also provided historical support for Section 922(g)(1) since they provided for the permanent disarmament of persons who violated them).

forging a marriage license. *See Zherka*, No. 22-1108, Dkt. No. 158 at 4-5. As uniquely relevant here, "forgery" was considered a capital offense. *See United States v. Perez-Garcia*, 96 F.4th 1166, 1183-84 (9th Cir. 2024). So too was "counterfeiting." *See United States v. Quiroz*, 125 F.4th 713, 720 (5th Cir. 2025).

In addition, a "highly influential 'precursor' to the Second Amendment" was "the Address and Reasons of Dissent of the Minority of the Convention and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). That included a proposal to protect the right to bear arms, prohibiting laws that "disarm[] the people or any of them unless for crimes committed, or real danger of public injury from individuals." *Id.* at 648 (Sykes, J., dissenting). This proposal's "use of the word 'or'" shows that its authors distinguished between criminal convictions and dangerousness and that they supported disarmament for either or both. *See Medina*, 913 F.3d at 158-59 (same proposal's "use of the word 'or'" demonstrates that "criminals, in addition to those who posed a 'real danger' . . . were proper subjects of disarmament").

35

Under these precedents, Section 922(g)(1) fits within the historical regulation of firearms as a restriction on possession of weapons by a class of persons who have demonstrated a disregard for the law, or by those deemed by the legislature to exhibit a risk of danger, or as a punishment for having committed a serious crime—or all three. As the Eighth Circuit put it:

> [L]egislatures traditionally employed status-based restrictions to disqualify categories of persons from possessing firearms. Whether those actions are best characterized as restrictions on persons who deviated from legal norms or persons who presented an unacceptable risk of dangerousness, Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons.

*Jackson*, 110 F.4th at 1129; *see also Hunt*, 123 F.4th at 707 ("Just as early legislatures retained the discretion to disarm categories of people because they refused to adhere to legal norms in the pre-colonial and colonial era, today's legislatures may disarm people who have been convicted of conduct the legislature considers serious enough to render it a felony"). To use the language of *Bruen* (and *Rahimi*), "both the why (whether 'modern and historical regulations' impose a 'burden' on the Second Amendment right that was 'comparably justified') and the how

(whether the regulations 'impose a comparable burden on the right of armed self-defense') support Section 922(g)(1)'s constitutionality." *Hunt*, 123 F.4th at 707 (quoting *Bruen*, 597 U.S. at 29). Accordingly, the nation's history and tradition of firearms regulation supports Congress's enactment of Section 922(g)(1) as a legitimate criminal sanction that does not infringe the Second Amendment.

VI. Sternquist's Facial and As-Applied
     Challenges to Section 922(g)(1) Fail

Against this historical backdrop, Sternquist contends that Section 922(g)(1) is facially unconstitutional. (*See* SBr.33-38). As the Supreme Court has observed, a facial challenge is the most difficult to sustain because, to succeed, it must be shown that the statute can have no possible applications that would be constitutional. *See Rahimi*, 602 U.S. at 693 ("[T]o prevail, the Government need only demonstrate that Section 922(g)(8) is constitutional in some of its applications"). In view of the clear historical precedents that legislatures could, consistent with the Second Amendment, disarm persons found to be dangerous, Section 922(g)(1) is plainly constitutional where it works to bar firearms possession by individuals who have been convicted of violent felonies.

Even courts of appeals that have resisted concluding that Section 922(g)(1) is constitutional in all respects have acknowledged that facial challenges to the statute cannot be sustained. *See, e.g.*, *Williams*, 113 F.4th at 657 ("[O]ur nation's history and tradition demonstrate that Congress may disarm individuals they believe are dangerous. Section 922(g)(1) is an attempt to do just that. Because . . . most applications of § 922(g)(1) are constitutional, the provision is not susceptible for a facial challenge").

With respect to Sternquist's as-applied challenge (SBr.38-40), the government respectfully submits that this Court should follow the lead of the Eighth and Fourth Circuits and hold that Section 922(g)(1) is constitutional without the need for "felony-by-felony litigation." *Jackson*, 110 F.4th at 1125. The history of Section 922(g)(1)'s enactment shows that it was a deliberate effort to respond to the risk of firearms being used by individuals whom Congress had determined posed a risk of danger. *See id.* at 1127-28. Notably, the statute only prohibits firearms possession by those convicted of crimes punishable by more than one year, a limitation that reasonably functions as a proxy for serious criminal conduct. Given *Rahimi*'s guidance concerning how strictly a

court should make a comparison between a modern statute and its historical counterpart, Congress's assessment of risk in this context passes constitutional muster. As the Fourth Circuit has explained:

> [T]he power to determine the content of the criminal law is serious business. But legislatures have always had that power, and it is subject to few constitutional constraints. And there is no doubt that legislatures can subject people found to have engaged in serious criminal conduct to consequences the Constitution would otherwise forbid, including—most notably—deprivations of life, liberty, or property . . . We conclude that the same is true of the ability to lawfully possess a firearm.

*Hunt*, 123 F.4th at 707.

Even if this Court were to permit as-applied challenges to Section 922(g)(1), Sternquist's challenge would fail. As detailed above, at the time of the offense conduct, Sternquist had been convicted of two prior federal felonies for which Sternquist was sentenced to a total of 39 months' incarceration (plus additional jail time for violations of supervised release). Those felonies involved the creation and sale of fraudulent identification documents, including documents for government agencies. Comparable historical crimes—forgery and counterfeiting—were capital offenses; courts have generally found that

39

crimes authorizing the ultimate punishment necessarily permit the lesser punishment of disarmament. *See, e.g.*, *Diaz*, 116 F.4th at 469-70 (denying an as-applied challenge to Section 922(g)(1) when prior offense was "theft," which historically would have resulted in either capital punishment or estate forfeiture).

As a practical matter, Sternquist's prior conduct of creating fraudulent identification documents indicates an ability to potentially access (or to allow others to access) sensitive locations without authorization, which necessarily results in danger. That Sternquist in fact continued to manufacture fraudulent identification documents while also assembling homemade automatic weapons vividly illustrates those possible risks. Under these circumstances, when considering Sternquist's entire criminal history, which also includes a felony conviction for theft in Texas state court when Sternquist was 19 years old (PSR ¶ 39), it is clear Sternquist is someone who would have been vulnerable to disarmament in the founding era. *Cf. Williams*, 113 F.4th at 659-60 (finding Section 922(g)(1) constitutional only as applied to "dangerous" persons, but allowing courts to consider not just the "particular felony (if any) listed in an indictment or plea agreement" but

40

also "any evidence of past convictions in the record, as well as other judicially noticeable information—such as prior convictions—when assessing a defendant's dangerousness").

This case is thus nothing like *Range v. Attorney General of the United States*, 124 F.4th 218 (3d Cir. 2024) ("*Range II*") (en banc). In *Range II*, the Third Circuit affirmed its prior holding in *Range v. Attorney General of the United States*, 69 F.4th 96 (3d Cir. 2023) (en banc), sustaining an as-applied challenge to Section 922(g)(1) by a petitioner who had been convicted of a misdemeanor offense (making a false statement on an application for food stamps) that carried up to a five-year penalty. *Range II* at 222-23, 232. In doing so, the court noted that its decision was a "narrow one" and limited to the facts of that case. *See id.* at 232.

As an initial matter, the analysis employed in *Range II* is inconsistent with *Bruen* and *Rahimi* in that it used too specific a lens in evaluating the country's longstanding tradition of prohibiting those who did not respect the law from possessing firearms. Indeed, the court rejected many analogous laws and instead required what was in effect a historical twin. *See Range II* at 292-93 (Shwartz, J., dissenting)

41

(explaining that the majority required the government "to identify a historical crime, including its punishment, that mirrors" the petitioner's conviction, even though *Rahimi* specifically disavowed this very approach). This is flatly inconsistent with the Supreme Court's latest guidance. *See Rahimi*, 602 U.S. at 698 ("Section 922(g)(8) is by no means identical to [surety and going armed laws], but it does not need to be . . . Its prohibition on the possession of firearms by those found by a court to present a threat to others fits neatly within the tradition that surety and going armed laws represent").

In addition, *Range II* (and its predecessor opinion) is factually distinguishable from this case. As discussed above, Sternquist's counterfeit documents created a specific risk: their purchasers could use them to misrepresent themselves as law enforcement officers to intimidate or menace others or gain access to secure locations. This is unlike food-stamp fraud that does not present a discernible risk to public safety. Moreover, unlike the defendant in *Range II*, whose criminal history was limited to "minor traffic and parking infractions and a summary offense for fishing without a license" in the decades after his misdemeanor conviction, *see* 124 F.4th at 223, Sternquist was convicted

42

of two federal felonies within three years and violated court-imposed terms of supervised release both times. After learning that he had been barred from purchasing a firearm because of his misdemeanor conviction, the defendant in *Range II* sought judicial protection from prosecution under Section 922(g)(1) for any future possession of a firearm. *Id.* at 232. Sternquist, on the other hand, committed a third federal offense by stockpiling numerous dangerous firearms while in possession of fraudulent law enforcement credentials (a separate federal crime). Accordingly, the narrow holding in *Range II* is inapplicable here.

\*   \*   \*

For all these reasons, the Court should conclude—as the district court did—that *Bruen* did not abrogate precedent upholding the constitutionality of Section 922(g) or cast doubt on the nation's historical tradition of disarming lawbreakers. Sternquist's conviction should be affirmed.

POINT TWO

STERNQUIST'S SENTENCE WAS
PROCEDURALLY AND SUBSTANTIVELY REASONABLE

Sternquist challenges the district court's sentence as both procedurally and substantively unreasonable. As a procedural matter, Sternquist contends that the district court's calculation of the Guidelines erred in two ways. *First*, it relied on a disputed finding that Sternquist possessed a silencer and/or machinegun, which enhanced to 20 the base offense level under U.S.S.G. § 2K2.1(a)(4)(B)(II). (SBr.42-50). *Second*, Sternquist claims, the district court counted each of the (disputed) silencers and an unassembled handgun receiver to increase the total number of firearms in Sternquist's possession and thus trigger a four-point enhancement under U.S.S.G. § 2K2.1(b)(1)(B). (*Id.*).

As a substantive matter, Sternquist challenges the district court's weighing of various factors at sentencing, ultimately arguing that the within-Guidelines sentence was "too long." (SBr.52-58). As explained below, these arguments lack merit.

I.    Standard of Review

This Court reviews a defendant's challenge to his sentence under a reasonableness standard that contains both procedural and

substantive components. *United States v. Friedberg*, 558 F.3d 131, 133 (2d Cir. 2009). In that context, "'reasonableness' is inherently a concept of flexible meaning, generally lacking precise boundaries," *United States v. Crosby*, 397 F.3d 103, 115 (2d Cir. 2005), and this Court's review of sentences for reasonableness "should exhibit restraint, not micromanagement," *United States v. Fleming*, 397 F.3d 95, 100 (2d Cir. 2005). In practice, the reasonableness standard is "a particularly deferential form of abuse-of-discretion review that [the Court will] apply both to the procedures used to arrive at the sentence (procedural reasonableness) and to the length of the sentence (substantive reasonableness)." *United States v. Broxmeyer*, 699 F.3d 265, 278 (2d Cir. 2012); *see United States v. Cavera*, 550 F.3d 180, 187 (2d Cir. 2008) (en banc) (reasonableness review "amounts to review for abuse of discretion").

A. <u>Procedural Reasonableness</u>

When reviewing a sentence for procedural reasonableness, this Court will "check the sentence to ensure . . . that the district court followed the right steps in imposing it." *United States v. Ramos*, 979 F.3d 994, 998 (2d Cir. 2020). "A district court commits procedural error when

it fails to calculate (or improperly calculates) the Sentencing Guidelines range, treats the Sentencing Guidelines as mandatory, fails to consider the 18 U.S.C. § 3553(a) factors, selects a sentence based on clearly erroneous facts, or fails adequately to explain the chosen sentence." *United States v. Traficante*, 966 F.3d 99, 102 (2d Cir. 2020).

In reviewing a sentencing court's Guidelines calculation, its "determination of the application of a Sentencing Guideline is a question of fact, entitled to the 'clearly erroneous' standard of review." *United States v. Lanese*, 890 F.2d 1284, 1291 (2d Cir. 1989). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Norman*, 776 F.3d 67, 76 (2d Cir. 2015). Instead, "[a] finding of fact is clearly erroneous only if, after reviewing all of the evidence, this Court is left with the definite and firm conviction that a mistake has been committed." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). And factual findings in the context of assessing the applicability of Guidelines enhancements "need be supported only by a preponderance of the evidence." *United States v. Ryan*, 806 F.3d 691, 694 (2d Cir. 2015).

Nor does procedural reasonableness "require that a district court refer specifically to every factor in section 3553(a)." *United States v. Goffi*, 446 F.3d 319, 321 (2d Cir. 2006) (reliance on "seriousness" of defendant's offenses and "the need to protect society" was procedurally reasonable to justify above-Guidelines sentence); *see United States v. Verkhoglyad*, 516 F.3d 122, 131 (2d Cir. 2008) ("the law does not impose any rigorous requirement of specific articulation on sentencing judges with respect to their consideration of 3553(a) factors"). Rather, "[a]s long as the judge is aware of both the statutory requirements and the sentencing range or ranges that are arguably applicable, and nothing in the record indicates a misunderstanding about such materials or misperception about their relevance," this Court "will accept that the requisite consideration [of the Section 3553(a) factors] has occurred." *Fleming*, 397 F.3d at 100.

B.    <u>Substantive Reasonableness</u>

On a review for substantive reasonableness, this Court will set aside a district court's sentence only "in exceptional cases where the trial court's decision cannot be located within the range of permissible decisions." *Cavera*, 550 F.3d at 189. Put plainly, the Court will uphold

47

a sentence unless it is "so shockingly high, shockingly low, or otherwise unsupportable as a matter of law that allowing [it] to stand would damage the administration of justice." *United States v. Muzio*, 966 F.3d 61, 64 (2d Cir. 2020); *see Verkhoglyad*, 516 F.3d at 134 ("Although the brevity or length of a sentence can exceed the bounds of 'reasonableness,' we anticipate encountering such circumstances infrequently").

And while this Court has expressly declined to presume that a within-Guidelines sentence is substantively reasonable, it has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Watkins*, 667 F.3d 254, 261 (2d Cir. 2012); *cf. United States v. Fiumano*, 721 F. App'x 45, 50 (2d Cir. 2018) ("A Guidelines sentence will rarely raise such concerns; a below-Guidelines sentence even less so").

In conducting its review, this Court must consider the "totality of the circumstances, giving due deference to the sentencing judge's exercise of discretion, and bearing in mind the institutional advantages of district courts." *Cavera*, 550 F.3d at 190. "The particular weight to be afforded aggravating and mitigating factors is a matter

48

firmly committed to the discretion of the sentencing judge." *Broxmeyer*, 699 F.3d at 289. In the end, "if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, [this Court] will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor." *United States v. Pope*, 554 F.3d 240, 246-47 (2d Cir. 2009).

II.   Sternquist's Sentence Was Procedurally Reasonable

    A.   The District Court Properly
        Determined the Base Offense Level

Contrary to Sternquist's contentions on appeal (SBr.42-52), the district court did not err in calculating a base offense level of 20 upon finding that the offense of conviction involved silencers and/or a machinegun within the meaning of U.S.S.G. § 2K2.1(a)(4)(B).

    1.   Sternquist Possessed At Least One "Silencer"

The record shows that Sternquist possessed at least one firearm silencer. According to 26 U.S.C. § 5845(a), the term "firearm" includes any "silencer" as defined by 18 U.S.C. § 921. Section 921(a)(25), in turn, defines a "firearm silencer" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any

49

combination of parts, designed or redesigned, and intended for use in assembling or fabricating a [silencer], and any part intended only for use in such assembly or fabrication." Technical examiners for the ATF analyzed several items recovered from Sternquist's apartment and concluded that 15 of them qualified as "silencers" under the definition in Section 921(a)(25).

This conclusion followed from the observation that those items generally consisted of cylindrical metal tubes that had "front and rear end-caps . . . and multiple baffles" for use inside the tubes—all standard design features of devices intended to function as silencers. (SA:145). As explained in the ATF reports, the "end-caps," when attached to the metal tubes (which are, in turn, attached to firearms), are designed to create "expansion chambers" within which hot propellant gases, emitting from the barrel of a gun after a bullet is fired, expand and cool before slowly being released into the atmosphere, thereby reducing the sound created by a gunshot. (*Id.*). "Baffles" are generally used "to slow, create turbulence in, or redirect the flow of hot propellant gases [and] can be used to segregate a large expansion chamber to create multiple, smaller expansion chambers of various sizes by stacking several baffles

50

together." (*Id.*). The reports referenced and attached the patent for baffles, U.S. Patent No. 8,910,745 B2, which described their design purpose and characteristics. (SA:146). The analysis and observations documented in these reports were sufficient to establish that the items are "silencers" by a preponderance of the evidence.

Sternquist argues that since some of the items had not been "drilled" (meaning that they would not—without modification—permit a bullet to pass through the cylinders) they should not be classified as "silencers." (*See* SBr.45). The ATF reports rebut this point. As explained in the report that discussed ATF Exhibit No. 1, for example, the fact that "[n]one of the baffles or the front end-cap feature a centrally located hole to facilitate the passage of a projectile" is not dispositive as to their purpose, since "they each possess a small dimpling in the center." (SA:140). This "dimpling" is designed to "create[] a reference point which designates the correct location to drill the center hole" that would permit a projectile to pass through the front end-cap and the baffles without obstruction. (*Id.*). The report added that "unfinished center holes are advantageous . . . as [they allow] the center hole sizes to be customized by the end-user to maximize efficiency." (*Id.*). The report also observed

that the front end-cap could be drilled in approximately five minutes. (*Id*.). Accordingly, the absence of drilled holes in some or all relevant pieces does not remove them from the statutory definition of a "silencer."

Notwithstanding that certain component parts were not fully drilled, the ATF examiners were able to affix certain of the devices to firearms and conduct test fires (without the use of undrilled baffles) to determine whether certain devices, in fact, muffled the noise of a gunshot. (SA:148-52, 154-57). The results of those experiments showed that the relevant devices reduced the noise of a gunshot in each instance. (*Id*.). Accordingly, the test-fires demonstrate that the devices did, in fact, "silenc[e], muffl[e], or diminish[] the report of a portable firearm"— fulfilling the definition of a "silencer" set forth in Section 921(a)(25).

As supposed proof that the devices were not intended for use as silencers, Sternquist observes that the tested devices only slightly reduced the decibel levels of the sounds created by the test-fires. (SBr.15, 45-46 (the "items were quite bad at muffling gunshots")). The definition of a "silencer," however, does not require the achievement of any measurable minimum sound reduction. In any event, the relevant tests in this case were conducted without the use of the baffles, which

52

accompanied each device—meaning, the potential sound-reduction capability of any particular device was much greater than the one actually measured. (SA:148 (test-fire was performed with a "simplistic silencer" that was "simply one large expansion chamber")). Notwithstanding this qualification, courts have upheld convictions for the illegal possession of silencers for devices that have produced less decibel reduction than the devices at issue here. *See, e.g.*, *United States v. Kavoukian*, 354 F.3d 117, 119 (2d Cir. 2003) (affirming conviction for possession of an illegal silencer for device that "was capable of reducing the volume of a shot fired from a 22-caliber firearm by about 3.2 decibels"). The law is also clear that Sternquist need not have tested the device as a silencer for it to qualify as such. *See id.* at 120 ("a defendant can be convicted of making or possessing a firearm silencer without proof that he knew from experience that the silencer functions.").

Sternquist also argues that, even if the identified items could function as silencers, there is no evidence that Sternquist intended them to be used as such. (SBr.43-45). Without citation to evidence in the record, Sternquist asserts that the devices could have been intended as solvent traps—devices that collect solvent fluid used to clean a firearm.

(SBr.44 (stating, without support, that the devices "appeared to have been purchased on the regular internet as solvent traps")). Here, the evidence of the necessary intent to classify the devices as silencers is amply supplied by the characteristics of the devices themselves, as detailed in the ATF reports and illustrated by commentary upon which Sternquist relied in objecting to the PSR. For example, as noted above, the relevant items feature baffles—components that serve no function whatsoever for solvent traps but that do enhance the muffling capability of silencers. (GSA:53 (devices purporting to be solvent traps "often come with a set of 'spacers' which resemble firearm silencer baffles" and observing that "[t]hese 'spacers' serve no legitimate purpose in a 'solvent trap.'")). In addition, as noted above, the items were manufactured with indentations indicating where to drill holes to permit projectiles to pass through unobstructed. (SA:140 (front and rear end-caps possessed "small dimpling[s]" indicating where holes should be drilled)). Like baffles, such indentations serve no function for solvent traps but do facilitate the operation of the devices as silencers.[11]

---

[11] *See, e.g.*, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Open Letter to All Federal Firearm Licensees*, 1-2 (Nov. 20,

A person, like Sternquist, engaged in the (successful) manufacture of multiple privately assembled firearms, is fairly charged with knowledge of these technical design features. It is also implausible that someone with Sternquist's base of knowledge and prior military service (*see* PSR ¶ 63) would possess 15 separate solvent traps—nearly twice the number of recovered firearms—when just one solvent trap would ostensibly suffice to collect dirty solvent as it runs out of the muzzle of a particular firearm during the cleaning process. (GSA:59 ("Legitimate solvent traps are attached to the muzzle of a firearm barrel designed to catch or 'trap' dirty cleaning solvent pushed through the barrel from the chamber end and out through the muzzle. Solvent traps are intended to prevent solvent from dripping, spraying, or spattering when pushed out the muzzle end of a firearm barrel")). The purported "solvent traps" found in Sternquist's apartment possessed no design

---

2023), https://www.atf.gov/file/186521/download ("[H]oles (or marks indicating where holes should be drilled) that allow the passage of a projectile are clear indicators that the device or component parts may be properly classified as 'firearm silencers,' because this allows the propellant gasses to expand and cool. By contrast, a hole serves no purpose in collecting solvent or debris and is actually contrary to the purported use of a 'solvent trap.'").

features to accomplish this lone purpose. Instead, they shared virtually all design features with known firearm silencers. Since solvent traps can be emptied of dirty solvent and reused, the sheer number of devices possessed by Sternquist is evidence of an intent to use them not as solvent traps, but as silencers. At a minimum, it was not clearly erroneous for the district court to so conclude.

The reasoning of *United States v. Crooker*, 608 F.3d 94, 95-96 (1st Cir. 1999) (per curiam), does not apply here because the device at issue in *Crooker* was a silencer designed to muffle the noise of an air gun that could not—without the use of an adapter—be used to muffle the noise of a conventional, "powder bearing" firearm. The *Crooker* court distinguished devices (like Sternquist's) that were plainly designed to be compatible with firearms, noting that "[i]n the ordinary criminal case, the device charged as a silencer is one manufactured for use with a firearm and is easily connected (*e.g.*, by threading one onto another); and the possessor knows perfectly well the intended function of the device." *Id.* at 96-97.

In this case, the ATF reports classified as silencers multiple items recovered from Sternquist's apartment, after they were

56

successfully affixed to firearms for test-firing without the need for additional equipment. (*See* SA:148-52). Coupled with the product design features described above and Sternquist's knowledge and familiarity with firearms, the record amply supported (at least by preponderant evidence) the district court's factual finding that the items were "silencers" as defined in 18 U.S.C. § 921(a)(25).

### 2. Sternquist Possessed a Machinegun

Even if the district court erred by concluding that the devices described above qualify as silencers (it did not), a base offense level of 20 would still have been appropriate because Sternquist possessed a "machinegun" within the meaning of U.S.S.G. § 2K2.1(a)(4)(B).

An ATF technical examiner determined that one of the firearms Sternquist possessed (identified in the examiner's reports as ATF Exhibit No. 22) fit the statutory definition of "machinegun." (SA:176). Section 5845 defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). As described in a report of technical examination, ATF Exhibit No. 22 ("Exhibit 22") had a "three-

position safety selector" that allowed the gun to be placed in safe mode, "semiautomatic" mode, or "automatic" mode. (SA:176). When the selector was placed in the "automatic" setting, the gun test-fired two bullets with a single pull of the trigger on two occasions. (SA:176-77). On two other occasions, the gun test-fired the first bullet of a multi-round load but failed to fire the second; on each of those occasions, the unfired bullet exhibited a "light primer strike," indicating that the gun had attempted to discharge the bullet but lacked sufficient force to do so due to its "hammer follow" design. (*Id*.). Under these circumstances, the district court did not clearly err in concluding that the firearm was a "machinegun" insofar as it was designed to, and did, fire more than one bullet with a single trigger pull, without requiring any repair or modification. (SA:94-100).

The district court also acted within its discretion in rejecting Sternquist's argument that the Supreme Court's recent decision in *Garland v. Cargill*, 602 U.S. 406 (2024), compelled a contrary conclusion. *Cargill* involved an assessment by the Supreme Court of a "bump stock"—an accessory device designed to be attached to a semiautomatic firearm. A bump stock harnesses the energy generated by the firearm's

58

recoil to repeatedly "bump" the trigger of the gun against a stationary trigger finger, thereby simulating the automatic fire of a machinegun. *See Cargill*, 602 U.S. at 420-22. Though the trigger is manually depressed by the shooter only once, the action generated by the bump stock effectively pulls the trigger multiple times in rapid succession, with each trigger pull corresponding to one shot of the firearm. *See id.* at 422-23. The Supreme Court held that the bump stock could not therefore qualify as a "machinegun" because it did not result in a firearm that fired more than one shot "by a single function of the trigger." *See id.* at 423.

The Supreme Court further held that, even if the use of a bump stock could result in the firing of multiple shots by one trigger pull, it still would not fit the definition of "machinegun" because the firing did not occur "automatically." This was so because, to create the desired result, the user of the bump stock must depress the trigger and also "maintain just the right amount of forward pressure on the [gun's] front grip with his nontrigger hand." *Cargill*, 602 U.S. at 424. Accordingly, because the firing of multiple shots requires more than just a single trigger pull—in that case, constant forward pressure—the bump stock

does not "automatically" fire more than one shot based solely on a single function of the trigger. *See id.* at 427.

None of the Supreme Court's observations concerning bump stocks has relevance to the classification of Exhibit 22 as a machinegun. As documented in the relevant ATF report, Exhibit 22 was equipped with a "three-position safety selector" allowing the shooter to toggle between three settings: safe, "semiautomatic," and "automatic." (SA:176). This fact alone makes it difficult to see how the weapon was neither "designed to shoot" nor incapable of being "readily restored to shoot" automatically. 26 U.S.C. § 5845(b).

In any event, the report further noted that the firearm had been created using an "M16-type bolt carrier" with various component parts and that the gun functioned in a "hammer follow" method, whereby "the hammer is not retained by the disconnector and follows the bolt as it feeds the cartridge into the chamber." (SA:176). Because of that design, the report observed that the "hammer fall is uncontrolled and may lack sufficient force to detonate the primer of the cartridge"; notwithstanding that possibility, "[h]ammer follow AR-type firearms that shoot automatically are classified as 'machineguns.'" (*Id.*).

60

To be sure, when the ATF examiner test-fired Exhibit 22 in the "automatic" setting, the gun fired more than one bullet with a single trigger pull on two occasions. (SA:177). It is true that the firearm on some occasions fired only one bullet in the automatic setting, but the report explained that was due to the "hammer follow" method of construction—in each such instance, the examiner noted "a light primer strike" on the "unfired cartridge." (*Id*.). In this case, the firearm was clearly designed to, and did, fire multiple shots "automatically" with a single trigger pull. That the firearm may not have performed its intended function with perfect reliability has no legal significance.

In the weapon's inconsistent performance Sternquist sees proof that no machinegun existed, quoting the Supreme Court's observation in *Cargill* that "[m]achinegun variants of the AR-15 style rifle include an additional component known as an auto sear . . . [that] permits a shooter to fire multiple shots while engaging the trigger only once" and noting that Exhibit 22 did not have an auto sear. (SBr.49). But Sternquist's reasoning is flawed. That an auto sear would necessarily convert an "AR-15 style rifle" into a machinegun does not mean that no gun without an auto sear can ever function as a

machinegun. (SA:99-100). As noted above, Exhibit 22 was "assembled utilizing an M16-type bolt carrier and . . . three-round burst parts"; the weapon operated in a "hammer follow" condition that resulted in automatic firing, albeit with glitches on some occasions. (SA:176-77).

Whatever purported ambiguity there may be in the gun's design features (there is none), the test-firing of Exhibit 22 here is conclusive: the gun fired more than one bullet with a single trigger pull on multiple occasions and therefore satisfied the statutory definition of a "machinegun." Contrary to Sternquist's implication, that conclusion is not undermined by a report from the Forensic Laboratory of the U.S. Postal Inspection Service that concluded the firearm was "semi-automatic" and not "fully automatic." (SA:168-70; *see* SBr.15, 49 (noting that "the first government agency to test the gun concluded it wasn't a machinegun")). That report did not purport to classify the firearm using the terminology of Section 5845(b) and did not explicitly say whether the firearm fired multiple bullets with "a single function of the trigger," which is the definition of a "machinegun" adopted by the statute. The ATF report described above, by contrast, analyzed the firearm using Section 5845(b)'s definition and concluded that the gun qualifies as a

62

"machinegun" because it was designed to, could readily be restored to, and did fire more than one bullet with a single trigger pull. The district court did not clearly err in so finding.

\*     \*     \*

Because the record amply warranted the district court's conclusion that Sternquist possessed silencers and/or a machinegun, within the meaning of Section 5845, it was not a procedural error to apply a base offense level of 20 pursuant to U.S.S.G. § 2K2.1(a)(4)(B).

B. The District Court Properly
   Determined the Total Number of Firearms

Nor, contrary to Sternquist's contentions, did the district court err in counting each silencer and an unassembled handgun receiver when determining the total number of firearms involved in the offense of conviction. Section 2K2.1(b)(1)(B) of the Guidelines provides for a four-level enhancement to the base offense level if the "offense involved" between eight and 24 firearms. Here, there can be no dispute that, if the silencers possessed by Sternquist qualify as "firearms," then the enhancement applies. Sternquist argues that, if the silencers do not count as "firearms," then Sternquist possessed fewer than eight firearms,

with the result that only a two-level enhancement should apply under Section 2K2.1(b)(1)(A) of the Guidelines. (SBr.17-18, 47-48).

*First*, the record refutes Sternquist's claim that the district court wrongly counted each of the silencers in determining the total number of firearms involved in this offense. For all the reasons stated above, the devices recovered from Sternquist's apartment are properly classified as "silencers" and are therefore "firearms," such that the four-level enhancement is warranted. *See* 18 U.S.C. § 921(a)(3)(C).

*Second*, even if none of the silencers counts as a "firearm," Sternquist still possessed eight total firearms, as set forth in the ATF reports. Specifically, in addition to Exhibit 22 discussed above (which is undeniably a firearm, regardless of whether it is a "machinegun"), ATF Exhibit Nos. 2, 11, 16, 17, 20, 21, and 23 were also determined to be "firearms." (SA:172-80; GA:1-9). The only one of those that Sternquist challenges is ATF Exhibit No. 17 ("Exhibit 17"), which Sternquist describes as an "incomplete receiver." (SBr.51-52).

As described in the relevant ATF report, Exhibit 17 is a "metal AR-type lower receiver . . . attached to a jig intended to aid the firearm builder in completing the receiver." (GA:7). Section 921 defines "firearm"

64

to mean "(A) any weapon . . . which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; [or] (B) the frame or receiver of any such weapon."  18 U.S.C. § 921(a)(3).  In this case, the ATF technical examiner concluded that Exhibit 17 satisfied the statutory definition because it was a "partially completed receiver possessed with a compatible jig or template." (GA:9).  In other words, the receiver was attached to a "jig," which held the partially completed receiver in place and indicated where to drill the holes that would permit the receiver to accept the remaining parts of a firearm, thus converting it to a completed receiver.  (GA:7-9).

The government acknowledges that the question of whether a partially completed receiver qualifies as a "firearm" is presently pending before the Supreme Court in *Bondi v. VanDerStok* (23-852).  But the government respectfully submits that it has the stronger position, given the plain language of the statutory definition.  That is especially true in this case, where the partially completed receiver was affixed to the device (the "jig") necessary to complete it.  As such, Exhibit 17 qualifies as the "receiver" of a weapon "that may readily be converted to expel a projectile by the action of an explosive" under Section 921(a)(3).  Because

65

Exhibit 17 counts as a "firearm," therefore, the district court would not have clearly erred in concluding that Sternquist possessed a total of eight firearms (not including any silencers) and that the four-level enhancement in U.S.S.G. § 2K2.1(b)(1)(B) applied.

III.   Sternquist's Sentence Was Substantively Reasonable

Sternquist's argument that the district court's within-Guidelines sentence was "too long" fares no better.  (SBr.53).

The record reveals that the district court undertook a sober analysis of the relevant sentencing factors, specifically noting the danger Sternquist's conduct posed to the community and remarking that "[w]hat we have here is a person who bought pieces online and created what are commonly called now ghost guns . . . which creates a specific danger. When those guns get out into the community, they are not traceable. They do as much damage as a regular gun." (SA:123).  The district court also considered Sternquist's criminal history, which included two prior federal convictions involving the manufacturing of counterfeit law enforcement credentials. (SA:109-10, 124-25).  In that regard, the court emphasized Sternquist's repeated failure to comply with judicially imposed conditions of supervised release, which led to additional terms

66

of incarceration. (SA:127). Even so, the district court imposed a sentence squarely within the advisory Guidelines range. Under those circumstances, the sentence cannot be considered so "shockingly high" as to constitute "damage [to] the administration of justice." *Muzio*, 966 F.3d at 64.

Sternquist contends that the district court relied on "inappropriate and irrelevant considerations, including . . . terrorism and gangs." (SBr.53-55). The record demonstrates otherwise. Contrary to the contention that the district court "compared" Sternquist to "'gang bangers' who were 'murdering people'" (SBr.53), the record shows that the district court invoked the notion of violent criminals merely as an anecdotal example of other defendants who have improperly relied on claims of self-defense to justify their illegal possession of firearms (SA:108). To be sure, the stated justification for Sternquist's possession of illegal firearms in this case was self-defense. (SA:107-08; *see* SBr.3 (Sternquist "assembled guns" "after receiving death threats")). Yet Sternquist conceded below that no such affirmative defense excused the offense of conviction. (SA:107-08). Indeed, it was only after Sternquist's counsel "apologize[d]" for suggesting that self-defense could apply to

"excus[e]" Sternquist's conduct (SA:108), that the court made the comparison to other kinds of defendants who similarly claim a fear for their safety: "[t]here is no defense there either" (*id.*).

Along the same lines, contrary to the contention that the district court "connected" Sternquist to "terrorist attacks" (SBr.53), the record shows that the court (reasonably) noted that one logical consequence of selling fake identifications, birth certificates, and law enforcement credentials online is that they could fall into the hands of criminals far more dangerous than Sternquist (SA:125). Indeed, it was in the context of the district court's summary of Sternquist's prior felonies for similar conduct that the challenged remark was made:

> What's scary about the prior two convictions is that [Sternquist] was selling them online.
>
> And, in fact, in the second case, [Sternquist] was— it turns out, she was selling them to a federal undercover . . .
>
> In that second case, the defendant was also selling New York State birth certificates, blank birth certificates, which the undercover managed to buy.
>
> And in an age where we have already suffered in this country terrorist attacks, and continued to have to deal with that specter hanging over our heads, I don't understand for the life of me why

> people forget that we lost more than thirty—3,000
> American lives on 9/11, right here on our soil.
>
> To have identifications like that available on an
> open internet market is a scary thing.
>
> And then you add to that ghost guns that cannot
> be traced.

(SA:125).

Viewed in context, it is obvious that the district court did not

"compare[]" or "connect" Sternquist to terrorists; the court pointed out

the far-reaching dangers that conduct like Sternquist's could potentially

pose. Indeed, as the record makes plain, the court's remarks about gang

members and the September 11 terrorist attacks were neither

inappropriate nor irrelevant; they were not accorded outsized weight in

the final analysis; and they were not offered as "justifications for"

Sternquist's sentence at all. (SBr.54).

Sternquist's claim that the district court was "dismissive" of

the potential for sentencing disparities is meritless. (SBr.55).

Section 3553(a) required the district court to consider "the need to avoid

unwarranted sentence disparities among defendants with similar records

who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

While citing the district court to examples of "[b]elow-guideline

69

sentences . . . in this district for people convicted of gun possession" (DE:111), however, the record reveals no effort to explain whether the defendants in those cases had "similar records" to Sternquist. (*See* SBr.23 (claiming to have "cit[ed] numerous cases of 922(g)(1) in the same district")). And despite highlighting some cases that Sternquist alleged involved "more aggravated fact patterns than presented here," those cases did not clearly involve people who had "been found guilty of similar conduct." (*See* DE:111 at 13 (highlighting cases involving shootings and arguing Sternquist "did not shoot a gun" at anyone)).

While those examples were arguably relevant comparators in some respects, the district court was entitled to—and did—determine that Sternquist had failed to establish that any of the cited cases involved the assembly of illegal ghost guns, recidivist defendants, or, in addition to the possession of a firearm, the manufacture and possession of forged law enforcement credentials. After all, the district court did not disregard Sternquist's argument; the court explicitly noted that Sternquist had identified a "laundry list of cases" involving violations of Section 922(g)(1). (SA:123). But in the absence of a sufficient showing by Sternquist that those cases involved "defendants with similar records

70

who ha[d] been found guilty of similar conduct," the court was within its discretion to conclude that those cases did not establish a standard from which a deviation would offend Section 3553(a)(6).

Finally, in asserting that the sentence was "too long," Sternquist charges that the district court failed to appropriately weigh mitigating circumstances, including Sternquist's upbringing (SBr.56 ("difficult childhood and young adulthood")), medical conditions (*id.* (partial paralysis)), and conditions of pretrial confinement (*id.* at 56-57 ("shackled to a bed at a nursing home")). But each of these arguments was fully developed below, both in written submissions and remarks to the district court. Sternquist's subjective assessment that the court should have, but did not, give them more weight does not amount to substantive unreasonableness. *See Broxmeyer*, 699 F.3d at 289 ("[t]he particular weight to be afforded aggravating and mitigating factors is a matter firmly committed to the discretion of the sentencing judge").

In any event, the record makes abundantly clear that the district court did, in fact, consider Sternquist's individualized circumstances—both medically and related to pretrial confinement—in fashioning an appropriate sentence, explaining that "but for" Sternquist's

medical conditions and the fact that Sternquist had already "suffered more than the average inmate has suffered," the court would have "considered a significant upward variance from the guideline range." (SA:128). There is simply no basis to second guess the district court's evaluation. *See Pope*, 554 F.3d at 246-47 ("[I]f the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, [this Court] will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor"). That is especially true since the district court's sentence fell squarely within the advisory Guidelines range. *See Watkins*, 667 F.3d at 261 ("In the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances"); *Fiumano*, 721 F. App'x at 50 ("A Guidelines sentence will rarely raise [reasonableness] concerns").

72

## CONCLUSION

For the reasons stated above, the judgment should be affirmed in all respects.

Dated:      Brooklyn, New York
            March 12, 2025

Respectfully submitted,

JOHN J. DURHAM,
*United States Attorney,*
*Eastern District of New York.*

By:   /s/ ANDRÉS PALACIO
      ANDRÉS PALACIO
      Assistant U.S. Attorney

ANTHONY BAGNUOLA,
FRANK TURNER BUFORD,
ANDRÉS PALACIO,
*Assistant United States Attorneys*,
      (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 13,124 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
       March 12, 2025

/s/ ANTHONY BAGNUOLA
ANTHONY BAGNUOLA
Assistant U.S. Attorney

APPENDIX

## TABLE OF CONTENTS

Page

ATF Report of Investigation,
   *United States v. Kara Sternquist*, No. 22-CR-473 (DLI)
   April 11, 2023 ..................................................................... GA1

**U.S. Department of Justice**
Bureau of Alcohol, Tobacco, Firearms and Explosives

# Report of Investigation

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number:<br>▇▇▇▇▇▇ | Report Number:<br>4 |
| --- | --- | --- |

**SUMMARY OF EVENT:**
04/11/2023: Examination and Classification of Privately Made Firearms in ATF Evidence.

**NARRATIVE:**

1) On 04/11/2023 ATF Special Agent Robert Soukeras examined ATF property Exhibits 002, 011, 016 and 017 for the purpose of classifying them under Title 18 of the United States Code (U.S.C.) and the Code of Federal Regulations (CFR).

## DEFINITIONS

2) The Gun Control Act of 1968 (GCA), 18 U.S.C. § 921(a)(3), defines the term "firearm" as: **"…(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon;** (C) any firearm muffler or silencer or (D) any destructive device. Such term does not include an antique firearm."

3) The GCA, 18 U.S.C. § 921(a)(30), defines the term "**handgun**" as: "(a) **firearm which has a short stock and is designed to be held and fired by the use of a single hand**; and (b) any combination of parts from which a firearm described in subparagraph (a) can be assembled."

4) 27 CFR § 478.11, a regulation implementing the GCA, defines "**pistol**" as: *"a weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having (a) a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and (b) a short stock designed to be gripped by one hand and at an angle to and extending below the line of the bore(s.)."*

5) 27 CFR § 478.12 (c), a regulation implementing the GCA, defines "**Partially complete, disassembled, or nonfunctional frame or receiver**" as: "The terms "frame" and "receiver" shall include a **partially complete, disassembled, or nonfunctional frame or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver**, *i.e.,* to house or provide a structure for the primary energized component of a handgun, breech blocking or sealing component of a projectile weapon other than a

| Prepared by:<br>Robert Soukeras | Title:<br>Special Agent, New York III / Hudson Valley Field Office | Signature:<br>▇▇▇▇▇▇ | Date:<br>Digitally signed by ROBERT SOUKERAS<br>Date: 2023.04.11 12:59:02 -04'00' |
| --- | --- | --- | --- |
| Authorized by:<br>Kelvin G. Jackson Jr / Horowitz Acting For | Title:<br>Acting Group Supervisor, New York III / Hudson Valley Field Office | Signature:<br>GREG HOROWITZ | Date: |
| Second level reviewer (optional):<br>John B. DeVito | Title:<br>Special Agent in Charge, New York Field Division | Signature: | Date: |

ATF EF 3120.2 (10-2004)
For Official Use Only

STERNQUIST_006451

GA2

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number:<br> | Report Number:<br>4 |
|---|---|---|

handgun, or internal sound reduction component of a firearm muffler or firearm silencer, as the case may be."

- Example 1 to § 478.12 paragraph (c) further describes a frame or receiver as**:**
  A frame or receiver parts kit containing a partially complete or disassembled billet or blank of a frame or receiver that is sold, distributed, or **possessed with a compatible jig or template is a frame or receiver**, as a person with online instructions and common hand tools may readily complete or assemble the frame or receiver parts to function as a frame or receiver.

---

## EXHIBIT 002

6) <u>Exhibit 002</u> is described as an AR-type receiver with a trigger assembly installed, with no manufacturer's markings or serial number. A partial AR-type upper and buffer tube attached.

- The receiver displays the following markings:

Left Side above the grip:
- Safe
- Fire



Exhibit 002 Photo #1

ATF EF 3120.2 (10-2004)<br>For Official Use Only

STERNQUIST_006452

GA3

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number:<br>████████ | Report Number:<br>4 |
|---|---|---|



Exhibit 002 Phot #2



Exhibit 002 Photo #3

**Exhibit 002** meets the definition of a "firearm" by being a **completed receiver** of any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive under 18 U.S.C. § 921 (a)(3)(B).

ATF EF 3120.2 (10-2004)
For Official Use Only

STERNQUIST_006453

| Title of Investigation: STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: ███████ | Report Number: 4 |
| --- | --- | --- |

## EXHIBIT 011

7) **Exhibit 011** is described as a privately made firearm made from an AR-type receiver with no manufacturer's markings or serial number and an American Tactical brand upper displaying "US Patent 9098786." The receiver has a trigger assembly installed. The upper has a bolt and barrel installed, and is chambered for .22 Long Rifle (.22LR) ammunition. It is designed with a pistol grip and is intended to be fired by the use of a single hand.



Exhibit 011 Photo #1



Exhibit 011 Photo #2

ATF EF 3120.2 (10-2004)
For Official Use Only

STERNQUIST_006454

GA5

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: | Report Number:<br>4 |
|---|---|---|



Exhibit 011 Photo #3

**Exhibit 011** meets the definitions of a handgun and a pistol made from a **completed frame or receiver**. Handguns, pistols and completed frames or receivers all meet the definition of "firearm" as described in 18 U.S.C. § 921(a)(3).

---

### **EXHIBIT 016**

8)  Exhibit 016 is described as a Polymmer80, model PF940C completed frame marketed by Polymer80, Inc., of Dayton, Nevada.

-       the frame displays the following markings:

Right side of the grip:
• **PF940C MADE IN USA**
• **POLYMER80, INC. DAYTON, NV**

Left and right side of the grip:
• **P80**

ATF EF 3120.2 (10-2004)<br>For Official Use Only

STERNQUIST_006455

GA6

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: | Report Number:<br>4 |
|---|---|---|



Exhibit 016 Photo #1



Exhibit 016 Photo #2

ATF EF 3120.2 (10-2004)<br>For Official Use Only

STERNQUIST_006456

GA7

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: | Report Number:<br>4 |
|---|---|---|



Exhibit 016 Photo #3

**Exhibit 016** meets the definition of a "firearm" by being a completed frame of any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive under 18 U.S.C § 921(a)(3)(B).

---

## **EXHIBIT 017**

9) **Exhibit 017** is described as a metal AR-type lower receiver with no manufacturer's markings or serial number attached to a jig intended to aid the firearm builder in completing the receiver.

ATF EF 3120.2 (10-2004)<br>For Official Use Only

STERNQUIST_006457

GA8

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: | Report Number:<br>4 |
| --- | --- | --- |



Exhibit 017 Photo #1



Exhibit 017 Photo #2

ATF EF 3120.2 (10-2004)<br>For Official Use Only

STERNQUIST_006458

GA9

| Title of Investigation:<br>STERNQUIST, Kara - Postal Inspection Recovery | Investigation Number: | Report Number:<br>4 |
|---|---|---|



Exhibit 017 Photo #3

**Exhibit 017** meets the definition of a "receiver" as it is a partially completed receiver possessed with a compatible jig or template. A "receiver" meets the definition of a 'firearm' under 18 U.S.C § 921(a)(3)(B).

---

**SUMMARY**
**Exhibit 002** is the receiver of a weapon which is designed to expel a projectile by the action of an explosive; therefore, it is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(B).

**Exhibit 011** is a weapon which is designed to expel a projectile by the action of an explosive and incorporated the frame or receiver of such a weapon; therefore, it is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(A) and (B).

**Exhibit 016** is the frame of a weapon which is designed to expel a projectile by the action of an explosive; therefore, it is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(B).

**Exhibit 017** is the receiver of a weapon which is designed to expel a projectile by the action of an explosive; therefore, it is a "**firearm**" as defined in 18 U.S.C. § 921(a)(3)(B). **Exhibit 017** is a partially completed receiver possessed with a compatible jig or template, therefore may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver.

ATF EF 3120.2 (10-2004)
For Official Use Only

STERNQUIST_006459