# 24-2135-cr

To be argued by:
**ALLEGRA GLASHAUSSER**

United States Court of Appeals
For the Second Circuit
_____

Docket No. 24-2135-cr
_____

UNITED STATES OF AMERICA,

Appellee,

-against-

KARA STERNQUIST, a/k/a CARA SANDIEGO, a/k/a KARA WITHERSEA,

Defendant-Appellant.
_____

APPEAL FROM A JUDGMENT OF
THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
_____

**REPLY BRIEF FOR DEFENDANT-APPELLANT KARA STERNQUIST**
_____

Federal Defenders of New York, Inc.
Appeals Bureau
52 Duane Street, 10th Floor
New York, New York 10007
Tel. No.: (212) 417-8742

*Attorney for Defendant-Appellant*
**KARA STERNQUIST**

**ALLEGRA GLASHAUSSER**,
*Of Counsel*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................iii

Preliminary Statement ............................................................................................ 1

Argument ................................................................................................................ 2

Point I

Kara Sternquist—a victim, not perpetrator, of violent crime—has a Second
Amendment right to possess a gun for her protection. Her prior nonviolent
convictions, for theft and making false identifications, did not strip her of
that right .................................................................................................................. 2

    A.   *Rahimi* explicitly disavowed previous dicta purporting to limit Second
           Amendment rights ........................................................................................ 3

    B.   Ms. Sternquist is part of the people.......................................................... 4

    C.   The government cannot show a longstanding historical tradition of
           permanently disarming all people convicted of felonies, or disarming
           individuals similar to Ms. Sternquist ........................................................ 6

    D.   Section 922(g)(1) is unconstitutional as applied to Ms. Sternquist .................... 10

Point II

The court incorrectly calculated Ms. Sternquist's guideline range and the
government fails to respond to Ms. Sternquist's argument that she did not
intend to use any items to muffle gunshots ........................................................ 13

    A.   The evidence did not show that Ms. Sternquist intended to possess a
           machine gun.................................................................................................. 17

    B.   Item 17 is not properly classified as a gun............................................... 18

Point III

At Ms. Sternquist's sentencing, the court A) made inappropriate remarks about "gang bangers" and terrorist attacks; B) inaccurately accused her of committing crimes while on bond (she wasn't on bond); C) ignored comparable sentences; and D) didn't adequately account for Ms. Sternquist's suffering while partially paralyzed and chained to a bed for two full years .......................................................... 20

    A.   The sentencing court should not have compared Ms. Sternquist's conduct in possessing unloaded guns at home to committing murder and terrorism......... 21

    B.   The government does not rebut that the court relied on inaccurate facts ........ 23

    C.   The court improperly failed to consider sentencing disparities .......................... 23

    D.   Ms. Sternquist's sentence was also too long........................................................ 26

Conclusion.................................................................................................................... 28

# TABLE OF AUTHORITIES

## Cases

*Antonyuk v. James,*
  120 F.4th 941 (2d Cir. 2024) ................................................................. 2

*Bondi v. VanDerStok,*
  No. 23-852, 2025 WL 906503 (U.S. Mar. 26, 2025) ............................... 18, 19

*Garland v. Range,*
  144 S. Ct. 2706 (2024) .......................................................................... 9

*Kanter v. Barr,*
  919 F.3d 437 (7th Cir. 2019) ................................................................. 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  597 U.S. 26 ...................................................................................... 3, 10, 13

*O'Lone v. Estate of Shabazz,*
  482 U.S. 342 (1987) .............................................................................. 5

*Range v. Attorney General,*
  124 F.4th 218 (3d Cir. 2024) ............................................................ 7, 10, 12

*Range v. United States,*
  69 F.4th 96 (3d Cir. 2023) .................................................................... 9

*Rehaif v. United States,*
  588 U.S. 225 (2019) ............................................................................. 17

*Staples v. United States,*
  511 U.S. 600 (1994) ............................................................................. 17

*United States v. Baer,*
  235 F.3d 561 (10th Cir. 2000) .............................................................. 5

*United States v. Cavera,*
    550 F.3d 180 (2d. Cir. 2008) ................................................................ 24

*United States v. Comstock,*
    560 U.S. 126 (2010) .............................................................................. 5

*United States v. Connelly,*
    117 F.4th 269 (5th Cir. 2024) ............................................................. 10

*United States v. Crooker,*
    608 F.3d 94 (1st Cir. 2010) ................................................................. 16

*United States v. Diaz,*
    116 F.4th 458 (5th Cir. 2024) ........................................................ 8, 10

*United States v. Eaglin,*
    913 F.3d 88 (2d Cir. 2019) ................................................................... 5

*United States v. Gay,*
    98 F.4th 843 (7th Cir. 2024) ............................................................... 11

*United States v. Gomez,*
    24-cr-000735 (N.D. Tex. March 25, 2025) ........................................ 10

*United States v. Gregg,*
    463 F.3d 160 (2d Cir. 2006) ................................................................. 5

*United States v. Holcombe,*
    883 F.3d 12 (2d Cir. 2018) ................................................................... 5

*United States v. Hook,*
    471 F.3d 766 (7th Cir. 2006) ............................................................... 5

*United States v. Hunt,*
    123 F.4th 697 (4th Cir. 2024) ............................................................. 11

*United States v. Jackson,*
    110 F.4th 1120 (8th Cir. 2024) ...................................................... 8, 11

*United States v. Kavoukian*,
  354 F.3d 117 (2d Cir. 2003) .......................................................... 15

*United States v. Morrissette*,
  No. 24-10353, 2024 WL 4709935, at *2 (11th Cir. Nov. 7, 2024) ............................ 11

*United States v. Neal*,
  715 F. Supp. 3d 1084 (N.D. Ill. 2024) ............................................. 9

*United States v. Rahimi*,
  602 U.S. 680 (2024) ............................................................ 2, 3, 8

*United States v. Richardson*,
  754 F.3d 1143 (9th Cir. 2014) ....................................................... 5

*United States v. Perez-Garcia*,
  96 F.4th 1166 (9th Cir. 2024) ....................................................... 9

*United States v. Quiroz*,
  125 F.4th 713 (5th Cir. 2025) ....................................................... 9

*United States v. Stewart*,
  No. 23-6330-CR, 2024 WL 3517853 (2d Cir. July 24, 2024) ...................................... 24

*United States v. Williams*,
  113 F.4th 637 (6th Cir. 2024) ..................................................... 10, 12

## Regulations

27 C.F.R. § 478.12 ................................................................. 18

## Other Authorities

2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to
Feb. 28, 1807, pp. 652–653 (1807), available at
https://www.google.com/books/edition/_/bVZHAAAAYAAJ?hl=en&gbpv=1 ..... 8

"Acts of the North Carolina General Assembly," 1745, Ch. III, Sec. V, available at https://docsouth.unc.edu/csr/index.php/document/csr23-0015 .............................. 8

Kaja Andric and Corey Kilgannon, "A New Generation Of 'Unbeatable' Fake IDs is Bedeviling Bouncers," N.Y.Times, Feb. 13, 2025, https://www.nytimes.com/2025/02/13/nyregion/students-high-tech-fake-ids.html.......................................................................................................................... 22

Shawn Musgrave, "Trans Women in Federal Custody Face the Terror Being Transferred to Men's Prisons," Jan. 1, 2025, the Intercept, available at https://theintercept.com/2025/01/28/trans-women-federal-prisons-trump-executive-order/............................................................................................................. 27

Stuart Banner, The Death Penalty: An American History 23 (2002)............................. 9

U.S. Dep't of Justice, Civil Rights Division, Guide to State Voting Rules That Apply After a Criminal Conviction (July 1, 2023) .................................................................. 4

U.S. Const. amend. XIV ................................................................................................ 5

## Preliminary Statement

Kara Sternquist, a transgender woman, had been assaulted in an apparent hate crime and had received online death threats. Afterward, because she was scared, she kept guns at home. She was arrested and charged with possessing a gun after a previous felony conviction. Those prior convictions involved theft and making fake identifications – non-violent crimes committed with paper, special ink, and a computer. As argued in her opening brief, her conduct in possessing guns at home should have been protected under the Second Amendment, especially as she had no history of violence or dangerousness.

During her case, Ms. Sternquist, who is partially paralyzed, spent two years shackled to a bed, incarcerated in a nursing home. At sentencing, the court miscalculated her guideline range; invoked 9/11, murders, and "gang-bangers"; relied on incorrect facts, saying Ms. Sternquist had committed crimes while on bail (when she was not even on bail and, thus, had committed no crimes on bail); and sentenced her to five years in prison, ignoring comparable sentences that were much shorter for the same crime. The sentence was procedurally and substantively unreasonable.

The government's response brief largely does not respond to Ms. Sternquist's brief and merely rehashes the same arguments it made below. Its arguments should be rejected.

1

## Argument

### Point I

**Kara Sternquist—a victim, not perpetrator, of violent crime—has a Second Amendment right to possess a gun for her protection. Her prior nonviolent convictions, for theft and making false identifications, did not strip her of that right.**

Ms. Sternquist's main brief explained at length why the government's arguments to the district court about the Second Amendment were wrong. App. Br. 25-41. In response, the government trots out the exact same arguments it made below, generally ignoring Ms. Sternquist's arguments on appeal. For example, it continues to rely on *Bogle*, ignoring Ms. Sternquist's argument that this Court has already recognized unequivocally that *Bruen* "abrogated [this Court's] circuit precedent . . . and the general approach [this Court] took to Second Amendment claims." *Antonyuk v. James,* 120 F.4th 941, 964 (2d Cir. 2024). It continues to ignore that the *Rahimi* Court explicitly disavowed previous Supreme Court dicta implying that only "responsible" citizens could possess guns. *United States v. Rahimi*, 602 U.S. 680, 701-02 (2024). And, it quotes the exact same historical sources about temporary disarmament that it cited below, without addressing Ms. Sternquist's arguments on appeal that permanent disarmament is a more severe burden than temporary disarmament. Finally, it urges this Court to join a minority of other circuits in refusing to consider as-applied challenges to Section 922(g)(1).

2

This Court should reject the government's arguments.

A. *Rahimi* explicitly disavowed previous dicta purporting to limit Second Amendment rights.

As noted in Ms. Sternquist's main brief, *Rahimi* dispelled the government's claim that the Second Amendment applies only to "responsible" people (a term the government previously used in the same breath as "law-abiding"). *Rahimi* made clear that the Court's statements in *Heller* and *Bruen* suggesting such a limitation were dicta and cannot be relied on as accurate statements of the law. As the *Rahimi* Court explained:

> In *Heller* and *Bruen*, we used the term 'responsible' to describe the class of ordinary citizens who undoubtedly enjoy the Second Amendment right. But those decisions did not define the term and said nothing about the status of citizens who were not 'responsible.' The question was simply not presented.

*Rahimi*, 602 U.S. at 701–02 (internal citations omitted).

The government does not respond to or address this point. Instead, it persists in claiming that that same dicta in *Bruen* and *Heller* limits the Second Amendment right to "law-abiding" people. Gov. Br. 18, 25-29. Indeed, it states that *Bruen* used the phrases "law-abiding citizens" "no fewer than 14 times in the majority opinion." Gov. Br. 26. This is irrelevant. *Bruen* did not decide the rights of non-"law-abiding" citizens any more than it decided the rights of "citizens who were not 'responsible,'" *Rahimi*, 602 U.S. at 701—in fact, the cases typically use the two terms interchangeably, with *Bruen* often using the phrase "law-abiding, responsible citizens." *Bruen*, 597 U.S. at 26,

38 n. 9, 70. Just like the repeated use of "responsible" citizens in previous cases is dicta, the repeated use of the phrase "law-abiding" citizens is dicta. This Court should not rely on it.

B. Ms. Sternquist is part of the people.

The government next argues that Ms. Sternquist is not part of "the people" entitled to Second Amendment rights because people with felony convictions can be excluded from "the right to vote, hold public office or serve on a jury, all of which are political rights akin to that conferred by the Second Amendment." Gov. Br. 29. Similarly, it asserts that the "right to vote" "can be understood as a variation on the right to self-defense." Gov. Br. 29, n. 9. This too should be rejected, as it ignores important textual differences between how the Constitution addresses gun rights on the one hand, and how it addresses the "political rights" discussed by the government on the other. At bottom, the constitutional treatment of these rights says nothing about whether those with felony convictions are among "the people" protected by the Second Amendment (and, relatedly, other constitutional guarantees).

As an initial matter, individuals with prior felony convictions may vote to elect members of Congress, in accordance with Article I, § 2. *See, e.g.*, U.S. Dep't of Justice, Civil Rights Division, Guide to State Voting Rules That Apply After a Criminal Conviction (July 1, 2023) (summarizing voting laws, noting multiple states that don't restrict voting rights following criminal convictions and other states that allow voting rights to be restored after a conviction). But in contrast to the broad, unequivocal text

4

of the Second Amendment, the Constitution does not include a freestanding right of "the people" to vote (or hold political office, or serve on juries), so the government has greater leeway to restrict such rights. Indeed, the Fourteenth Amendment specifically states – in its text – that the right to vote can be abridged in the event of participation in a crime. U.S. Const. amend. XIV (stating that the right to vote cannot be "abridged," "except for participation in rebellion, or other crime . . ."). That type of restriction does not appear in the text of the Second Amendment.

People with felony convictions also retain their rights under other constitutional amendments. They retain their various rights under the First Amendment. *See, e.g., O'Lone v. Estate of Shabazz*, 482 U.S. 342, 346 (1987); *United States v. Eaglin*, 913 F.3d 88, 96 (2d Cir. 2019). They are protected by the Fourth Amendment. *See, e.g., United States v. Gregg*, 463 F.3d 160, 165 (2d Cir. 2006). And they are part of "the people" to whom rights are reserved under the Ninth and Tenth Amendments. *See, e.g., United States v. Comstock*, 560 U.S. 126, 143-44 (2010) (deciding challenge to federal civil commitment statute raising Tenth Amendment claims, among others, by people who had felony convictions); *United States v. Richardson*, 754 F.3d 1143, 1146 (9th Cir. 2014) (deciding Tenth Amendment challenge by person with a felony conviction to federal sex offender registration law and collecting cases related to same); *United States v. Holcombe*, 883 F.3d 12, 18 (2d Cir. 2018) (same); *United States v. Baer*, 235 F.3d 561, 564 (10th Cir. 2000) (adjudicating Ninth Amendment challenge to § 922(g)(1) by individual previously convicted of felony); *United States v.*

5

*Hook*, 471 F.3d 766, 775 (7th Cir. 2006) (deciding Ninth Amendment challenge to collection of DNA of those on federal supervised release).

The same is true of the Second Amendment. The government's argument that Ms. Sternquist is not part of "the people" must be rejected.

C. The government cannot show a longstanding historical tradition of permanently disarming all people convicted of felonies, or disarming individuals similar to Ms. Sternquist.

The government also does not identify any historical tradition dating from 1791 permanently disarming people convicted of felonies—let alone those convicted of non-violent felonies.

In Ms. Sternquist's main brief, she explained that laws temporarily disarming "disfavored groups," were not the same as permanent disarmament, App. Br. 35-36; that a "minority report" proposing limits to gun rights was unpersuasive as it was not incorporated into the Second Amendment, App. Br. 36-37; and that a North Carolina hunting law and "going armed" laws did not provide for permanent disarmament. App. Br. 37. In response, the government simply ignores Ms. Sternquist's brief and cites the same exact historical sources that it cited below. It fails to respond to or rebut Ms. Sternquist's arguments that its historical examples are dissimilar as they involved only temporary disarmament.

First, the government cites – again – the Pennsylvania minority report. In doing so, it offers no rebuttal to Ms. Sternquist's argument that this recommendation to

exclude dangerous people from the Second Amendment was rejected and not included in the U.S. Constitution, which only supports Ms. Sternquist's argument. Gov. Br. 34.

Second, it cites – again –  laws allowing for temporary disarmament of various types of people, using a variety of phrases to describe those who were disarmed: "disfavored classes of people," those who "refused to declare an oath of loyalty," those who "presented an unacceptable risk of danger if armed," people who "demonstrated disrespect for legal norms of society," those who "demonstrated disobedience toward the sovereign," and those who "did not show sufficient respect for the law." Gov. Br. 31-32. Despite these varied phrases, the government provides no historical evidence suggesting any of those people were permanently disarmed. No wonder: The evidence shows the contrary. *See Range v. Attorney General*, 124 F.4th 218, 262-63 (3d Cir. 2024) (en banc) (Krause, J., concurring) (noting that in these historical instances, people could have their rights restored); *Range*, 124 F.4th at 288 n.10 (Roth, J., concurring) (noting that such individuals could "contemporaneously restore their right to possess firearms, including by swearing loyalty oaths"); *Range*, 124 F.4th at 240 (Matey, J., concurring) (people could "keep necessary weapons for the defence of his House or person."). The government also does not respond to Ms. Sternquist's argument, App. Br. 36, that temporary disarmament is not the same type of burden as permanent disarmament.

Third, it asserts that "[h]istorical sources [ ] conclusively establish that disarmament (or worse) was well understood to be a permanent penalty for serious crimes." Gov. Br. 33. But the government again cites no historical examples involving permanent disarmament. Instead, it cites *United States v. Jackson*, 110 F.4th 1120, 1127 (8th Cir. 2024), which, in turn, cites the same North Carolina hunting law the government cited below. As discussed in Ms. Sternquist's brief, App. Br. 37, that law did not require permanent disarmament. *See* "Acts of the North Carolina General Assembly," 1745, Ch. III, Sec. V, available at https://docsouth.unc.edu/csr/index.php/document/csr23-0015 (noting that person "shall forfeit his Gun" and pay a fine). The government doesn't rebut or respond to this argument.

Similarly, the government asserts without support that the "going armed" laws cited in *Rahimi* permanently disarmed people. Gov. Br. 33, n. 10.[1] As noted in Ms. Sternquist's brief, App. Br. 35, the going armed laws allowed temporary disarmament "[w]hen an individual pose[d] a clear threat of physical violence to another." *Rahimi*, 602 U.S. at 698, citing, *inter alia,* 2 Laws of the Commonwealth of Massachusetts from Nov. 28, 1780 to Feb. 28, 1807, pp. 652–653 (1807), available at https://www.google.com/books/edition/_/bVZHAAAAYAAJ?hl=en&gbpv=1

---

[1] Although the government cites *United States v. Diaz*, 116 F.4th 458, 470 (5th Cir. 2024) for the proposition that the "going armed" laws resulted in permanent disarmament, *Diaz* does not make that factual assertion. *Id.* (finding the "going armed laws to be a relevant historical analogue," but not discussing whether those laws required permanent disarmament).

(mentioning nothing about permanent disarmament). The government provides no historical evidence to suggest that the going armed laws permanently disarmed people after the threat had dissipated.

Finally, the government says that some crimes were "punishable by death," including "forgery" and "counterfeiting." Gov. Br. 34. As a preliminary matter, the assertion that forgery or counterfeiting were capital crimes appears to be only loosely supported. The government cites *United States v. Perez-Garcia*, 96 F.4th 1166, 1183 (9th Cir. 2024) and *United States v. Quiroz*, 125 F.4th 713, 720 (5th Cir. 2025) to support this proposition. But both cases cite the same portion of one book, Stuart Banner, <u>The Death Penalty: An American History</u> 23 (2002), which—seemingly anecdotally, and without citation to specific laws—tells a brief story about two people, who had "escaped from jail" "after being condemned to death" "for forgery" in Georgia between 1790 and 1805. *Id.* at 18. This is an exceedingly thin reed on which to base the conclusion that forgery was generally a capital offense.

It is also an exceedingly weak ground to justify § 922(g)(1)'s permanent, lifelong ban on possessing arms. After all, "'capital punishment in the colonies was used sparingly'" and people with felony convictions who were not executed "could 'repurchase arms' after they discharged their sentence." *United States v. Neal*, 715 F. Supp. 3d 1084, 1101 (N.D. Ill. 2024) (quoting, respectively, *Kanter v. Barr*, 919 F.3d 437, 459 (7th Cir. 2019) (Barrett, J., dissenting), and *Range v. United States*, 69 F.4th 96, 105 (3d Cir. 2023), cert. granted, judgment vacated sub nom. *Garland v. Range*, 144 S.

9

Ct. 2706 (2024)). Additionally, as the Third Circuit persuasively explains in its most recent en banc opinion, the "founding-era practice of punishing some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue here –de facto lifetime disarmament for all felonies – is rooted in our nation's history and traditions." *Range*, 124 F.4th at 231.

It is the government's burden to put forward historical evidence. *See Bruen*, 597 U.S. at 60 (a court itself is "not obliged to sift the historical materials for evidence . . . . That is [the government's] burden."). It has not done so.

D.  Section 922(g)(1) is unconstitutional as applied to Ms. Sternquist.

Since Ms. Sternquist's main brief was filed, the en banc Third Circuit reaffirmed that an as-applied framework was appropriate for Second Amendment challenges, finding that § 922(g)(1) was unconstitutional as applied to a person with one prior felony conviction for food-stamp fraud. *Range*, 124 F.4th at 232. Thus far, three circuits have adopted an as-applied framework to Second Amendment challenges to Section 922. *Id.*; *United States v. Williams*, 113 F.4th 637 (6th Cir. 2024); *United States v. Connelly*, 117 F.4th 269, 277 (5th Cir. 2024) (in context of 922(g)(3)). *See also United States v. Diaz*, 116 F.4th 458, 470 (5th Cir. 2024) (in 922(g)(1) context, noting that the "opinion today does not foreclose future as-applied challenges by defendants with different predicate convictions."); *United States v. Gomez*, 24-cr-00073, Dkt. 35 (N.D. Tex. March 25, 2025) (finding Section 922(g)(1) unconstitutional as

applied to person with conviction for possession of marijuana). At least one other circuit has left open the possibility of future as-applied challenges. *United States v. Gay*, 98 F.4th 843, 846 (7th Cir. 2024) ("We may assume for the sake of argument that there is some room for as-applied challenges.").[2]

The government cites two circuits that have thus far rejected as-applied challenges, citing *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024), and *United States v. Jackson,* 110 F.4th 1120, 1129 (8th Cir. 2024) (holding that "the statute [was] constitutional as applied to Jackson"). This Court should reject this minority viewpoint and adopt an as-applied framework.

It is clear why the government wishes to avoid an as-applied challenge in Ms. Sternquist's case: she has no history of any violence and her prior felony convictions for making fake identifications were committed with paper and computers, not weapons. In addressing the merits of Ms. Sternquist's as-applied challenge, the government resorts to speculation and hyperbole, claiming that making fake IDs "necessarily results in danger" because Ms. Sternquist had "an ability to potentially access (or allow others to access) sensitive locations without authorization." Gov. Br. 39. There are no facts to support this assertion: Ms. Sternquist has never even been accused of accessing any location – no less a sensitive location – without

---

[2] Additionally, the Supreme Court just vacated a judgment of the 11th Circuit, which had failed to fully analyze the as-applied challenge for someone with a non-violent felony conviction. *United States v. Morrissette*, No. 24-10353, 2024 WL 4709935 (11th Cir. Nov. 7, 2024), cert. granted, judgment vacated sub nom. Morrissette, Raheem v. United States, No. 24-6415, 2025 WL 951148 (U.S. Mar. 31, 2025). The Supreme Court remanded the case to the 11th Circuit for "further consideration." *Id.*

authorization. The government also discusses a theoretical risk that fake ID "purchasers" – that is, not Ms. Sternquist – "could use [fake IDs] to misrepresent themselves as law enforcement officers to intimidate or menace others." Gov. Br. 41. This hypothetical risk posed by theoretical purchasers has no relation to any danger posed by Ms. Sternquist herself – the focus of an as-applied challenge. *See Range*, 124 F.4th at 232.

The government next claims without any support that Ms. Sternquist's conviction for theft when she was 19 years old makes it "clear" she "would have been vulnerable to disarmament in the founding era." Gov. Br. 39. This decades-old theft involved an online, eBay transaction. PSR 9-10. The government provides no explanation how this conviction is at all related to any risk of danger – it isn't.[3] In support of this assertion, the government cites *Williams*, 113 F.4th at 659-60, which itself explains that "crimes like mail fraud," "or making false statements," "[o]ften cause no physical harm to another person or the community," meaning "courts will have no trouble concluding that many of these crimes don't make a person dangerous." *Id.* (cited at Gov. Br. 39–40). *Williams* does not support the government's assertion. Just as the examples in *Williams*, Ms. Sternquist's prior convictions do not make her dangerous.

---

[3] In the government's fact section, it also notes that Ms. Sternquist had been arrested in New York State in the months before her federal arrest. Gov. Br. 9. The government, however, fails to mention that this case resolved not with a criminal conviction but with a disorderly conduct violation. S. 28-29.

12

Finally, this Court should reject the government's sweeping, unsupported pronouncement that "[c]lear historical precedent (supported by sound policy) justifies application of the statute to [Ms.] Sternquist's conduct – which amply demonstrates the dangers posed by even non-violent felons' possession of firearms." Gov. Br. 13. The government has not "amply" demonstrated any danger that Ms. Sternquist posed at the time she possessed guns. On the contrary, Ms. Sternquist had no history of being dangerous.

Because the government hasn't shown a "long, unbroken line of common-law precedent," or practice "when the Bill of Rights was adopted in 1791," *Bruen*, 597 U.S. at 35, 37, of permanently disarming someone like Ms. Sternquist, doing so is "inconsistent with the Second Amendment." *Id.* at 26. Her conviction should be vacated.

## Point II

### The court incorrectly calculated Ms. Sternquist's guideline range and the government fails to respond to Ms. Sternquist's argument that she did not intend to use any items to muffle gunshots.

In Ms. Sternquist's main brief, she argued that none of the cylindrical items she had were intended to be used as silencers. None could be used as silencers without modification, and there was no evidence she planned to so modify them. App. Br. 42-48. In response, the government quotes from ATF reports, but cites almost no case law and barely addresses Ms. Sternquist's argument that the evidence did not establish

13

her knowledge and intent. Gov. Br. 49-50. This Court should reject the government's unsupported arguments and find that the cylindrical items should not have been used to enhance Ms. Sternquist's guideline range.

First, the government asserts without citation that Ms. Sternquist is "fairly charged with knowledge of [] technical design features" because she "privately assembled firearms." Gov. Br. 54. But Ms. Sternquist assembled guns quite badly. As the ATF reports note, the items were "crudely made," and "of very low quality in both materials used and craftsmanship applied." GSA 13. One of the guns jammed immediately; two did not work until ATF took them apart and reassembled them with replacement parts. GSA 13. That she managed to assemble guns poorly does not support that she had "knowledge of [] technical design features" of silencers.

Second, the government says that the "sheer number of devices" "is evidence of an intent to use them not as solvent traps, but as silencers." Gov. Br. 55. Relatedly, it states that it is "implausible" with her "base of knowledge and prior military service" that she would have 15 solvent traps, when "just one solvent trap would ostensibly suffice to collect dirty solvent." Gov. Br. 54. But the number of cylinders does nothing to advance the government's argument because just as one "solvent trap would ostensibly suffice," so too would "just one silencer." That is, there was no logical reason for Ms. Sternquist to have either 15 silencers or 15 solvent traps; she did not have 15 guns. All this number establishes is that Ms. Sternquist was a collector

14

bordering on a hoarder and had multiples of everything she owned, including these undrilled tubes. It does not speak to her intent to use any of them as silencers.

Third, the government incorrectly says that only "some of the [cylindrical] items had not been 'drilled' (meaning that they would not – without modification – permit a bullet to pass through the cylinders)," Gov. Br. 50. <u>None</u> of the cylindrical items had holes drilled in them and none of the items would "permit a bullet to pass" without modification. A. 140-52. The government also claims that "[t]he absence of drilled holes in some or all relevant pieces does not remove them from the statutory definition of a 'silencer,'" and points to "indentations" as sufficient. Gov. Br. 51 and 53. The government cites nothing to support this assertion. It cites no cases where a court found an item was a silencer despite the item lacking a hole in it for a bullet to pass through.

Fourth, the government says that no "measurable minimum sound reduction" is required for an item to be a silencer. Gov. Br. 51 (citing *United States v. Kavoukian*, 354 F.3d 117, 119 (2d Cir. 2003)). But this misunderstands Ms. Sternquist's argument. Ms. Sternquist did not argue that the fact that the tubes were quite bad at reducing sound categorically took them outside the "definition of a 'silencer.'" Gov. Br. 51. Instead, she argued that the fact they were bad at reducing sound suggested that she did not *intend* to use them to reduce sound. App. Br. 45-46. *Kavoukian* did not rely solely on a marginal sound reduction to uphold a defendant's conviction for possessing a silencer; instead, this Court found that the defendant in that case

15

"frequently spoke . . . of his intent to make a silencer." 354 F.3d at 119. That key element of intent is missing in Ms. Sternquist's case.

Finally, the government argues that Ms. Sternquist had "baffles," which "serve no function whatsoever for solvent traps but that do enhance the muffling of silencers." Gov. Br. 49-53. It defines baffles as items "generally used to 'slow, create turbulence in, or redirect the flow of hot propellant case [that] can be used to segregate a large expansion chamber to create multiple smaller expansion chambers of various sizes . . . .'" Gov. Br. 49. It cites no cases, however, where the existence of "baffles" was used as evidence that an item was intended to be a silencer. Indeed, *Crooker* involved a "cylinder made of black metal with a hole running through it" and "baffles inside." *United States v. Crooker*, 608 F.3d 94, 95 (1st Cir. 2010) (noting that the person also had "books and other materials evidencing [his] interest in firearms," including an article about the federal definition of silencer). Nonetheless, the First Circuit found the item was not a silencer because the "threading" would have had to be adapted to fit the cylinder on a gun. *Id.* at 100.

Instead of citing any case law indicating that the presence of "baffles" shows items are silencers—or that they were intended to be used as such—the government cites an ATF technical bulletin that further proves Ms. Sternquist's point. The bulletin explained that companies were selling "solvent traps": devices marketed to "catch excess cleaning fluid" but that could be converted to use as silencers. GSA 6, 53. The same bulletin focuses on intent being the "key factor in distinguishing between a

16

'solvent trap' and a firearm silencer." *Id.* Intent is what is lacking in Ms. Sternquist's case. She had no items with holes drilled in them; the items barely reduced the sound of a gunshot; none were attached to a gun; and she made no statements suggesting she was interested in silencers.

Because Ms. Sternquist had neither the knowledge nor the intent to possess gun silencers, her base offense level should have been 14, under U.S.S.G. § 2K2.1(a)(6)(A). Also, none of the 15 cylindrical items should have been counted as guns, under U.S.S.G. § 2K2.1(b)(1).

A.  The evidence did not show that Ms. Sternquist intended to possess a machine gun.

Ms. Sternquist also argued that the court erred in finding that she possessed a machine gun because there was insufficient evidence that Ms. Sternquist intended the gun to operate automatically or even knew that it could. App. Br. 48-50, citing *e.g., Rehaif v. United States*, 588 U.S. 225, 229 (2019) and *Staples v. United States,* 511 U.S. 600, 615 (1994). After all, even the ATF was only twice able to get the gun to fire two shots with one trigger pull. App. Br. 49.

The government does not address this argument in its response. Gov. Br. 56-62. It does not dispute that evidence of knowledge and intent are required, but it does not mention Ms. Sternquist's intent or knowledge. It also does not rebut her argument that the two times ATF managed to get the gun to fire two shots with one trigger pull were, in fact, misfires. App. Br. 49-50. Instead, it simply states that the gun was

17

"clearly designed to . . . fire multiple shots 'automatically,'" and that it did not do so "with perfect reliability has no legal significance." Gov. Br. 60. This unsupported argument should be rejected.

B.    Item 17 is not properly classified as a gun.

Last week, the Supreme Court decided that ATF's rule defining "frame" and "receiver" as including "[p]artially complete, disassembled, or nonfunctional frame[s] or receiver[s]," 27 C.F.R. § 478.12 (c), was not facially invalid. *Bondi v. VanDerStok*, No. 23-852, 2025 WL 906503, at *8 (U.S. Mar. 26, 2025). In reaching this conclusion, the Court found that there were examples of partially complete frames and receivers that were sufficiently close to being complete to fall within the definition of a gun. *Id.* at *6, 10. As the Court noted, however, "[f]uture cases may present other and more difficult questions" about the regulation as applied to a specific item. *Id.* *8. Thus, *VanDerStok* does not resolve challenges to the regulation as applied in a particular case.

In Ms. Sternquist's case, item 17 does not meet the definition of gun. The only information the government submitted related to item 17 are two pictures and ATF's conclusion that the item was a "partially completed" receiver "attached to a jig." GA 7-8. The government introduced no evidence as to what modification would be necessary to make item 17 a complete receiver. And, unlike the pictures in the Supreme Court's decision in *VanDerStok*, the pictures submitted in Ms. Sternquist's

18

case do not depict an item readily identifiable as essentially the same as a completed gun part. *Compare* GA8 and *VanDerStok*, No. 23-852, 2025 WL 906503 at *6, 10.



Excerpt from GA 8.



Photo from *VanDerStok*, No. 23-852, 2025 WL 906503 at *10 (showing a completed frame on top, and an incomplete frame on the bottom, that would become complete when the tabs in the red circles were removed).

19

Thus, the evidence did not show that item 17 was sufficiently close to a completed receiver to be classified as a gun.

## Point III

**At Ms. Sternquist's sentencing, the court A) made inappropriate remarks about "gang bangers" and terrorist attacks; B) inaccurately accused her of committing crimes while on bond (she wasn't on bond); C) ignored comparable sentences; and D) didn't adequately account for Ms. Sternquist's suffering while partially paralyzed and chained to a bed for two full years.**

Ms. Sternquist, a partially paralyzed, transgender woman who legitimately feared for her safety after receiving death threats, possessed guns and gun parts. She never used the guns – indeed, she didn't even possess ammunition that would allow her to use the guns – and she never committed any violent act in connection with the charged offense or any other offense. Nonetheless, at her sentencing, the court invoked the September 11th terrorist attack, murderers, and "gang bangers"; misstated the facts; and ignored that other defendants in the district regularly receive much lower sentences for the same crime of conviction.

Incredibly, in its response, the government claims that the judge conducted "a sober analysis." Gov. Br. 65. It also mischaracterizes the numerous errors that Ms. Sternquist raised in Point III of her main brief as being simply an argument that the sentence was just too long. Gov. Br. 43, 65. And, it barely mentions Ms. Sternquist's extremely sympathetic individual circumstances. Indeed, rather than mention any of

the abuse and threats she has suffered related to being a transgender woman, the government avoids even using any gendered pronouns for Ms. Sternquist.

This Court should vacate Ms. Sternquist's sentence.

A. <u>The sentencing court should not have compared Ms. Sternquist's conduct in possessing unloaded guns at home to committing murder and terrorism.</u>

At sentencing, the court compared Ms. Sternquist – a disabled woman with no history of violence – to "gang bangers" who were "murdering people," and connected her conduct in possessing unloaded guns to "terrorist attacks," proclaiming that the court did not "understand for the life of [the court] why people forget that we lost more than thirty – [three thousand] American lives on 9/11 right here on our soil." A. 108, 125-26. These remarks were inappropriate.

In response, the government claims that the court did not "compare[ ]" Ms. Sternquist to "'gang bangers' who were 'murdering people,'" but instead "invoked the notion of violent criminals merely as an anecdotal example of other defendants who have improperly relied on claims of self defense to justify their illegal possession of firearms." Gov. Br. 66. To support this illogical conclusion, the government mischaracterizes Ms. Sternquist's explanation as to why she had guns – because she had "receiv[ed] death threats" – as an argument that her conduct was legally justified as self-defense. Gov. Br. 66-67. Ms. Sternquist pleaded guilty; she never raised an affirmative defense. Thus, she was not at all similar to a person who killed someone and then argued that they were not guilty because the killing was legally justified by

21

self-defense. Any comparison between Ms. Sternquist having guns for protection and a person "murdering" others and claiming self-defense is false.

It was similarly not "reasonabl[e]" to connect Ms. Sternquist's conduct in selling fake IDs in 2007 and 2010 to September 11th, the biggest terrorist attack in the United States. Gov. Br. 67. The government incredibly claims that the court's remarks about terrorism merely "pointed out the far-reaching dangers" that fake IDs can pose. Gov. Br. 68. In the government's view, "one logical consequence of selling" fake IDs is that "they could fall into the hands of criminals far more dangerous than [Ms.] Sternquist." Gov. Br. 67. There was zero evidence that Ms. Sternquist made identifications for any "far more dangerous" people.[4] And, the 9/11 attacks had absolutely nothing to do with Ms. Sternquist, who was still a child when they happened. The court's remarks were not appropriate.

The government also claims that the "September 11 terrorist attacks" were "not accorded outsized weight in the final analysis" and just states – without analysis – that they were "not offered as justifications for" the sentence. Gov. Br. 68. Any weight placed on September 11th, murders, and "gang bangers" was too much weight. The court made numerous comments about violent criminals and criminal activities as

---

[4] Instead, surely the most common market for fake IDs are college students and other young people who wish to purchase alcohol before they are 21 years old. *See e.g.* Kaja Andric and Corey Kilgannon, "A New Generation Of 'Unbeatable' Fake IDs is Bedeviling Bouncers," N.Y.Times, Feb. 13, 2025, https://www.nytimes.com/2025/02/13/nyregion/students-high-tech-fake-ids.html. (discussing how "[s]coring a fake ID has been a rite of passage for generations of underage New Yorkers eager to join the bar scene," and that, now, in 2025, the fake IDs are difficult to spot).

justifications for Ms. Sternquist's sentence for possessing unloaded guns. This was error.

B.  <u>The government does not rebut that the court relied on inaccurate facts.</u>

Ms. Sternquist also argued that the court made two inaccurate remarks: first, that she had "committed new crimes" "while on bond," when Ms. Sternquist had not been on bond, and second, that the "conditions at the MDC are horrible," in response to counsel's arguments about the conditions at Ms. Sternquist's nursing home. App. Br. 54-55, A. 127. The government does not dispute that these facts are wrong, that Ms. Sternquist did not commit any crimes on bond because she was never released on bond, and that she was at a nursing home, rather than MDC. As explained in Ms. Sternquist's main brief, relying on these inaccurate facts was procedural error and a due process violation. App. Br. 55. The government simply ignores this argument; it doesn't mention them at all.

This error alone requires a resentencing.

C.  <u>The court improperly failed to consider sentencing disparities.</u>

Ms. Sternquist also provided the court with 13 comparison sentences for people convicted of the same crime as her, all of whom had received sentences that were less than the time she had already served in pre-sentencing custody. Dkt. 111 at 12-13. Those cases included people with guideline ranges that were higher than the range the court ultimately found for Ms. Sternquist. *E.g. United States v. Kyle Balkissoon*, 21-cr-186 (EK) (5 years of probation; guideline range of 70 to 87 months); *United*

*States v. Michael Willis*, 15-cr-472 (ARR) (5 years of probation with first 15 months on curfew; guideline range of 84 to 105 months); *United States v. United States v. Coello*, 19-cr-111 (JBW) (time-served sentence where defendant faced 70-to-87-month guidelines range). The court discounted all of these examples without question or discussion, instead just asserting that it was "sure that the factual backgrounds of all those cases is quite varied." S. 38. This is exactly the type of "sparse reasoning" with respect to avoiding sentencing disparities that has been rejected by this Court. *United States v. Stewart*, No. 23-6330-CR, 2024 WL 3517853, at *2 (2d Cir. July 24, 2024) ("We cannot uphold a discretionary decision unless we have confidence that the district court exercised its discretion and did so on the basis of reasons that survive our limited review." (quoting *United States v. Cavera*, 550 F.3d 180, 193 (2d. Cir. 2008) (en banc))).

In response, the government first concedes that Ms. Sternquist's examples were "arguably relevant comparators," but then faults Ms. Sternquist for making "no effort to explain whether" the prior comparable cases "involved . . . illegal ghost guns, recidivist defendants,[5] or . . . possession of forged law enforcement credentials." Gov. Br. 69. The government cites no case suggesting that the defense must show that the facts of prior cases were an exact match for a sentencing court to be required to consider sentencing disparities. It's no surprise the government hasn't pointed to such a case, because that is not what the statute itself requires. Section 3553(a)(6) provides

---

[5] By definition, all people convicted of possessing a gun after having a prior felony conviction are "recidivist defendants."

that a sentencing judge must consider "the need to avoid unwarranted sentence disparities among defendants with <u>similar</u> records who have been found guilty of <u>similar</u> conduct." (emphasis added). By relying on the guideline range as a good proxy for severity of a person's criminal history and current offense, Ms. Sternquist provided cases involving defendants with similar records and similar conduct. The court should have, therefore, considered the need to avoid unwarranted sentencing disparities.

Ms. Sternquist also cited cases to the district court involving people who had not only possessed guns, but shot them, and still received lower sentences. Dkt. 111 at 13, citing *United States v. Dwayne Patterson*, 21-cr-524 (PKC) (person fired gun several times; guideline range of 51 to 63 months imprisonment; sentenced to time served of about 5 months); *United States v. David Wright*, 20-cr-351 (ENV) (30 months of imprisonment; person shot another person in the leg); *United States v. Matthew Ottey*, 19-cr-334 (MKB) (three years of probation, when person shot gun in the air; guideline range of 57 to 71 months); *United States v. Raheem Boomer*, 17-cr-453 (ENV) (multiple shots fired; sentence of 6 months of home detention and two years of supervised release). The government now says those cases were all irrelevant to unwarranted sentencing disparities because they "did not [ ] involve people who had been found guilty of similar conduct." Gov. Br. 69. This is a strained interpretation of Section 3553(a)(6). That other defendants got shorter sentences for the same crime as Ms. Sternquist, a violation of Section 922(g)(1), despite *worse* conduct should have been relevant to the court's analysis under Section 3553(a)(6).

That the sentencing court provided no reasoning with respect to avoiding unwarranted sentencing disparities is another procedural error.

D. <u>Ms. Sternquist's sentence was also too long.</u>

Ms. Sternquist's conditions of pretrial detention were uniquely horrifying. For the first two weeks of her incarceration, she was at MDC, where officials initially gave her no medical treatment, failing to change her catheter, and then gave her harmful treatment, changing her catheter, but inflating it in the wrong place. She had to be rushed to the emergency room with a life-threatening infection. Afterward, she was moved to a nursing home, where she was chained to a bed, even though she cannot walk. She received only minimal physical therapy while shackled; unsurprisingly, she made essentially no progress. She frequently did not receive her medications; she was bleeding from her bowel for months without treatment; her hormone levels were unmonitored and unstable. Although she is incontinent, she was regularly without clean clothes for weeks at a time. Throughout, she was in a room all by herself, with no one to talk to. These dehumanizing conditions alone should have militated for a lower sentence.

But the conditions of her confinement were only the latest in a life full of traumatic events. She was born in jail and never knew her mother. Her grandparents, who raised her, were alcoholics. She was physically and sexually assaulted at her all-boys boarding school, an international school later shuttered by child protective

26

services, and in the Navy. Yet, despite all of this, she had been working full time at the same job for six years at the time of her arrest.

Unlike the cases cited by the government, this is an exceptional case, and her sentence was longer than necessary.

*      *      *

Today, Ms. Sternquist is wheelchair bound and incarcerated, with a release date in December 2026, almost two years away. She is in fear of being moved to a men's facility at any time. *See* Shawn Musgrave, "Trans Women in Federal Custody Face the Terror Being Transferred to Men's Prisons," Jan. 1, 2025, the Intercept, available at https://theintercept.com/2025/01/28/trans-women-federal-prisons-trump-executive-order/.

Given the district court's procedural and substantive errors, this Court should vacate Ms. Sternquist's sentence.

### Conclusion

For the reasons set forth above and in appellant's main brief, the Court should vacate Ms. Sternquist's conviction. In the alternative, it should vacate her sentence and remand for a resentencing.

Dated:     New York, New York
           April 1, 2025

                          Respectfully submitted,

                          FEDERAL DEFENDERS OF NEW YORK
                          APPEALS BUREAU

                          *Allegra Glashausser*
                          **ALLEGRA GLASHAUSSER**
                          Assistant Federal Defender
                          52 Duane Street, 10th Floor
                          New York, New York 10007
                          Tel.: (212) 417-8739

28

## CERTIFICATE OF SERVICE

I certify that a copy of this reply brief been served by the Court's Appellate Case Management System (ACMS) on the United States Attorney/ E.D.N.Y.; Attention: **ANDRES PALACIO, ESQ.**; Assistant United States Attorney, 271 Cadman Plaza East, Brooklyn, NY 11201.

Dated:     New York, New York
          April 1, 2025

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender

29

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.  This reply brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains 6,652 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a monospaced typeface using **Microsoft Word** with **14 characters per inch in Garamond** style.

Dated:  New York, New York
       April 1, 2025

*Allegra Glashausser*
**ALLEGRA GLASHAUSSER**
Assistant Federal Defender